ORAL ARGUMENT NOT YET SCHEDULED

**No. 22-1080 (consolidated with Nos. 22-1144 and 22-1145)**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

─────────────

**NATURAL RESOURCES DEFENSE COUNCIL,**

*Petitioners,*

**CLEAN FUELS DEVELOPMENT COALITION,**

*Intervenors for Petitioners,*

v.

**NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, ET AL.,**

*Respondents,*

─────────────

On Petitions for Review of Final Agency Action by the National
Highway Traffic Safety Administration

─────────────

**BRIEF OF *AMICI CURIAE* SENATOR TOM CARPER, CHAIRMAN OF
THE U.S. SENATE COMMITTEE ON ENVIRONMENT AND PUBLIC
WORKS, AND REPRESENTATIVE FRANK PALLONE, JR., RANKING
MEMBER OF THE U.S. HOUSE COMMITTEE ON ENERGY AND
COMMERCE, IN SUPPORT OF RESPONDENTS**

─────────────

CARA A. HOROWITZ
D.C. Circuit Bar No. 56629
GABRIEL F. GREIF
Frank G. Wells Environmental Law
Clinic, UCLA School of Law
405 Hilgard Avenue
Los Angeles, CA 90095
Tel: (310) 206-4033
horowitz@law.ucla.edu

*Counsel for* Amici Curiae

April 4, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and *Amici Curiae*

Except for the following, all parties, intervenors, and *amici curiae* appearing before this Court are listed or referenced in the Initial Brief for Respondents National Highway Traffic Safety Administration (ECF No. 1991134) (filed Mar. 21, 2023): *Amici* Senator Tom Carper and Representative Frank Pallone, Jr. ("*Amici*").

### B. Rulings Under Review

References to the rulings at issue appear in the Initial Brief for Respondents National Highway Traffic Safety Administration.

### C. Related Cases

Other than the cases consolidated in this case, earlier challenges to actions by the National Highway Traffic Safety Administration and the U.S. Environmental Protection Agency are pending before this Court, consolidated under *Union of Concerned Scientists v. National Highway Traffic Safety Administration*, No. 19-1230.

Four other cases before this Court challenge a related action by the U.S. Environmental Protection Agency, rescinding the agency's withdrawal of a Clean Air Act preemption waiver for California's vehicle emission standards,

i

consolidated under *Ohio v. EPA*, No. 22-1081. Counsel for *Amici* are aware of no other related cases.

**D. Corporate Disclosure Statement**

Pursuant to Fed. Rs. App. P. 26.1 and 29(a)(4)(A), *Amici* state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

/s/ Cara A. Horowitz

CARA A. HOROWITZ

April 4, 2023

## RULE 29 STATEMENTS

All parties in the consolidated action have indicated their consent to the filing of this brief. *See* Letter Filed by Environmental Defense Fund, Environmental Law and Policy Center, Natural Resources Defense Council, Public Citizen, Sierra Club, and Union of Concerned Scientists, ECF No. 1975007 (filed Nov. 23, 2022). Petitioners American Fuel & Petrochemical Manufacturers; Petitioners Texas, Arkansas, Indiana, Kentucky, Louisiana, Mississippi, Montana, Nebraska, Ohio, South Carolina, and Utah; Respondents National Highway Traffic Safety Administration (NHTSA); Intervenors Clean Fuels Development Coalition, Diamond Alternative Energy, LLC, ICM, Inc., Illinois Corn Growers Association, Kansas Corn Growers Association, Kentucky Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, Texas Corn Producers Association, Minnesota Soybean Growers Association, Valero Renewable Fuels Company, LLC, Wisconsin Corn Growers Association; City and County of Denver, City of Los Angeles, City of San Francisco, Massachusetts, Pennsylvania, District of Columbia, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Vermont, Washington, and Wisconsin; National Coalition for Advanced Transportation and Zero Emission

Transportation Association; and all other parties have provided their consent directly to counsel for *Amici*.

Pursuant to Fed. R. App. P. 29(a)(4)(E), undersigned counsel for *Amici* states that no party or party's counsel authored this brief in whole or in part, and no other person besides *Amici* or their counsel contributed money intended to fund preparing or submitting the brief.

Pursuant to D.C. Cir. R. 29(d), undersigned counsel for *Amici* states that a separate brief is necessary due to *Amici*'s distinct expertise and interests. *Amici* are members of Congress with personal experience and expertise regarding legislation that Fuel Intervenors have placed at issue in this case. *Amici* are therefore in a unique capacity to aid the Court in interpreting certain statutory provisions referenced in this case. No other *amici curiae* appearing in this case share these perspectives or expertise, as far as *Amici* are aware. Accordingly, *Amici*, through counsel, certify that filing a joint brief would not be practicable.

*/s/ Cara A. Horowitz*
CARA A. HOROWITZ
April 4, 2023

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ................................. i

Rule 29 Statements ...................................................................................... iii

Table of Contents ........................................................................................ v

Table of Authorities.................................................................................... vi

Glossary ......................................................................................................x

Statutes and Regulations............................................................................1

Summary of Argument and Identity, Interests, and Source of Authority to File Brief of *Amici Curiae* ..............................................................................1

Argument......................................................................................................7

I.     EPCA Does Not Preempt the Zero-Emission Vehicles Standards at Issue in This Case....................................................................7

   A.   EPCA Does Not Preempt Vehicle-Emissions Standards, It Prioritizes Them.....................................................................8

   B.   Subsequent Legislation Demonstrates a Consistent Understanding that EPCA Does Not Preempt the Zero Emission Vehicles Standards at Issue.....................................................................17

   C.   Intervenors' Additional Arguments for Preemption of Zero-Emission Vehicles Standards All Fail.........................................25

II.    Fuel Intervenors' Argument That NHTSA's Rule Is Arbitrary and Capricious Relies on Its Misreading of EPCA Preemption ......................27

Conclusion..................................................................................................30

## TABLE OF AUTHORITIES

### Cases

*Cent. Valley Chrysler-Jeep v. Goldstene*,
   529 F. Supp. 2d 1151 (E.D. Cal. 2007)...............................................14, 18, 20, 28

*Ex Parte Endo*,
   323 U.S. 283 (1944).....................................................................................23

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000)................................................................................18, 24

*Gobeille v. Liberty Mut. Ins. Co.*,
   577 U.S. 312 (2016)......................................................................................17

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
   508 F. Supp. 2d 295 (D. Vt. 2007)..............................................14, 17, 19, 20, 28

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   140 S. Ct. 2367 (2020)...................................................................................28

*Massachusetts v. EPA*,
   549 U.S. 497 (2007).....................................................................................20

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*,
   498 U.S. 211 (1991).....................................................................................29

*Mozilla Corp. v. FCC*,
   940 F.3d 1 (D.C. Cir. 2019) ...........................................................................9

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
   514 U.S. 645 (1995).....................................................................................26

*Weinberger v. Hynson, Westcott & Dunning, Inc.*,
   412 U.S. 609 (1973).....................................................................................13

*Wisc. Ctrl. Ltd. v. United States*,
   138 S. Ct. 2067 (2018)..................................................................................11

### Federal Statutes

15 U.S.C. § 2002(a) (1976) ...............................................................................11, 12

15 U.S.C. § 2002(b) (1976) ...............................................................11, 12

15 U.S.C. § 2002(c) (1976) ...............................................................11, 13

15 U.S.C. § 2002(d) (1976) ...............................................8, 9, 10, 12, 15

15 U.S.C. § 2002(e) (1976) ...........................................................11, 12, 15

15 U.S.C. § 2009(a) (1976) ......................................................................8, 9

42 U.S.C. § 13212(f) .................................................................................21

42 U.S.C. § 17002 .....................................................................................22

42 U.S.C. § 7521 .........................................................................................2

42 U.S.C. § 7543(a) .....................................................................................2

42 U.S.C. § 7543(b) .....................................................................................2

49 U.S.C. § 32902(f) .................................................................................11

49 U.S.C. § 32919(a) ............................................................................8, 26

Pub. L. No. 101-549, 104 Stat. 2399, 2520-23 (1990) ...........................18

Pub. L. No. 103-272, 108 Stat. 745, 1378-79 (1994) .............................11

Pub. L. No. 110-140, 121 Stat. 1492 (2007) .....................................21, 22

Pub. L. No. 110-140, 121 Stat. 1498 (2007) ...........................................22

Pub. L. No. 117-169, 136 Stat. 1818 (2022) ...........................................24

Pub. L. No. 94-163, 89 Stat. 871, 901-16 (1975) .....................................8

**California Code of Regulations**

13 Cal. Code Regs. § 1955.1(a) ...............................................................26

**Federal Register**

42 Fed. Reg. 13,807 (Mar. 14, 1977) ......................................................14

42 Fed. Reg. 13,814-15 (Mar. 14, 1977) .................................................14

74 Fed. Reg. 32,744 (July 8, 2009) ...............................................................3

78 Fed. Reg. 2,114 (Jan. 9, 2013) .................................................................3

78 Fed. Reg. 2,129 (Jan. 9, 2013) .................................................................3

87 Fed. Reg. 14,367 (Mar. 14, 2022) ...........................................................3

87 Fed. Reg. 25,762 (May 2, 2022) .............................................................28

87 Fed. Reg. 25,983 (May 2, 2022) .............................................................29

**Legislative History**

153 Cong. Rec. 34,178 (2007) ......................................................................22

153 Cong. Rec. 35,833 (2007) ......................................................................22

153 Cong. Rec. 35,927-28 (2007) ................................................................22

H.R. Rep. No. 110-297 (2007) ...............................................................20, 22

H.R. Rep. No. 94-340 (1975) ........................................................................16

S. Rep. No. 93-526 (1973) .............................................................................16

S. Rep. No. 93-793 (1974) .............................................................................16

S. Rep. No. 94-179 (1975) .......................................................................15, 16

S. Rep. No. 94-516 (1975) .............................................................................15

**Other Authorities**

Greg Dotson & Dustin J. Maghamfar, *The Clean Air Act Amendments of 2022: Clean Air, Climate Change, and the Inflation Reduction Act*, 53 Env't L. Rep. 10,017 (2023) ..............................................................................24, 25

Greg Dotson, *State Authority to Regulate Mobile Source Greenhouse Gas Emissions, Part 2: A Legislative and Statutory History Assessment*, 32 Geo. Env't L. Rev. 625 (2020) ......................................7, 8, 15, 16, 20, 25

Letter from Sens. Tom Carper, Dianne Feinstein & Edward J. Markey to Sec'y Elaine L. Chao & Acting Adm'r Andrew Wheeler (Oct. 25, 2018) https://www.carper.senate.gov/wp-

content/uploads/archives/GHG%20Tailpipe%20standards.pdf;
https://www.carper.senate.gov/wp-
content/uploads/archives/CAFEdocumentsFINAL.pd ........................................21

# GLOSSARY

| | |
|---|---|
| § 209(b) standards | Vehicle emission standards that have received a waiver pursuant to § 209(b) of the Clean Air Act, 42 U.S.C. § 7543(b) |
| EPCA | The Energy Policy and Conservation Act of 1975 |
| 2007 Amendments | The Energy Independence and Security Act of 2007 |
| EPA | The U.S. Environmental Protection Agency |
| NHTSA | The National Highway Traffic Safety Administration |

## STATUTES AND REGULATIONS

Pertinent statutes and regulations not reproduced in the parties' briefs are reproduced in the addendum filed with this brief.

## SUMMARY OF ARGUMENT AND IDENTITY, INTERESTS, AND SOURCE OF AUTHORITY TO FILE BRIEF OF *AMICI CURIAE*

Intervenors for Petitioners Clean Fuels Development Coalition, et al. ("Fuel Intervenors") raise important questions about the relationship between two longstanding federal statutes: the Clean Air Act, which provides for the protection of public health and air quality through, *inter alia*, the creation of motor vehicle emission standards, and the Energy Policy and Conservation Act of 1975 (EPCA, or "the Act"), which governs, *inter alia*, federal fuel economy standards. Sometimes, standards that regulate pollution from cars also affect fuel economy. Does that mean EPCA preempts such air pollution standards, as Fuel Intervenors argue?[1] For nearly 50 years, including at EPCA's enactment and at every major opportunity since, Congress has been clear that the answer is "No." Motor vehicle air pollution standards—including, explicitly, California's Zero-Emission Vehicles standards—are not preempted by EPCA, even if they affect fuel economy. This brief explains why.

_____

[1] Like Respondents, we do not concede that these preemption questions are properly before this court; nevertheless, we provide this analysis to respond to Fuel Intervenors' arguments on their merits. *See* Respondents' Br. 59-61.

1

The Clean Air Act creates a dual system for regulating motor vehicle emissions. One set of regulations applies nationwide and is issued by the U.S. Environmental Protection Agency (EPA). 42 U.S.C. § 7521. States sometimes have the option to adopt an alternative set of regulations (here called "§ 209(b) standards" after the authorizing provision in the Clean Air Act). *Id.* §§ 7507, 7543(b). Congress left the authority to craft these alternative regulations to California—the state that had pioneered vehicle-emissions regulations—and required EPA to approve these regulations except under narrow circumstances. *Id.* § 7543(a)-(b) (preempting state regulation of new-vehicle emissions, but allowing the "State which has adopted [such] standards . . . prior to March 30, 1966," i.e., California, to apply for a preemption waiver, which EPA must approve unless any of three limited exceptions applies).

For over fifty years, California has exercised this authority to create § 209(b) standards, and since 1990 those standards have included production targets for vehicles that emit no pollutants during operation, known as zero-emission vehicles. In 2013, EPA granted the § 209(b) waiver at issue here, requiring automakers to acquire or generate credits for zero-emission vehicles sold in California (the "Zero-Emission Vehicles standards"), which Fuel Intervenors now claim are preempted. *See* Notice of Decision Granting a Waiver of Clean Air Act Preemption for

2

California's Advanced Clean Car Program, 78 Fed. Reg. 2,114 (Jan. 9, 2013).[2]

Collectively, California's suite of § 209(b) standards has successfully reduced

emissions of both traditional air pollutants and greenhouse gases and galvanized

innovation in zero-emission vehicle technology. 87 Fed. Reg. 14,367 (Mar. 14,

2022) ("California's [zero-emission vehicle] mandates have so far supported

development of technologies such as battery electric and fuel cell vehicles that

embody the pioneering efforts Congress envisaged"). Consequently, California's §

209(b) standards have played a significant role in shaping federal vehicle-emission

policy. *See* 78 Fed. Reg. 2,129 (Jan. 9, 2013) (acknowledging "the numerous times

that EPA has followed California's lead—blazing a new trail as a laboratory for

innovation—by catching up to or harmonizing with California's standards.").

In crafting and enacting EPCA in 1975, Congress was clear that it was not

displacing EPA's authority to approve § 209(b) standards, even when such

standards would directly affect fuel economy. Indeed, Congress took the opposite

approach, tasking the National Highway Traffic Safety Administration (NHTSA)

with designing fuel-economy standards to *accommodate* (not displace) all emission

---

[2] Over 50 years, EPA has approved California's § 209(b) standards nearly universally, denying California's application only once, and in that case reversing itself almost immediately. *See* Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles, 74 Fed. Reg. 32,744 (July 8, 2009) (reversing 2008 waiver denial).

standards authorized by the Clean Air Act, including those adopted under § 209(b). See *infra* Section I.A. Later amendments to both EPCA and the Clean Air Act have recognized the continued vitality of § 209(b) standards, specifically including those requiring the production and sale of zero-emission vehicles. See *infra* Part I.B.

Fuel Intervenors now argue, however, that EPCA preempts California's Zero-Emission Vehicles standards and that NHTSA's incorporation of these standards into its baseline is therefore unlawful. Fuel Intervenors' Br. 14-19, 21-22, ECF No. 1976944 (filed Dec. 8, 2022). In the alternative, Fuel Intervenors claim that the Zero-Emission Vehicles standards were so plainly vulnerable to a preemption challenge that NHTSA's failure to take a position on their validity was arbitrary and capricious. *Id.* at 22-26.

Both arguments are without merit. Under either formulation, Fuel Intervenors' overbroad arguments strike not only at California's Zero-Emission Vehicles standards, but at the heart of § 209(b) emission standards more generally. *Id.* at 14-19, 22-26 (characterizing properly adopted § 209(b) standards as mere "preempted state laws" and raising arguments about the validity of all greenhouse gas § 209(b) standards).

*Amici*—Senator Tom Carper, Chairman of the U.S. Senate Committee on Environment and Public Works, and Representative Frank Pallone, Jr., Ranking Member of the U.S. House Committee on Energy and Commerce—are leaders of

4

the House and Senate Committees with relevant expertise. They offer their insight into EPCA, the Clean Air Act, and related legislation as an aid to the Court and submit this brief pursuant to Fed. R. App. P. 29(a)(2), making the following arguments:

*First*, EPCA does not preempt the Zero-Emission Vehicles standards. Nothing in EPCA indicates an intent to invalidate or inhibit any element of the Clean Air Act. Congress understood that the fuel-economy improvements it sought through EPCA could be affected by the vehicle-emissions standards created under the Clean Air Act, either because emissions-reducing technology might directly impact fuel economy or because some manufacturers might not be able to improve on both fronts simultaneously. But Congress struck the balance between these two aims in favor of public health and air-quality goals: it took steps in EPCA to prioritize Clean Air Act emissions reductions over fuel-economy improvements, not the other way around. In doing so, Congress explicitly required NHTSA to consider the effect of § 209(b) standards on fuel economy in setting fuel-economy requirements under EPCA. Thus, reading the Act to preempt § 209(b) standards that affect fuel economy both contradicts Congressional intent and makes the Act nonsensical.

Nothing about the particular standards at issue here changes this analysis. Subsequent federal legislation has consistently reaffirmed Congress's intent to

broadly preserve § 209(b) standards, specifically including the Zero-Emission Vehicles standards. Indeed, the Clean Air Act Amendments of 1990 and the Inflation Reduction Act of 2022 both explicitly recognize and incorporate § 209(b) zero-emission vehicles standards—regulation that would be preempted if Fuel Intervenors' reading of EPCA was correct. Moreover, the Energy Independence and Security Act of 2007, which amended EPCA (the "2007 Amendments"), ratified two federal district court opinions holding that § 209(b) standards approved by EPA have the same stature as emissions regulations adopted by EPA and therefore are not preempted by EPCA, regardless of effects on fuel economy.

**Second,** the Zero-Emission Vehicles standards are firmly established, not "legally dubious." Fuel Intervenors' Br. 23. Fuel Intervenors rely on the same incorrect preemption theories in asserting that NHTSA's treatment of the Zero-Emission Vehicles standards is arbitrary and capricious, arguing that those standards are so precarious that NHTSA was required to take a formal position on whether EPCA preempts them. But NHTSA has no obligation—or authority—to ignore the existing Zero-Emission Vehicles standards based on the remote possibility that a court may later invalidate them. *See* Respondents' Br. 50-55 ("[t]he potential for changed circumstances does not render a rule unlawful"). More fundamentally, Congress's manifest intent to preserve § 209(b) standards regardless of effects on fuel-economy, along with California's thirty-year history

6

of adopting and enforcing zero-emission vehicle standards, proves that the Zero-Emission Vehicles standards are legally sound.

## ARGUMENT

### I. EPCA Does Not Preempt the Zero-Emission Vehicles Standards at Issue in This Case.

In designing the fuel-economy portions of EPCA, Congress took care not to interfere with public health protections, including vehicle-emissions standards. Congress rejected several proposals to remove or delay emissions standards in favor of improved fuel economy, explicitly endorsed prioritizing environmental regulation in committee reports, and incorporated § 209(b) standards into the Act's regulatory structure. *See generally* Greg Dotson, *State Authority to Regulate Mobile Source Greenhouse Gas Emissions, Part 2: A Legislative and Statutory History Assessment*, 32 Geo. Env't L. Rev. 625, 631-42 (2020).

Given EPCA's manifest intent, it would be surprising to discover in the same Act a provision that *prevents* states from adopting the § 209(b) standards at issue in this case, as Fuel Intervenors claim to have done. *See* Fuel Intervenors' Br. 14-19. Indeed, the text and history of EPCA, as well as that of relevant subsequent legislation, confirm that Fuel Intervenors' interpretation is incorrect: Congress did not preempt such standards when it passed EPCA, and the Act cannot now be read to do so.

A. *EPCA Does Not Preempt Vehicle-Emissions Standards, It Prioritizes Them.*

The text and legislative history of EPCA indicate Congress's intent to prioritize vehicle-emissions standards, and particularly § 209(b) standards, over the new fuel-economy standards created by EPCA. EPCA's preemption provision does not affect vehicle-emissions standards; rather, it applies to state "law[s] or regulation[s] related to fuel economy standards," 49 U.S.C. § 32919(a); *see also* 15 U.S.C. § 2009(a) (1976) (original language).[3] Further, Congress explicitly subordinated fuel economy requirements to "Federal [air pollution] standards," which were defined to include state regulations authorized by § 209(b) of the Clean Air Act. 15 U.S.C. § 2002(d)(1)(D) (1976). The history of EPCA cements this reading: the enacting Congress was legislating to manage the nation's oil resources, but where conflict arose between achieving fuel economy and controlling vehicle emissions, it prioritized the latter. *See generally* Dotson, *supra*, at 631-42.

1. On a Plain Reading, EPCA Shows No Intent to Preempt § 209(b) Standards.

---

[3] The fuel-economy provisions of EPCA are all contained in a single, undifferentiated section. Pub. L. No. 94-163, § 301, 89 Stat. 871, 901-16 (1975). For readability and precision, *Amici* cite to these provisions as codified in the 1976 U.S. Code rather than the session law.

8

On its face, EPCA's preemption provision does not address vehicle-emissions standards. The Act preempts state regulations "related to fuel economy standards or average fuel economy standards," with no suggestion that it preempts vehicle-emissions regulations, such as § 209(b) standards. 15 U.S.C. § 2009(a) (1976). To the contrary, EPCA specifically incorporated § 209(b) standards as one of the "Federal standards" that NHTSA must consider in setting fuel-economy standards, given those federal standards' effects on fuel economy. *Id.* § 2002(d)(2)(A) (directing NHTSA to consider impact of "Federal standards" when setting fuel economy standards); *id.* § 2002(d)(3)(D)(i) (listing "emissions standards applicable by reason of section 209(b) of [the Clean Air] Act" as "a category of Federal standards").

Thus, reading the Act to preempt § 209(b) standards (like California's Zero-Emission Vehicles standards) simply because of their effects on fuel economy—which Congress anticipated and EPCA accommodated—would lead to a "statutory contradiction" that Congress would not have intended. *See Mozilla Corp. v. FCC*, 940 F.3d 1, 37 (D.C. Cir. 2019) ("interpretations needed to avert 'statutory contradiction' (really, self-contradiction) ipso facto have a leg up on reasonableness.").

Fuel Intervenors acknowledge that EPCA "treated California [§ 209(b)] standards as federal standards" when it was passed, but they argue it "no longer

does." Fuel Intervenors' Br. 19.[4] They note that EPCA used the phrase "Federal standards" in allowing NHTSA to modify the fuel-economy standards set by statute for vehicles with model years from 1978 through 1980. 15 U.S.C. § 2002(d) (1976) (giving NHTSA the authority to relax fuel-economy requirements if manufacturers demonstrated that the applicable emissions regulations—the "Federal standards"—were impacting their fuel economy). Fuel Intervenors suggest that, since the 1980 model year is long gone, EPCA no longer recognizes § 209(b) standards as federal standards, so the Act's preemption provision may now eliminate them. Fuel Intervenors' Br. 19.

This argument is incorrect for two reasons. First, it does not address the underlying issue: even if the § 209(b) standards were incorporated into EPCA only for a limited purpose, interpreting EPCA as both incorporating and eliminating them still creates a contradiction. For the Act to have made sense at the time it was passed, the Act's preemption provision must not have prohibited § 209(b) standards notwithstanding any effects on fuel economy (which, again, Congress understood and accommodated). And since Congress has not expanded EPCA's

_____

[4] Fuel Intervenors incorporate by reference arguments from another case before this Court. Fuel Intervenors' Br. 19 (citing State Pet'rs' Br. 39-41, *Ohio v. EPA*, No. 22-1081, ECF No. 1969895 (filed Nov. 2, 2022)). To reply to these arguments more completely, this brief responds to the conclusions included in Fuel Intervenors' brief, as well as the reasoning included in the State Petitioners' brief to which Fuel Intervenors cite.

10

preemption provision since, it should not now be read to prohibit those standards. *See, e.g.*, *Wisc. Ctrl. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (since "Congress alone has the . . . authority to revise statutes," the "original meaning of the written law" remains in effect until that law is changed).

Second, despite Fuel Intervenors' assertion to the contrary, § 209(b) standards are still incorporated into EPCA as a criterion for setting several types of fuel-economy standards. *See* Fuel Intervenors' Br. 19. Specifically, EPCA requires NHTSA to use "Federal motor vehicle standards"—together with "technological feasibility," "economic practicability," and "the need for the Nation to conserve energy"—to determine the "maximum feasible average fuel economy level" achievable for a given sector or manufacturer. 15 U.S.C. § 2002(e) (1976).[5] NHTSA must use the "maximum feasible" level in setting several fuel-economy standards, including for non-passenger vehicles such as light-duty trucks or recreational vehicles; manufacturers producing fewer than 10,000 passenger vehicles a year; and passenger vehicles after model year 1980. *Id.* § 2002(a)(3)-(4), (b)-(c).

---

[5] A 1994 recodification changed this language to "motor vehicle standards of the Government." Revision of Title 49, Pub. L. No. 103-272, § 1(e), 108 Stat. 745, 1060 (codified at 49 U.S.C. § 32902(f)). The change is not substantive. *Id.* § 6(a), 108 Stat. at 1378.

11

While "Federal motor vehicle standards" were not defined in EPCA, it is clear from the Act's structure that they must include § 209(b) standards. "Federal motor vehicle standards" were used in the same section as the "Federal standards" that explicitly incorporated § 209(b) standards. There is no semantic difference between "Federal standards" applied to motor vehicles and "Federal motor vehicle standards," and the two phrases are used for the same purpose: determining the fuel-economy level achievable given existing emissions (and other) standards. *Compare id.* § 2002(d), *with id.* § 2002(a)-(c), (e).

Furthermore, excluding § 209(b) standards from "Federal motor vehicle standards," despite their explicit inclusion in "Federal standards," would lead to incongruous results. As discussed, EPCA allowed passenger-vehicle manufacturers to request individualized adjustments to the statutory fuel-economy standards applicable to the 1978 through 1980 model years, which would relax those manufacturers' statutory requirements to account for the effect of "Federal standards" on their fuel economy. 15 U.S.C. § 2002(d) (1976). By contrast, NHTSA set standards for those same model years for non-passenger vehicles and for small manufacturers, accounting for the impact of "Federal motor vehicle standards." *Id.* § 2002(e). Accordingly, excluding § 209(b) standards from the set of "Federal motor vehicle standards" would have created an illogical discrepancy as to model years 1978-1980: one means of setting fuel-economy requirements—

12

the one used for passenger vehicles—would account for the effects of § 209(b) standards, while those for small manufacturers and non-passenger vehicles would not.

Such a distinction would have made no sense. It is particularly perverse as to small manufacturers, which receive special consideration under EPCA: if the national fuel-economy standard is too onerous, they can petition NHTSA for a separate "maximum feasible average fuel economy" standard designed to fit their particular circumstances, accounting for the impact of "Federal motor vehicle standards." *Id.* § 2002(c), (e)(3). If § 209(b) standards were excluded from "Federal motor vehicle standards" but included in "Federal standards," the small-manufacturer option could be *more stringent* than the adjustment generally available to passenger-vehicle manufacturers because it would not account for the impact of § 209(b) standards that reduce fuel economy.

Including § 209(b) standards in the category of "Federal standards" while excluding them from "Federal motor vehicle standards" would have created perverse and unintended results. The more natural reading of the statute—in which "Federal motor vehicle standards" includes § 209(b) standards—provides "'the most harmonious, comprehensive meaning possible' in light of the legislative policy and purpose," and is therefore correct. *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 631-32 (1973) (citation omitted).

13

It is not surprising, therefore, that both NHTSA and federal courts have read EPCA as incorporating § 209(b) standards into "Federal motor vehicle standards." In setting the first non-passenger fuel-economy standards under EPCA, NHTSA explicitly considered the "[e]ffect of California emissions standards," Average Fuel Economy Standards for Nonpassenger Automobiles, 42 Fed. Reg. 13,807, 13,814-15 (Mar. 14, 1977), and NHTSA has continued to do so across the decades. *See Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 347 n.54 (D. Vt. 2007) (collecting examples). The two federal courts that have issued final opinions on this issue have agreed. *See id.* at 346-47 (finding "beyond serious dispute" that § 209(b) standards have "the same stature as a federal regulation with regard" to EPCA); *Cent. Valley Chrysler-Jeep v. Goldstene*, 529 F. Supp. 2d 1151, 1173 (E.D. Cal. 2007) (once "a California regulation is granted waiver of preemption pursuant to section 209 of the Clean Air Act . . . the Secretary of Transportation must consider [it] in formulating maximum feasible average fuel economy standards under" EPCA). Additionally, Congress itself ratified these interpretations in amendments passed immediately after *Green Mountain* and *Central Valley*. *See infra*, Part I.B.2.

### 2. The History of EPCA Demonstrates that Congress Had No Intent to Preempt Emissions Regulations Impacting Fuel Economy.

Congress's manifest objectives in passing EPCA confirm that it intended emissions standards—including § 209(b) standards—to survive preemption, even

14

where they affect fuel economy. In drafting EPCA, Congress closely considered

the question of whether it should limit vehicle-emissions regulation to maximize

fuel-economy reductions. The two goals were feared to be incompatible, as new

emissions-reduction technologies could reduce vehicle mileage, and manufacturers

might not have the resources to advance in both fields simultaneously. Dotson,

*supra*, at 631-33; *see also* S. Rep. No. 94-516, at 202-03 (1975) (Conf. Rep.). The

White House and some members of Congress pushed to favor fuel economy:

President Ford twice proposed language that would have weakened vehicle-

emissions standards, and members of Congress raised concerns that California's

emissions standards would prevent any gains in fuel economy. *See* Dotson, *supra*,

at 636-41 (collecting sources); S. Rep. No. 94-179, at 65 (1975) (separate

statement of Sens. Robert P. Griffin and James L. Buckley) (citing EPA report that

California's emissions standards for the 1977 model year could reduce fuel

economy by 8-24 percent).

   But Congress instead prioritized protecting air quality and public health.

EPCA excused manufacturers from full compliance with its fuel-economy

requirements if emissions-reductions standards—explicitly including California's

§ 209(b) standards—impacted their fleets' mileage. 15 U.S.C. § 2002(d) (1976).

The Act also required NHTSA to incorporate any impact of emissions standards on

fuel economy into future fuel-economy standards. *Id.* § 2002(e)(3).

Congress made this choice deliberately, as the legislative record demonstrates. *See, e.g.*, S. Rep. No. 94-179, at 6 (1975) (noting intent to create "the most fuel-efficient new car fleets compatible with safety, damageability, and emission standards"); H.R. Rep. No. 94-340, at 90 (1975) (noting the need for fuel economy standards to "take account of" possible future fuel-economy effects from emissions standards); S. Rep. No. 93-526, at 76-77 (1973) (acknowledging that Clean Air Act standards may have delayed fuel-economy improvements, but arguing that "this fact should certainly not be interpreted as an indictment of the standards"). Congress particularly favored § 209(b) standards, and even proposals to weaken other vehicle-emissions standards would have preserved § 209(b). *See, e.g.*, S. Rep. No. 93-793, at 98 (1974) (Conf. Rep.) (noting that under the Emergency Energy Act, an early bill which would have, *inter alia*, loosened vehicle-emissions standards, "California retains the right under section 209 of the Clean Air Act to seek a waiver for a more stringent standard"); Dotson, *supra*, at 638 (under President Ford's initial proposal, "authority would be retained allowing California to establish more stringent emission standards") (quoting letter from President Gerald Ford to Sen. Nelson Rockefeller, Jan. 30, 1975).

Thus, the text of EPCA and its legislative record demonstrate Congress's intent to preserve emissions-reduction regulations, and particularly the § 209(b) standards. This clear intent is further reason to favor a reading of the Act's

16

preemption provisions that broadly preserves § 209(b) standards. *Cf. Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320 (2016) (considering, in the context of an express preemption provision, "the objectives of the . . . statute as a guide to the scope of the state law that Congress understood would survive").

### B. Subsequent Legislation Demonstrates a Consistent Understanding that EPCA Does Not Preempt the Zero Emission Vehicles Standards at Issue.

Fuel Intervenors argue that EPCA preempts the Zero-Emission Vehicles standards because those standards limit carbon dioxide emissions from vehicles, and carbon dioxide emissions have a "direct correlation" with fuel economy. Fuel Intervenors' Br. 15. Thus, the logic goes, the Zero-Emission Vehicles standard must be preempted by EPCA. If accepted, Fuel Intervenors' argument would invalidate not only all zero-emission vehicle standards adopted under § 209(b), but all such greenhouse gas standards as well.

However, nearly fifty years of consistent congressional action since the passage of EPCA affirms the validity under § 209(b) of both greenhouse gas standards and zero-emission vehicle standards. Through amendments to the Clean Air Act in 1990, the 2007 Amendments to EPCA, and the Inflation Reduction Act of 2022, Congress has reaffirmed that these standards are not—and never were—preempted. This understanding aligns with contemporary interpretations from NHTSA, *see Green Mountain*, 508 F. Supp. 2d at 347 n.54 (collecting examples of

17

NHTSA regulations treating § 209(b) standards as incorporated into the Act), and federal courts. *See id.* at 346-47; *Cent. Valley*, 529 F. Supp. 2d at 1173. By repeatedly enacting legislation premised on this clear understanding, Congress has "effectively ratified" NHTSA's and the courts' interpretation that these standards are in no way limited by EPCA. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 156 (2000) (finding Congressional ratification of an agency statutory interpretation where Congress had demonstrated an awareness of that interpretation, and enacted legislation premised on that understanding).

> 1. The 1990 Amendments to the Clean Air Act Explicitly Incorporated § 209(b) Standards Similar to the Zero-Emission Vehicles Standards.

In the comprehensive Clean Air Act Amendments of 1990, Congress specifically incorporated and relied on § 209(b) zero-emission standards to create a federal clean-fleet program. These amendments require operators of certain vehicle fleets to add more low-emission vehicles to their fleets and award transferable credits for adding zero-emission vehicles. Pub. L. No. 101-549, § 229(a), 104 Stat. 2399, 2520-23 (1990) (adding § 246 to the Clean Air Act). In setting the standards for zero-emission vehicles, the amendments require EPA to "conform as closely as possible to standards which are established by the State of California for . . . ZEVs [i.e., zero-emission vehicles] in the same class." *Id.*, 104 Stat. at 2523 (adding § 246(f)(4)). By enacting amendments explicitly premised on the existence of

California's § 209(b) zero-emission standards, Congress endorsed these standards. Congress plainly would not have incorporated these standards into its legislative scheme if it considered them preempted by EPCA.

> ### 2. The 2007 Amendments to EPCA Affirmed the Validity of § 209(b) Standards As Against Preemption Challenges.

Fuel Intervenors' preemption arguments are similarly at odds with the Energy Independence and Security Act of 2007, which amended the fuel-economy provisions of EPCA. Here, Congress endorsed an interpretation of EPCA that preserves § 209(b) standards as "Federal standards" that NHTSA must consider when adopting fuel-economy regulations. *See supra* Part I.A.1. Congress passed the 2007 Amendments in the wake of several important judicial decisions, including two explicitly holding that § 209(b) standards regulating greenhouse gases are not preempted by EPCA—and, going even further, holding that no § 209(b) standards are preempted by EPCA. *Green Mountain*, 508 F. Supp. 2d at 347, 350 (holding that the Clean Air Act affords § 209(b) standards "the same stature as a federal regulation" and that "the preemption doctrines do not apply to the interplay between [§ 209(b)] and EPCA"); *Cent. Valley*, 529 F. Supp. 2d at 1173 ("[t]he court can discern no legal basis for the proposition that an EPA-promulgated regulation or standard functions any differently than a California-promulgated and EPA-approved standard or regulation."). Congress not only declined the opportunity to rework EPCA to reverse the courts' actions, it

19

incorporated § 209(b) greenhouse-gas standards into the amendments, while

favorably noting the "greenhouse gas emissions standards . . . adopted by

California and other states." H.R. Rep. No. 110-297, at 17 (2007).

In the first of these judicial decisions, the Supreme Court's landmark

opinion in *Massachusetts v. EPA* held that EPCA's fuel-economy standards do not

alter EPA's regulatory obligations under the Clean Air Act. 549 U.S. 497, 532

(2007) ("[t]he two obligations may overlap, but there is no reason to think the two

agencies cannot both administer their obligations and yet avoid inconsistency").

Shortly afterward, two district courts published opinions specifically addressing

whether EPCA preempts § 209(b) standards that regulate greenhouse-gas

emissions. Much like Fuel Intervenors do here, Plaintiffs in those cases argued that

the challenged § 209(b) standards were related to fuel economy standards, and

were therefore preempted; both courts rejected those arguments. *Green Mountain*,

508 F. Supp. 2d at 356-57, 369 (upholding § 209(b) standards establishing

greenhouse-gas emissions standards against preemption challenge); *Cent. Valley*,

529 F. Supp. 2d at 1165-67.

The relevance of these cases was not lost on Congress. Several proposals

were introduced to eliminate federal greenhouse-gas emissions standards for

vehicles, including those adopted through § 209(b). *See generally* Dotson, *supra*, at

652-58 (recounting proposals and collecting sources); Letter from Sens. Tom

20

Carper, Dianne Feinstein & Edward J. Markey to Sec'y Elaine L. Chao & Acting Adm'r Andrew Wheeler (Oct. 25, 2018) (referencing lobbyists' proposals to subordinate greenhouse-gas regulation under the Clean Air Act to EPCA's fuel-economy standards).[6]

But Congress rejected these proposals and did the opposite: it incorporated California's greenhouse-gas motor vehicle regulations into the legislation, ratifying those regulations and the recent cases upholding them. The 2007 Amendments include a requirement that federal agencies purchase only "low greenhouse gas emitting vehicles." Pub. L. No. 110-140, § 141, 121 Stat. 1492, 1517 (2007) (codified at 42 U.S.C. § 13212(f)(2)(A)). The law tasked EPA with identifying "low greenhouse gas emitting vehicles," taking into account "the *most stringent standards* for vehicle greenhouse gas emissions applicable to and enforceable against motor vehicle manufacturers *for vehicles sold anywhere in the United States*." *Id.*, 121 Stat. at 1518 (codified at 42 U.S.C. § 13212(f)(2)(B)) (emphasis added).

Congress's reference to enforceable greenhouse-gas standards "for vehicles sold anywhere in the United States" was necessarily a reference to § 209(b)

---

[6] *Available at* https://www.carper.senate.gov/wp-content/uploads/archives/GHG%20Tailpipe%20standards.pdf; https://www.carper.senate.gov/wp-content/uploads/archives/CAFEdocumentsFINAL.pdf.

standards. As explained in the committee report on H.R. 2635, the bill where the language originated, "[c]urrently, the only applicable greenhouse gas emissions standards are those adopted by California and other states. Those standards will be enforceable if and when EPA grants the waiver requested by the state of California under the Clean Air Act." H.R. Rep. No. 110-297, at 17.

To avoid any doubt about its intent, Congress enacted a savings clause preserving, *inter alia*, existing state authority and showing Congress's approval of the *Green Mountain* and *Central Valley* decisions. Pub. L. No. 110-140, § 3, 121 Stat. 1492, 1498 (2007) (codified at 42 U.S.C. § 17002) ("Except to the extent expressly provided," nothing in the amendments to EPCA "supersedes [or] limits the authority provided . . . by . . . any provision of law (including a regulation)"); *see also* 153 Cong. Rec. 35,833, 35,927-28 (statement of Rep. Markey, lead author of the legislation) ("It is the intent of Congress to fully preserve existing federal and State authority under the Clean Air Act," including "the authority affirmed . . . in *Green Mountain* . . . [and] *Central Valley*"); *see also id.* at 34,178 (statement of Sen. Dianne Feinstein, co-sponsor of the legislation) (explaining that the amendments "do[] not impact the authority to regulate tailpipe emissions of the EPA, California, or other States under the Clean Air Act," and citing *Central Valley*).

22

The 2007 Amendments to EPCA thus directly contradict Fuel Intervenors' strained reading of EPCA's preemption provision, under which § 209(b) standards are treated no differently than ordinary state laws and under which vehicle emissions standards that regulate carbon dioxide emissions are preempted, including the Zero-Emission Vehicles standards. To the contrary, the 2007 Amendments affirm and ratify the holdings of multiple courts that § 209(b) standards are not—and cannot be—preempted by EPCA, even when those standards affect fuel economy.

> 3. The Inflation Reduction Act of 2022 Again Incorporated And Ratified State Zero-Emission Vehicles Regulations.

In the Inflation Reduction Act of 2022, Congress again confirmed that state zero-emission vehicle standards adopted via § 209(b) are both legal and in the public interest. Where Congress appropriates funding for an agency to engage in a specific action, that appropriation acts as a ratification from Congress when it "plainly show[s] a purpose to bestow the precise authority which is claimed." *Ex parte Endo*, 323 U.S. 283, 303 n. 24 (1944).

It is particularly telling that Congress adopted § 60105(g) of the Inflation Reduction Act, which allocates $5 million to EPA to help "States to adopt and implement greenhouse gas *and zero-emission standards* for mobile sources pursuant to section 177 of the Clean Air Act," which is the provision that allows states other than California to adopt § 209(b) standards. Pub. L. No. 117-169, 136

23

Stat. 1818, 2068-69 (emphasis added). Congress thus has again ratified the understanding that state zero-emission-vehicle standards are not preempted by "affirmatively act[ing]" to "create[] a distinct scheme . . . premised on th[at] belief." *Brown & Williamson*, 529 U.S. at 156; *see also* Greg Dotson & Dustin J. Maghamfar, *The Clean Air Act Amendments of 2022: Clean Air, Climate Change, and the Inflation Reduction Act*, 53 Env't L. Rep. 10,017, 10,030-32 (2023) (noting Congressional ratification of the validity of both greenhouse-gas and zero-emission § 209(b) standards via this provision of the Inflation Reduction Act).

*Amici* are in the best possible position to understand the origin and purpose of this provision. As the Chairs of the Senate and House Committees with jurisdiction over the Clean Air Act, *Amici* collaborated to conceive and draft the language of § 60105(g), which *Amici* included in the bill that was reported from the U.S. House Committee on Energy and Commerce. *Amici* continued to protect that provision as they shepherded the bill through the negotiation process, and— alongside a majority of their colleagues—voted to enact it. *Amici* and the enacting Congress intended this provision to provide funding to support state adoption of § 209(b) greenhouse-gas and zero-emission standards, including the particular Zero-Emission Vehicles standards that Fuel Intervenors now claim are preempted. Indeed, the provision allows for no other use of these funds. Congress understood this, and its intent could only be fulfilled if the standards were not preempted by

24

EPCA, as legal scholars have recognized. *See* Dotson & Maghamfar, *supra*, at 10,031-32 (noting that Congress has incorporated measures into the Inflation Reduction Act "that necessarily depend upon and approve existing regulatory understandings that . . . California may control emissions of GHGs and other pollutants by reliance on zero emissions technologies"). By enacting § 60105(g) to fund activities that could only occur if NHTSA was correct in withdrawing its determination that § 209(b) standards are preempted, Congress knowingly and deliberately ratified NHTSA's action and reaffirmed the validity of California's Zero-Emission Vehicles standards under § 209(b).

### C. Intervenors' Additional Arguments for Preemption of Zero-Emission Vehicles Standards All Fail.

The text and history of EPCA, together with Congress's subsequent legislative enactments, all indicate an unwavering Congressional understanding that the Act does not preempt the § 209(b) standards at issue in this case. None of Fuel Intervenors' additional arguments concerning the nature of zero-emission vehicle standards succeeds in suggesting otherwise.

Fuel Intervenors first argue that the Zero-Emission Vehicles standards are preempted because they regulate carbon-dioxide emissions and therefore have a "direct correlation" with fuel economy. Fuel Intervenors' Br. 15. But even if compliance with the Zero-Emission Vehicles standards affects fuel economy, that fact cannot be determinative here. EPCA anticipates and accommodates effects on

25

fuel economy from compliance with emissions standards and is neutral about whether those effects might improve or hinder fuel economy. Further, as Congress recognized when it drafted EPCA, regulation of traditional pollutants in gas-powered vehicles has a correlation with fuel economy, too. If this logic applies to preempt carbon-dioxide regulations, then it must, as a corollary, also preempt the hydrocarbon, carbon-monoxide, and nitrogen-oxides regulations in place when EPCA was passed. *See, e.g.*, 13 Cal. Code Regs. § 1955.1(a). In any case, Congress's legislative enactments make clear that § 209(b) standards that promote zero-emission vehicles or regulate greenhouse gases are no more subject to preemption than other § 209(b) standards. *See supra* Parts I.B.2-4.

Next, Fuel Intervenors argue that producing vehicles that conform to the Zero-Emission Vehicles standards will affect the average fuel economy of a manufacturer's fleet, and therefore the standards "relate to" the fuel economy of that fleet and are preempted. Fuel Intervenors' Br. 18-19. But even if the Zero-Emission Vehicle standards were "related to" fuel economy, that alone would not render them "related to . . . fuel economy *standards*," 49 U.S.C. § 32919(a) (emphasis added). If accepted, Fuel Intervenors' overbroad reading would preempt nearly all standards that have an incidental effect on fuel economy, potentially including, for example, speed limits and vehicle weight limits. *See N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 668 (1995)

26

("if 'relate to' were taken to the furthest reach of its indeterminacy, then for all practical purposes pre-emption would never run its course"). In any case, Fuel Intervenors' argument proves too much. As discussed in detail above, *supra* Part I.A.2, Congress assumed that § 209(b) standards would have a significant effect on fuel economy, yet preserved them. Thus, concluding that standards are preempted simply because they have a significant effect on fleetwide fuel economy leads to a contradiction in the statute, and that reading should be rejected.

In sum, EPCA's text, structure, and history, together with subsequent interpretations that Congress has ratified, demonstrate that EPCA cannot be read to preempt the Zero-Emission Vehicles standards. Such a reading would not only be incompatible with the text, it would be contrary to Congress's manifest intent in crafting and maintaining a regulatory structure that has consistently relied on the validity of § 209(b) standards, including those that require the adoption of zero-emission vehicles.

### II. Fuel Intervenors' Argument That NHTSA's Rule Is Arbitrary and Capricious Relies on Its Misreading of EPCA Preemption.

Fuel Intervenors also argue that NHTSA's rulemaking was arbitrary and capricious because the agency declined to take a position on whether the Zero-Emission Vehicles standards are preempted. Fuel Intervenors' Br. 22. In Fuel Intervenors' view, these standards are so legally vulnerable as to make the scope of EPCA's preemption provision an "important aspect" of NHTSA's rulemaking that

NHTSA neglected to consider. Fuel Intervenors' Br. 22 (quoting *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2384 (2020)). This argument necessarily depends on Fuel Intervenors' characterization of the Zero-Emission Vehicles standards as "legally dubious state laws." *Id.* at 23.

This argument fails for many of the same reasons as Fuel Intervenors' outright preemption argument. California's thirty-year-old ZEV standards are firmly established, not "legally dubious." As provided for by § 209 and as repeatedly approved by EPA, California has successfully required the adoption of zero-emission vehicles since 1990 as means of controlling both greenhouse gases and smog-forming pollutants. 87 Fed. Reg. 25,762 (May 2, 2022). EPCA and subsequent legislation explicitly favor and incorporate § 209(b) standards, including zero-emission vehicles standards and others that affect fuel economy. Moreover, two federal courts have considered whether EPCA may preempt EPA-approved § 209(b) standards, and both held that the Act could not. *See Green Mountain*, 508 F. Supp. 2d at 350; *Cent. Valley*, 529 F. Supp. 2d at 1173. Congress later codified these decisions through the 2007 Amendments to EPCA, and Congress affirmatively endorsed and approved § 209(b) zero-emission vehicle standards in the Inflation Reduction Act. *See supra* Part I.B.3.

The mere fact that Fuel Intervenors raised their incorrect preemption theories during NHTSA's rulemaking does not unsettle this law, nor does it create

a duty for NHTSA to conduct a substantive preemption analysis in this rulemaking. *See Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230-31 (1991) (an agency enjoys broad discretion in determining the scope of its own rulemaking). This is especially true because Fuel Intervenors do not dispute that NHTSA cannot make a determination on the scope of EPCA's preemption provision with the force of law. Fuel Intervenors' Br. 25. Moreover, a preemption determination would have been irrelevant to NHTSA's goal in setting its baseline, which was "to understand[] the state of the world absent any further regulatory action by NHTSA." 87 Fed. Reg. 25,983 (May 2, 2022).

Auto manufacturers also understand the well-settled nature of the Zero-Emission Vehicles standards. In a brief submitted in a related case, a coalition of automakers regulated under California's § 209(b) standards voiced their support for these standards—including the Zero-Emission Vehicles standards—calling them "an incremental step in a multi-decade regulatory effort to reduce vehicle emissions, improve California's air quality, and mitigate the state's contribution to climate change." Br. of Ford Motor Co., et al. 39-41, *Ohio v. EPA*, No. 22-1081, ECF No. 1985804 (filed Feb. 13, 2023). These automakers have relied on the Zero-Emission Vehicles standards to plan multi-billion-dollar investments, *id.* at 6, and even voluntarily entered into a framework agreement committing to achieve agreed-upon emissions reductions during the period when EPA temporarily

29

withdrew California's waiver. *Id.* at 9-10. Automakers would not have placed such substantial reliance on merely "legally dubious" standards.

## CONCLUSION

*Amici* urge the Court to reject Fuel Intervenors' argument that EPCA preempts California's Zero-Emission Vehicles standards.

Respectfully submitted,

*/s/ Cara A. Horowitz*
CARA A. HOROWITZ
D.C. Circuit Bar No. 56629
GABRIEL F. GREIF
Frank G. Wells Environmental Law
Clinic, UCLA School of Law
405 Hilgard Avenue
Los Angeles, CA 90095
Tel: (310) 206-4033
horowitz@law.ucla.edu

*Counsel for* Amici Curiae

April 4, 2023

30

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitations set forth in D.C. Cir. R. 32(e)(3), Fed. R. App. P. 29(a)(5), and the Court's Scheduling Order, ECF No. 1965625 (filed Sept. 22, 2022), because this brief contains 6480 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1). The foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Cara A. Horowitz*
CARA A. HOROWITZ
April 4, 2023

## CERTIFICATE OF SERVICE

I hereby certify that, on this 4th day of April, 2023, I caused to be electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's CM/ECF system, which constitutes service on all parties and parties' counsel who are registered ECF filers.

/s/ Cara A. Horowitz

CARA A. HOROWITZ
April 4, 2023

ORAL ARGUMENT NOT YET SCHEDULED

**No. 22-1080 (and consolidated cases)**

---

NATURAL RESOURCES DEFENSE COUNCIL,

*Petitioners,*

CLEAN FUELS DEVELOPMENT COALITION,

*Intervenors for Petitioners,*

v.

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, ET AL.,

*Respondents,*

---

On Petitions for Review of Final Agency Action by the
National Highway Traffic Safety Administration

---

**STATUTORY AND REGULATORY ADDENDUM OF *AMICI CURIAE*
SENATOR TOM CARPER, CHAIRMAN OF THE SENATE
ENVIRONMENT AND PUBLIC WORKS COMMITTEE, AND
REPRESENTATIVE FRANK PALLONE, JR., RANKING MEMBER OF
THE HOUSE COMMITTEE ON ENERGY AND COMMERCE**

---

CARA A. HOROWITZ
D.C. Circuit Bar No. 56629
GABRIEL F. GREIF
Frank G. Wells Environmental Law
Clinic, UCLA School of Law
405 Hilgard Avenue
Los Angeles, CA 90095
Tel: (310) 206-4033
horowitz@law.ucla.edu

*Counsel for* Amici Curiae

April 4, 2023

# TABLE OF CONTENTS

**Federal Statutes**

15 U.S.C. §§ 2001-2012 (1976) ............................................................ A-1

42 U.S.C. § 13212 ............................................................................. A-12

42 U.S.C. § 17002 ............................................................................. A-17

Pub. L. No. 101-549, 104 Stat. 2399, 2520-23 (1990) ...................... A-18

Pub. L. No. 103-272, 108 Stat. 1378-79 (1994) ............................... A-23

Pub. L. No. 117-169, 136 Stat. 2067-69 (2022) ............................... A-25

**California Code of Regulations**

13 Cal. Code Regs. § 1955.1(a) .......................................................... A-28

such inspections. For the purposes of this section, the term "probable cause" means a valid public interest in the effective enforcement of this subchapter or regulations issued thereunder sufficient to justify administrative inspections of the area, factory, warehouse, establishment, premises, or motor vehicle, or contents thereof, in the circumstances specified in the application for the warrant.

(2) A warrant shall be issued only upon an affidavit of an officer or employee having knowledge of the facts alleged, sworn to before the judge or magistrate and establishing the grounds for issuing the warrant. If the judge or magistrate is satisfied that grounds for the application exist or that there is a reasonable basis for believing they exist, he shall issue a warrant identifying the area, factory, warehouse, establishment, premises, or motor vehicle to be inspected, the purpose of such inspection, and, where appropriate, the type of property to be inspected, if any. The warrant shall—

(A) identify the items or type of property to be impounded, if any;

(B) be directed to a person authorized under section 1990d of this title to execute it;

(C) state the grounds for its issuance and the name of the person or persons whose affidavit has been taken in support thereof;

(D) command the person to whom it is directed to inspect the area, factory, warehouse, establishment, premises, or motor vehicle identified for the purpose specified, and, where appropriate, shall direct the impoundment of the property specified;

(E) direct that it be served during the hours specified in it; and

(F) designate the judge or magistrate to whom it shall be returned.

(3) A warrant issued pursuant to this section must be executed and returned within 10 days of its date unless, upon a showing by the Secretary of a need therefor, the judge or magistrate allows additional time in the warrant. If property is impounded pursuant to a warrant, the person executing the warrant shall give the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken. The return of the warrant shall be made promptly and shall be accompanied by a written inventory of any property taken. The inventory shall be made in the presence of the person executing the warrant and of the person from whose possession or premises the property was taken, if they are present, or in the presence of at least one credible person other than the person making such inventory, and shall be verified by the person executing the warrant. The judge or magistrate, upon request, shall deliver a copy of the inventory to the person from whom or from whose premises the property was taken and to the applicant for the warrant.

(4) The judge or magistrate who has issued a warrant under this section shall attach to the warrant a copy of the return and all papers filed in connection therewith and shall file them with the clerk of the district court of the United States for the judicial district in which the inspection was made.

(Pub. L. 92–513, title IV, § 415, as added Pub. L. 94–364, title IV, § 408(2), July 14, 1976, 90 Stat. 987.)

§ 1990f. Compliance with inspection and investigation requirements

No person shall fail to comply with the requirements of section 1990d of this title to maintain records, make reports, provide information, permit access to or copying of records, permit entry or inspection, or permit impounding.

(Pub. L. 92–513, title IV, § 416, as added Pub. L. 94–364, title IV, § 408(2), July 14, 1976, 90 Stat. 988.)

§ 1990g. Authorization of appropriations

There are authorized to be appropriated to carry out this subchapter $450,000 for the fiscal year ending June 30, 1976; $100,000 for the period beginning July 1, 1976, and ending September 30, 1976; $650,000 for the fiscal year ending September 30, 1977; and $562,000 for the fiscal year ending September 30, 1978.

(Pub. L. 92–513, title IV, § 417, as added Pub. L. 94–364, title IV, § 408(2), July 14, 1976, 90 Stat. 989.)

§ 1991. State odometer requirements

This subchapter does not—

(1) annul, alter, or affect the laws of any State with respect to the disconnecting, altering, or tampering with odometers with the intent to defraud, or

(2) exempt any person subject to the provisions of this subchapter from complying with such laws,

except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency.

(Pub. L. 92–513, title IV, § 418, formerly § 411, Oct. 20, 1972, 86 Stat. 963, renumbered Pub. L. 94–364, title IV, § 408(1), July 14, 1976, 90 Stat. 984.)

## SUBCHAPTER V—IMPROVING AUTOMOTIVE EFFICIENCY

### PART A ¹—AUTOMOTIVE FUEL ECONOMY

#### PART REFERRED TO IN OTHER SECTIONS

This part is referred to in section 1901 of this title.

§ 2001. Definitions

For purposes of this part:

(1) The term "automobile" means any 4-wheeled vehicle propelled by fuel which is manufactured primarily for use on public streets, roads, and highways (except any vehicle operated exclusively on a rail or rails), and

(A) which is rated at 6,000 lbs. gross vehicle weight or less, or

¹ So in original. There are no other parts in this subchapter.

A-1

(B) which—

(i) is rated at more than 6,000 lbs. gross vehicle weight but less than 10,000 lbs. gross vehicle weight,

(ii) is a type of vehicle for which the Secretary determines, by rule, average fuel economy standards under this part are feasible, and

(iii) is a type of vehicle for which the Secretary determines, by rule, average fuel economy standards will result in significant energy conservation, or is a type of vehicle which the Secretary determines is substantially used for the same purposes as vehicles described in subparagraph (A) of this paragraph.

The Secretary may prescribe such rules as may be necessary to implement this paragraph.

(2) The term "passenger automobile" means any automobile (other than an automobile capable of off-highway operation) which the Secretary determines by rule is manufactured primarily for use in the transportation of not more than 10 individuals.

(3) The term "automobile capable of off-highway operation" means any automobile which the Secretary determines by rule—

(A) has a significant feature (other than 4-wheel drive) which is designed to equip such automobile for off-highway operation, and

(B) either—

(i) is a 4-wheel drive automobile, or

(ii) is rated at more than 6,000 pounds gross vehicle weight.

(4) The term "average fuel economy" means average fuel economy, as determined under section 2003 of this title.

(5) The term "fuel" means gasoline and diesel oil. The Secretary may, by rule, include any other liquid fuel or any gaseous fuel within the meaning of the term "fuel" if he determines that such inclusion is consistent with the need of the Nation to conserve energy.

(6) The term "fuel economy" means the average number of miles traveled by an automobile per gallon of gasoline (or equivalent amount of other fuel) consumed, as determined by the EPA Administrator in accordance with procedures established under section 2003(d) of this title.

(7) The term "average fuel economy standard" means a performance standard which specifies a minimum level of average fuel economy which is applicable to a manufacturer in a model year.

(8) The term "manufacturer" means any person engaged in the business of manufacturing automobiles. The Secretary shall prescribe rules for determining, in cases where more than one person is the manufacturer of an automobile, which person is to be treated as the manufacturer of such automobile for purposes of this part.

(9) The term "manufacturer" (except for purposes of section 2002(c) of this title) means to produce or assemble in the customs territory of the United States, or to import.

(10) The term "import" means to import into the customs territory of the United States.

(11) The term "model type" means a particular class of automobile as determined, by rule, by the EPA Administrator, after consultation and coordination with the Secretary.

(12) The term "model year", with reference to any specific calendar year, means a manufacturer's annual production period (as determined by the EPA Administrator) which includes January 1 of such calendar year. If a manufacturer has no annual production period, the term "model year" means the calendar year.

(13) The term "Secretary" means the Secretary of Transportation.

(14) The term "EPA Administrator" means the Administrator of the Environmental Protection Agency.

(Pub. L. 92–513, title V, § 501, as added Pub. L. 94–163, title III, § 301, Dec. 22, 1975, 89 Stat. 901.)

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 2004, 2006, 2012 of this title; title 42 section 6291.

§ 2002. Average fuel economy standards

(a) Standards for passenger vehicles manufactured after 1977; review of standards; report to Congress; standards for passenger automobiles manufactured from 1981 through 1984; amendment of standards

(1) Except as otherwise provided in paragraph (4) or in subsection (c) or (d) of this section, the average fuel economy for passenger automobiles manufactured by any manufacturer in any model year after model year 1977 shall not be less than the number of miles per gallon established for such model year under the following table:

| Model year: | Average fuel economy standard (in miles per gallon) |
|---|---|
| 1978 | 18.0. |
| 1979 | 19.0. |
| 1980 | 20.0. |
| 1981 | Determined by Secretary under paragraph (3) of this subsection. |
| 1982 | Determined by Secretary under paragraph (3) of this subsection. |
| 1983 | Determined by Secretary under paragraph (3) of this subsection. |
| 1984 | Determined by Secretary under paragraph (3) of this subsection. |
| 1985 and thereafter | 27.5. |

(2) Not later than January 15 of each year, beginning in 1977, the Secretary shall transmit to each House of Congress, and publish in the Federal Register, a review of average fuel economy standards under this part. The review required to be transmitted not later than January 15, 1979, shall include a comprehensive analysis of the program required by this part. Such analysis shall include an assessment of the ability of manufacturers to meet the average fuel economy standard for model year 1985 as specified in paragraph (1) of this subsection, and any legislative recommendations the Secretary

USCA Case #22-1080    Document #1993099    Filed: 04/03/2023    Page 48 of 74

or the EPA Administrator may have for improving the program required by this part.

(3) Not later than July 1, 1977, the Secretary shall prescribe, by rule, average fuel economy standards for passenger automobiles manufactured in each of the model years 1981 through 1984. Any such standard shall apply to each manufacturer (except as provided in subsection (c) of this section), and shall be set for each such model year at a level which the Secretary determines (A) is the maximum feasible average fuel economy level, and (B) will result in steady progress toward meeting the average fuel economy standard established by or pursuant to this subsection for model year 1985.

(4) The Secretary may, by rule, amend the average fuel economy standard specified in paragraph (1) for model year 1985, or for any subsequent model year, to a level which he determines is the maximum feasible average fuel economy level for such model year, except that any amendment which has the effect of increasing an average fuel economy standard to a level in excess of 27.5 miles per gallon, or of decreasing any such standard to a level below 26.0 miles per gallon, shall be submitted to the Congress in accordance with section 551 of the Energy Policy and Conservation Act [42 U.S.C. 6421], and shall not take effect if either House of the Congress disapproves such amendment in accordance with the procedures specified in such section.

(5) For purposes of considering any modification which is submitted to the Congress under paragraph (4), the 5 calendar days specified in section 551(f)(4)(A) of the Energy Policy and Conservation Act [42 U.S.C. 6421(f)(4)(A)] shall be lengthened to 20 calendar days, and the 15 calendar days specified in section 551(c) and (d) of such Act [42 U.S.C. 6421(c) and (d)] shall be lengthened to 60 calendar days.

**(b) Standards for other than passenger automobiles**

The Secretary shall, by rule, prescribe average fuel economy standards for automobiles which are not passenger automobiles and which are manufactured by any manufacturer in each model year which begins more than 30 months after December 22, 1975. Such rules may provide for separate standards for different classes of such automobiles (as determined by the Secretary), and shall[1] be set at a level which the Secretary determines is the maximum feasible average fuel economy level which such manufacturers are able to achieve in each model year to which this subsection applies. Any standard applicable to a model year under this subsection shall be prescribed at least 18 months prior to the beginning of such model year.

**(c) Exemptions for manufacturers of limited number of cars**

On application of a manufacturer who manufactured (whether or not in the United States) fewer than 10,000 passenger automobiles in the second model year preceding the model year for which the application is made, the Secretary may, by rule, exempt such manufacturer from subsection (a) of this section. An application for such an exemption shall be submitted to the Secretary, and shall contain such information

---
[1] So in original. Probably should be "such standards shall".

as the Secretary may require by rule. Such exemption may only be granted if the Secretary determines that the average fuel economy standard otherwise applicable under subsection (a) of this section is more stringent than the maximum feasible average fuel economy level which such manufacturer can attain. The Secretary may not issue exemptions with respect to a model year unless he establishes, by rule, alternative average fuel economy standards for passenger automobiles manufactured by manufacturers which receive exemptions under this subsection. Such standards may be established for an individual manufacturer, for all automobiles to which this subsection applies, or for such classes of such automobiles as the Secretary may define by rule. Each such standard shall be set at a level which the Secretary determines is the maximum feasible average fuel economy level for the manufacturers to which the standard applies. An exemption under this subsection shall apply to a model year only if the manufacturer manufactures (whether or not in the United States) fewer than 10,000 passenger automobiles in such model year.

**(d) Application for modification of standards**

(1) Any manufacturer may apply to the Secretary for modification of an average fuel economy standard applicable under subsection (a) of this section to such manufacturer for model year 1978, 1979, or 1980. Such application shall contain such information as the Secretary may require by rule, and shall be submitted to the Secretary within 24 months before the beginning of the model year for which such modification is requested.

(2)(A) If a manufacturer demonstrates and the Secretary finds that—

(i) a Federal standards fuel economy reduction is likely to exist for such manufacturer for the model year to which the application relates, and

(ii) such manufacturer applied a reasonably selected technology,

the Secretary shall, by rule, reduce the average fuel economy standard applicable under subsection (a) of this section to such manufacturer by the amount of such manufacturer's Federal standards fuel economy reduction, rounded off to the nearest one-tenth mile per gallon (in accordance with rules of the Secretary). To the maximum extent practicable, prior to making a finding under this paragraph with respect to an application, the Secretary shall request, and the EPA Administrator shall supply, test results collected pursuant to section 2003(d) of this title for all automobiles covered by such application.

(B)(i) If the Secretary does not find that a Federal standards fuel economy reduction is likely to exist for a manufacturer who filed an application under paragraph (1), he shall deny the application of such manufacturer.

(ii) If the Secretary—

(I) finds that a Federal standards fuel economy reduction is likely to exist for a manufacturer who filed an application under paragraph (1), and

(II) does not find that such manufacturer applied a reasonably selected technology,

the average fuel economy standard applicable under subsection (a) of this section to such manufacturer shall, by rule, be reduced by an amount equal to the Federal standards fuel economy reduction which the Secretary finds would have resulted from the application of a reasonably selected technology.

(3) For purposes of this subsection:

(A) The term "reasonably selected technology" means a technology which the Secretary determines it was reasonable for a manufacturer to select, considering (i) the Nation's need to improve the fuel economy of its automobiles, and (ii) the energy savings, economic costs, and lead-time requirements associated with alternative technologies practicably available to such manufacturer.

(B) The term "Federal standards fuel economy reduction" means the sum of the applicable fuel economy reductions determined under subparagraph (C).

(C) The term "applicable fuel economy reduction" means a number of miles per gallon equal to—

(i) the reduction in a manufacturer's average fuel economy in a model year which results from the application of a category of Federal standards applicable to such model year, and which would not have occurred had Federal standards of such category applicable to model year 1975 remained the only standards of such category in effect, minus

(ii) 0.5 mile per gallon.

(D) Each of the following is a category of Federal standards:

(i) Emissions standards under section 202 of the Clean Air Act [42 U.S.C. 1857f–1] and emissions standards applicable by reason of section 209(b) of such Act [42 U.S.C. 1857f–6a(b)].

(ii) Motor vehicle safety standards under the National Traffic and Motor Vehicle Safety Act of 1966 [15 U.S.C. 1381 et seq.].

(iii) Noise emission standards under section 6 of the Noise Control Act of 1972 [42 U.S.C. 4905].

(iv) Property loss reduction standards under subchapter I of this chapter.

(E) In making the determination under this subparagraph,[1] the Secretary (in accordance with such methods as he shall prescribe by rule) shall assume a production mix for such manufacturer which would have achieved the average fuel economy standard for such model year had standards described in subparagraph (D) applicable to model year 1975 remained the only standards in effect.

(4) The Secretary may, for the purposes of conducting a proceeding under this subsection, consolidate one or more applications filed under this subsection.

(e) Determination of maximum feasible average fuel economy

For purposes of this section, in determining maximum feasible average fuel economy, the Secretary shall consider—

(1) technological feasibility;

(2) economic practicability;

[1] So in original, probably should be "subsection,".

(3) the effect of other Federal motor vehicle standards on fuel economy; and

(4) the need of the Nation to conserve energy.

(f) Amendment of average fuel economy standards

(1) The Secretary may, by rule, from time to time, amend any average fuel economy standard prescribed under subsection (a)(3), (b), or (c) of this section, so long as such standard, as amended, meets the requirements of subsection (a)(3), (b), or (c) of this section, as the case may be.

(2) Any amendment prescribed under this section which has the effect of making any average fuel economy standard more stringent shall be—

(A) promulgated, and

(B) if required by paragraph (4) of subsection (a) of this section, submitted to the Congress,

at least 18 months prior to the beginning of the model year to which such amendment will apply.

(g) Application of other laws

Proceedings under subsection (a)(4) or (d) of this section shall be conducted in accordance with section 553 of title 5 except that interested persons shall be entitled to make oral as well as written presentations. A transcript shall be taken of any oral presentations.

(Pub. L. 92–513, title V, § 502, as added Pub. L. 94–163, title III, § 301, Dec. 22, 1975, 89 Stat. 902.)

References in Text

The National Traffic and Motor Vehicle Safety Act of 1966, referred to in subsec. (d)(3)(D)(ii), is Pub. L. 89–563, Sept. 9, 1966, 80 Stat. 718, which is classified to chapter 38 (§ 1381 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1381 of this title and Tables volume.

Section Referred to in Other Sections

This section is referred to in sections 2001, 2003, 2004, 2005, 2007, 2008, 2010 of this title.

§ 2003. Calculation of average fuel economy

(a) Method of calculation

(1) Average fuel economy for purposes of section 2002(a) and (c) of this title shall be calculated by the EPA Administrator by dividing—

(A) the total number of passenger automobiles manufactured in a given model year by a manufacturer, by

(B) a sum of terms, each term of which is a fraction created by dividing—

(i) the number of passenger automobiles of a given model type manufactured by such manufacturer in such model year, by

(ii) the fuel economy measured for such model type.

(2) Average fuel economy for purposes of section 2002(b) of this title shall be calculated in accordance with rules of the EPA Administrator.

(b) Automobile categories

(1) In calculating average fuel economy under subsection (a)(1) of this section, the EPA Administrator shall separate the total number of

passenger automobiles manufactured by a manufacturer into the following two categories:

(A) Passenger automobiles which are domestically manufactured by such manufacturer (plus, in the case of model year 1978 and model year 1979, passenger automobiles which are within the includable base import volume of such manufacturer).

(B) Passenger automobiles which are not domestically manufactured by such manufacturer (and which, in the case of model year 1978 and model year 1979, are not within the includable base import volume of such manufacturer).

The EPA Administrator shall calculate the average fuel economy of each such separate category, and each such category shall be treated as if manufactured by a separate manufacturer for purposes of this part.

(2) For purposes of this subsection:

(A) The term "includable base import volume", with respect to any manufacturer in model year 1978 or 1979, as the case may be, is a number of passenger automobiles which is the lesser of—

(i) the manufacturer's base import volume, or

(ii) the number of passenger automobiles calculated by multiplying—

(I) the quotient obtained by dividing such manufacturer's base import volume by such manufacturer's base base[1] production volume, times

(II) the total number of passenger automobiles manufactured by such manufacturer during such model year.

(B) The term "base import volume" means one-half the sum of—

(i) the total number of passenger automobiles which were not domestically manufactured by such manufacturer during model year 1974 and which were imported by such manufacturer during such model year, plus

(ii) 133 percent of the total number of passenger automobiles which were not domestically manufactured by such manufacturer during the first 9 months of model year 1975 and which were imported by such manufacturer during such 9-month period.

(C) The term "base production volume" means one-half the sum of—

(i) the total number of passenger automobiles manufactured by such manufacturer during model year 1974, plus

(ii) 133 percent of the total number of passenger automobiles manufactured by such manufacturer during the first 9 months of model year 1975.

(D) For purposes of subparagraphs (B) and (C) of this paragraph any passenger automobile imported during model year 1976, but prior to July 1, 1975, shall be deemed to have been manufactured (and imported) during the first 9 months of model year 1975.

(E) An automobile shall be considered domestically manufactured in any model year if at least 75 percent of the cost to the manufacturer of such automobile is attributable to value added in the United States or Canada,

[1] So in original.

unless the assembly of such automobile is completed in Canada and such automobile is not imported into the United States prior to the expiration of 30 days following the end of such model year. The EPA Administrator may prescribe rules for purposes of carrying out this subparagraph.

(F) The fuel economy of each passenger automobile which is imported by a manufacturer in model year 1978 or 1979, as the case may be, and which is not domestically manufactured by such manufacturer, shall be deemed to be equal to the average fuel economy of all such passenger automobiles.

(c) Definition of "automobiles manufactured"

Any reference in this part to automobiles manufactured by a manufacturer shall be deemed—

(1) to include all automobiles manufactured by persons who control, are controlled by, or are under common control with, such manufacturer; and

(2) to exclude all automobiles manufactured (within the meaning of paragraph (1)) during a model year by such manufacturer which are exported prior to the expiration of 30 days following the end of such model year.

(d) Testing and calculation procedures

(1) Fuel economy for any model type shall be measured, and average fuel economy of a manufacturer shall be calculated, in accordance with testing and calculation procedures established by the EPA Administrator, by rule. Procedures so established with respect to passenger automobiles (other than for purposes of section 2006 of this title) shall be the procedures utilized by the EPA Administrator for model year 1975 (weighted 55 percent urban cycle, and 45 percent highway cycle), or procedures which yield comparable results. Procedures under this subsection, to the extent practicable, shall require that fuel economy tests be conducted in conjunction with emissions tests conducted under section 206 of the Clean Air Act [42 U.S.C. 1857f–5]. The EPA Administrator shall report any measurements of fuel economy and any calculations of average fuel economy to the Secretary.

(2) The EPA Administrator shall, by rule, determine that quantity of any other fuel which is the equivalent of one gallon of gasoline.

(3) Testing and calculation procedures applicable to a model year, and any amendment to such procedures (other than a technical or clerical amendment), shall be promulgated not less than 12 months prior to the model year to which such procedures apply.

(e) Rounding off of measurements of fuel economy

For purposes of this part (other than section 2006 of this title), any measurement of fuel economy of a model type, and any calculation of average fuel economy of a manufacturer, shall be rounded off to the nearest one-tenth mile per gallon (in accordance with rules of the EPA Administrator).

(f) Consultation and coordination by Administrator with Secretary

The EPA Administrator shall consult and coordinate with the Secretary in carrying out his duties under this section.

A-5

(Pub. L. 92–513, title V, § 503, as added Pub. L. 94–163, title III, § 301, Dec. 22, 1975, 89 Stat. 908.)

### Section Referred to in Other Sections

This section is referred to in sections 2001, 2002, 2004, 2005, 2008 of this title.

### § 2004. Judicial review

#### (a) Review of rules in courts of appeals

Any person who may be adversely affected by any rule prescribed under section 2001, 2002, 2003, or 2006 of this title may, at any time prior to 60 days after such rule is prescribed (or in the case of an amendment submitted to each House of the Congress under section 2002(a)(4) of this title, at any time prior to 60 days after the expiration of the 60-day period specified in section 2002(a)(5) of this title), file a petition in the United States Court of Appeals for the District of Columbia, or for any circuit wherein such person resides or has his principal place of business, for judicial review of such rule. A copy of the petition shall be forthwith transmitted by the clerk of such court to the officer who prescribed the rule. Such officer shall thereupon cause to be filed in such court the written submissions and other materials in the proceeding upon which such rule was based. Upon the filing of such petition, the court shall have jurisdiction to review the rule in accordance with chapter 7 of title 5 and to grant appropriate relief as provided in such chapter. Findings of the Secretary under section 2002(d) of this title shall be set aside by the court on review unless such findings are supported by substantial evidence.

#### (b) Additional submissions

If the petitioner applies to the court in a proceeding under subsection (a) of this section for leave to make additional submissions, and shows to the satisfaction of the court that such additional submissions are material and that there were reasonable grounds for the failure to make such submissions in the administrative proceeding, the court may order the Secretary or the EPA Administrator, as the case may be to provide additional opportunity to make such submissions. The Secretary or the EPA Administrator, as the case may be, may modify or set aside the rule involved or prescribe a new rule by reason of the additional submissions, and shall file any such modified or new rule in the court, together with such additional submissions. The court shall thereafter review such new or modified rule.

#### (c) Finality of determination; review by United States Supreme Court

The judgment of the court affirming or setting aside, in whole or in part, any such rule shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

#### (d) Remedy in addition to other remedies provided by law

The remedies provided for in this section shall be in addition to, and not in lieu of, any other remedies provided by law.

(Pub. L. 92–513, title V, § 504, as added Pub. L. 94–163, title III, § 301, Dec. 22, 1975, 89 Stat. 908.)

### § 2005. Information and reports

#### (a) Reports by manufacturers; time; contents

(1) Each manufacturer shall submit a report to the Secretary during the 30-day period preceding the beginning of each model year after model year 1977, and during the 30-day period beginning on the 180th day of each such model year. Each such report shall contain (A) a statement as to whether such manufacturer will comply with average fuel economy standards under section 2002 of this title applicable to the model year for which such report is made; (B) a plan which describes the steps the manufacturer has taken or intends to take in order to comply with such standards; and (C) such other information as the Secretary may require.

(2) Whenever a manufacturer determines that a plan submitted under paragraph (1) which he stated was sufficient to insure compliance with applicable average fuel economy standards is not sufficient to insure such compliance, he shall submit a report to the Secretary containing a revised plan which specifies any additional measures which such manufacturer intends to take in order to comply with such standards, and a statement as to whether such revised plan is sufficient to insure such compliance.

(3) The Secretary shall prescribe rules setting forth the form and content of the reports required under paragraphs (1) and (2).

#### (b) Hearings; evidence

(1) For the purpose of carrying out the provisions of this part, the Secretary or the EPA Administrator, or their duly designated agents, may hold such hearings, take such testimony, sit and act at such times and places, administer such oaths, and require, by subpena, the attendance and testimony of such witnesses and the production of such books, papers, correspondence, memorandums, contracts, agreements, or other records as the Secretary, the EPA Administrator, or such agents deem advisable. The Secretary or the EPA Administrator may require, by general or special orders that any person—

(A) file, in such form as the Secretary or EPA Administrator may prescribe, reports or answers in writing to specific questions relating to any function of the Secretary or the EPA Administrator under this part, and

(B) provide the Secretary, the EPA Administrator, or their duly designated agents, access to (and for the purpose of examination, the right to copy) any documentary evidence of such person which is relevant to any function of the Secretary or the EPA Administrator under this part.

Such reports and answers shall be made under oath or otherwise, and shall be filed with the Secretary or the EPA Administrator within such reasonable period as either may prescribe.

(2) The district courts of the United States for a judicial district in the jurisdiction of which an inquiry is carried on may, in the case of contumacy or refusal to obey a duly authorized subpena or order of the Secretary, the

EPA Administrator, or a duly designated agent of either, issued under paragraph (1), issue an order requiring compliance with such subpena or order. Any failure to obey such an order of the court may be treated by such court as a contempt thereof.

(3) Witnesses summoned pursuant to this subsection shall be paid the same fees and mileage that are paid witnesses in the courts of the United States.

**(c) Tests, reports, etc., which may be required of manufacturers**

(1) Every manufacturer shall establish and maintain such records, make such reports, conduct such tests, and provide such items and information as the Secretary or the EPA Administrator may, by rule, reasonably require to enable the Secretary or the EPA Administrator to carry out their duties under this part and under any rules prescribed pursuant to this part. Such manufacturer shall, upon request of a duly designated agent of the Secretary or the EPA Administrator who presents appropriate credentials, permit such agent, at reasonable times and in a reasonable manner, to enter the premises of such manufacturer to inspect automobiles and appropriate books, papers, records, and documents. Such manufacturer shall make available all of such items and information in accordance with such reasonable rules as the Secretary or the EPA Administrator may prescribe.

(2) The district courts of the United States may, if a manufacturer refuses to accede to any rule or reasonable request made under paragraph (1), issue an order requiring compliance with such requirement or request. Any failure to obey such an order of the court may be treated by such court as a contempt thereof.

**(d) Disclosure of information to public**

(1) The Secretary and the EPA Administrator shall each disclose any information obtained under this part (other than section 2003(d) of this title) to the public in accordance with section 552 of title 5, except that information may be withheld from disclosure under subsection (b)(4) of such section only if the Secretary or the EPA Administrator, as the case may be, determines that such information, if disclosed, would result in significant competitive damage. Any matter described in section 552(b)(4) [of title 5] relevant to any administrative or judicial proceeding under this part may be disclosed in such proceeding.

(2) Measurements and calculations under section 2003(d) of this title shall be made available to the public in accordance with section 552 of title 5 without regard to subsection (b) of such section.

(Pub. L. 92-513, title V, § 505, as added Pub. L. 94-163, title III, § 301, Dec. 22, 1975, 89 Stat. 908.)

## § 2006. Labeling

**(a) Label required on automobile; contents**

(1) Except as otherwise provided in paragraph (2), each manufacturer shall cause to be affixed, and each dealer shall cause to be maintained, on each automobile manufactured in any model year after model year 1976, in a prominent place, a label—

(A) indicating—

(i) the fuel economy of such automobile,

(ii) the estimated annual fuel cost associated with the operation of such automobile, and

(iii) the range of fuel economy of comparable automobiles (whether or not manufactured by such manufacturer),

as determined in accordance with rules of the EPA Administrator,

(B) containing a statement that written information (as described in subsection (b)(1) of this section) with respect to the fuel economy of other automobiles manufactured in such model year (whether or not manufactured by such manufacturer) is available from the dealer in order to facilitate comparison among the various model types, and

(C) containing any other information authorized or required by the EPA Administrator which relates to information described in subparagraph (A) or (B).

(2) With respect to automobiles—

(A) for which procedures established in the EPA and FEA Voluntary Fuel Labeling Program for Automobiles exist on December 22, 1975, and

(B) which are manufactured in model year 1976 and at least 90 days after December 22, 1975,

each manufacturer shall cause to be affixed, and each dealer shall cause to be maintained, in a prominent place, a label indicating the fuel economy of such automobile, in accordance with such procedures.

(3) The form and content of the labels required under paragraphs (1) and (2), and the manner in which such labels shall be affixed, shall be prescribed by the EPA Administrator by rule. The EPA Administrator may permit a manufacturer to comply with this paragraph by permitting such manufacturer to disclose the information required under this subsection on the label required by section 3 of the Automobile Information Disclosure Act (15 U.S.C. 1232).

**(b) Booklet containing fuel economy data; distribution by administrator**

(1) The EPA Administrator shall compile and prepare a simple and readily understandable booklet containing data on fuel economy of automobiles manufactured in each model year. Such booklet shall also contain information with respect to estimated annual fuel costs, and may contain information with respect to geographical or other differences in estimated annual fuel costs. The Administrator of the Federal Energy Administration shall publish and distribute such booklets.

(2) The EPA Administrator, not later than July 31, 1976, shall prescribe rules requiring dealers to make available to prospective purchasers information compiled by the EPA Administrator under paragraph (1).

**(c) Violations**

(1) A violation of subsection (a) shall be treated as a violation of section 3 of the Automobile Information Disclosure Act (15 U.S.C. 1232). For purposes of the Federal Trade Commission Act [15 U.S.C. 41 et seq.] (other than sections

5(m) and (18) [15 U.S.C. 45(m) and 57a], a violation of subsection (a) shall be treated as an unfair or deceptive act or practice in or affecting commerce.

(2) As used in this section, the term "dealer" has the same meaning as such term has in section 2(e) of the Automobile Information Disclosure Act (15 U.S.C. 1231(e)) except that in applying such term to this section, the term "automobile" has the same meaning as such term has in section 2001(1) of this title.

(d) Creation of warranties

Any disclosure with respect to fuel economy or estimated annual fuel cost which is required to be made under the provisions of this section shall not create an express or implied warranty under State or Federal law that such fuel economy will be achieved, or that such cost will not be exceeded, under conditions of actual use.

(e) Consultation by Administrator with other agency personnel

In carrying out his duties under this section, the EPA Administrator shall consult with the Federal Trade Commission, the Secretary, and the Federal Energy Administrator.

(Pub. L. 92–513, title V, § 506, as added Pub. L. 94–163, title III, § 301, Dec. 22, 1975, 89 Stat. 910.)

REFERENCES IN TEXT

The Federal Trade Commission Act, referred to in subsec. (c)(1), is act Sept. 26, 1914, ch. 311, 38 Stat. 717, which is classified generally to subchapter I (§ 41 et seq.) of chapter 2 of this title. For complete classification of this Act to the Code, see section 58 of this title and Tables volume.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 2003, 2004, 2007, 2009 of this title.

§ 2007. Unlawful conduct

The following conduct is unlawful:

(1) the failure of any manufacturer to comply with any average fuel economy standard applicable to such manufacturer under section 2002 of this title (other than section 2002(b) of this title);

(2) the failure of any manufacturer to comply with any average fuel economy standard applicable to such manufacturer under section 2002(b) of this title, or

(3) the failure of any person (A) to comply with any provision of this part applicable to such person (other than section 2002, 2006(a), 2010, or 2011 of this title), or (B) to comply with any standard, rule, or order applicable to such person which is issued pursuant to such a provision.

(Pub. L. 92–513, title V, § 507, as added Pub. L. 94–163, title III, § 301, Dec. 22, 1975, 89 Stat. 911.)

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 2008 of this title.

§ 2008. Civil penalty

(a) Penalty for violations; credit against penalty

(1) If average fuel economy calculations reported under section 2003(d) of this title indicate that any manufacturer has violated section 2007(1) or (2) of this title, then (unless further measurements of fuel economy, further calculations of average fuel economy, or other information indicates there is no violation of section 2007(1) or (2) of this title) the Secretary shall commence a proceeding under paragraph (2) of this subsection. The results of such further measurements, further calculations, and any such other information, shall be published in the Federal Register.

(2) If, on the record after opportunity for agency hearing, the Secretary determines that such manufacturer has violated section 2007(1) or (2) of this title, or that any person has violated section 2007(3) of this title, the Secretary shall assess the penalties provided for under subsection (b) of this section. Any interested person may participate in any proceeding under this paragraph.

(3)(A)(i) Whenever the average fuel economy of the passenger automobiles manufactured by a manufacturer in a particular model year exceeds an applicable average fuel economy standard established under section 2002(a) or (c) of this title (determined without regard to any adjustment under section 2002(d) of this title), such manufacturer shall be entitled to a credit, calculated under clause (ii), which shall be—

(I) deducted from the amount of any civil penalty which has been or may be assessed against such manufacturer for a violation of section 2007(1) of this title occurring in the model year immediately prior to the model year in which such manufacturer exceeds such applicable average fuel economy standard, and

(II) to the extent that such credit is not deducted pursuant to subclause (I), deducted from the amount of any civil penalty assessed against such manufacturer for a violation of section 2007(1) of this title occurring in the model year immediately following the model year in which such manufacturer exceeds such applicable average fuel economy standard.

(ii) The amount of credit to which a manufacturer is entitled under clause (i) shall be equal to—

(I) $5 for each tenth of a mile per gallon by which the average fuel economy of the passenger automobiles manufactured by such manufacturer in the model year in which the credit is earned pursuant to clause (i) exceeds the applicable average fuel economy standard established under section 2002(a) or (c) of this title, multiplied by

(II) the total number of passenger automobiles manufactured by such manufacturer during such model year.

(B)(i) Whenever the average fuel economy of a class of automobiles which are not passenger automobiles and which are manufactured by a manufacturer in a particular model year exceeds an average fuel economy standard applicable to automobiles of such class under section 2002(b) of this title, such manufacturer shall be entitled to a credit, calculated under clause (ii), which shall be—

(I) deducted from the amount of any civil penalty which has been or may be assessed

A-8

against such manufacturer for a violation of section 2007(2) of this title, occurring in the model year immediately prior to the model year in which such manufacturer exceeds such applicable average fuel economy standard, and

(II) to the extent that such credit is not deducted pursuant to subclause (I), deducted from the amount of any such civil penalty assessed against such manufacturer for a violation of section 2007(2) of this title occurring in the model year immediately following the model year in which such manufacturer exceeds such applicable average fuel economy standard.

(ii) The amount of credit to which a manufacturer is entitled under clause (i) shall be equal to—

(I) $5 for each tenth of a mile per gallon by which the average fuel economy of the automobiles of such class manufactured by such manufacturer in the model year in which the credit is earned pursuant to clause (i) exceeds the applicable average fuel economy standard established under section 2002(b) of this title, multiplied by

(II) the total number of automobiles of such class manufactured by such manufacturer during such model year.

(C) Whenever a civil penalty has been assessed and collected under this section from a manufacturer who is entitled to a credit under this paragraph with respect to such civil penalty, the Secretary of the Treasury shall refund to such manufacturer the amount of credit to which such manufacturer is so entitled, except that the amount of such refund shall not exceed the amount of the civil penalty so collected.

(D) The Secretary may prescribe rules for purposes of carrying out the provisions of this paragraph.

(b) Amount of penalty; compromise or modification

(1)(A) Any manufacturer whom the Secretary determines under subsection (a) of this section to have violated a provision of section 2007(1) of this title,[1] shall be liable to the United States for a civil penalty equal to (i) $5 for each tenth of a mile per gallon by which the average fuel economy of the passenger automobiles manufactured by such manufacturer during such model year is exceeded by the applicable average fuel economy standard established under section 2002(a) and (c) of this title, multiplied by (ii) the total number of passenger automobiles manufactured by such manufacturer during such model year.

(B) Any manufacturer whom the Secretary determines under subsection (a) of this section to have violated section 2007(2) of this title shall be liable to the United States for a civil penalty equal to (i) $5 for each tenth of a mile per gallon by which the applicable average fuel economy standard exceeds the average fuel economy of automobiles to which such standard applies, and which are manufactured by such manufacturer during the model year in which the violation occurs, multiplied by (ii) the total number of automobiles to which such

[1] The words "in a model year" probably should appear immediately preceding the comma.

standard applies and which are manufactured by such manufacturer during such model year.

(2) Any person whom the Secretary determines under subsection (a) of this section to have violated a provision of section 2007(3) of this title shall be liable to the United States for a civil penalty of not more than $10,000 for each violation. Each day of a continuing violation shall constitute a separate violation for purposes of this paragraph.

(3) The amount of such civil penalty shall be assessed by the Secretary by written notice. The Secretary shall have the discretion to compromise, modify, or remit, with and without conditions, any civil penalty assessed under this subsection against any person, except that any civil penalty assessed for a violation of section 2007(1) or (2) of this title may be so compromised, modified, or emitted only to the extent—

(A) necessary to prevent the insolvency or bankruptcy of such manufacturer,

(B) such manufacturer shows that the violation of section 2007(1) or (2) of this title resulted from an act of God, a strike, or a fire, or

(C) the Federal Trade Commission has certified that modification of such penalty is necessary to prevent a substantial lessening of competition, as determined under paragraph (4).

The Attorney General shall collect any civil penalty for which a manufacturer is liable under this subsection in a civil action under subsection (c)(2) of this section (unless the manufacturer pays such penalty to the Secretary).

(4) Not later than 30 days after a determination by the Secretary under subsection (a)(2) of this section that a manufacturer has violated section 2007(1) or (2) of this title, such manufacturer may apply to the Federal Trade Commission for a certification under this paragraph. If the manufacturer shows and the Federal Trade Commission determines that modification of the civil penalty for which such manufacturer is otherwise liable is necessary to prevent a substantial lessening of competition in that segment of the automobile industry subject to the standard with respect to which such penalty was assessed, the Commission shall so certify. The certification shall specify the maximum amount that such penalty may be reduced. To the maximum extent practicable, the Commission shall render a decision with respect to an application under this paragraph not later than 90 days after the application is filed with the Commission. A proceeding under this paragraph shall not have the effect of delaying the manufacturer's liability under this section for a civil penalty for more than 90 days after such application is filed, but any payment made before a decision of the Commission under this paragraph becomes final shall be paid to the court in which the penalty is collected, and shall (except as otherwise provided in paragraph (5)), be held by such court, until 90 days after such decision becomes final (at which time it shall be paid into the general fund of the Treasury).

(5) Whenever a civil penalty has been assessed and collected from a manufacturer under this section, and is being held by a court

A-9

in accordance with paragraph (4), and the Secretary subsequently determines to modify such civil penalty pursuant to paragraph (3)(C) the Secretary shall direct the court to remit the appropriate amount of such penalty to such manufacturer.

(6) A claim of the United States for a civil penalty assessed against a manufacturer under subsection (b)(1) of this section shall, in the case of the bankruptcy or insolvency of such manufacturer, be subordinate to any claim of a creditor of such manufacturer which arises from an extension of credit before the date on which the judgment in any collection action under this section becomes final (without regard to paragraph (4)).

(c) Review of penalty by interested person

(1) Any interested person may obtain review of a determination (A) of the Secretary pursuant to which a civil penalty has been assessed under subsection (b) of this section, or (B) of the Federal Trade Commission under subsection (b)(4) of this section, in the United States Court of Appeals for the District of Columbia, or for any circuit wherein such person resides or has his principal place of business. Such review may be obtained by filing a notice of appeal in such court within 30 days after the date of such determination, and by simultaneously sending a copy of such notice by certified mail to the Secretary or the Federal Trade Commission, as the case may be. The Secretary or the Commission, as the case may be, shall promptly file in such court a certified copy of the record upon which such determination was made. Any such determination shall be reviewed in accordance with chapter 7 of title 5.

(2) If any person fails to pay an assessment of a civil penalty after it has become a final and unappealable order, or after the appropriate court of appeals has entered final judgment in favor of the Secretary, the Attorney General shall recover the amount for which the manufacturer is liable in any appropriate district court of the United States. In such action, the validity and appropriateness of the final order imposing the civil penalty shall not be subject to review.

(Pub. L. 92-513, title V, § 508, as added Pub. L. 94-163, title III, § 301, Dec. 22, 1975, 89 Stat. 911.)

§ 2009. State laws

(a) Fuel economy standards

Whenever an average fuel economy standard established under this part is in effect, no State or political subdivision of a State shall have authority to adopt or enforce any law or regulation relating to fuel economy standards or average fuel economy standards applicable to automobiles covered by such Federal standard.

(b) Fuel economy disclosures

Whenever any requirement under section 2006 of this title is in effect with respect to any automobile, no State or political subdivision of a State shall have authority to adopt or enforce any law or regulation with respect to the disclosure of fuel economy of such automobile, or of fuel cost associated with the operation of such automobile, if such law or regulation is not identical with such requirement.

(c) State or political subdivision automobiles

Nothing in this section shall be construed to prevent any State or political subdivision thereof from establishing requirements with respect to fuel economy of automobiles procured for its own use.

(Pub. L. 92-513, title V, § 509, as added Pub. L. 94-163, title III, § 301, Dec. 22, 1975, 89 Stat. 914.)

§ 2010. Use of fuel efficient passenger automobiles by Federal Government

(a) The President shall, within 120 days after December 22, 1975, promulgate rules which shall require that all passenger automobiles acquired by all executive agencies in each fiscal year which begins after December 22, 1975, achieve a fleet average fuel economy for such year not less than—

(1) 18 miles per gallon, or

(2) the average fuel economy standard applicable under section 2002(a) of this title for the model year which includes January 1 of such fiscal year,

whichever is greater.

(b) As used in this section:

(1) The term "fleet average fuel economy" means (A) the total number of passenger automobiles acquired in a fiscal year to which this section applies by all executive agencies (excluding passenger automobiles designed to perform combat related missions for the Armed Forces or designed to be used in law enforcement work or emergency rescue work), divided by (B) a sum of terms, each term of which is a fraction created by dividing—

(i) the number of passenger automobiles so acquired of a given model type, by

(ii) the fuel economy of such model type.

(2) The term "executive agency" has the same meaning as such term has for purposes of section 105 of title 5.

(3) The term "acquired" means leased for a period of 60 continuous days or more, or purchased.

(Pub. L. 92-513, title V, § 510, as added Pub. L. 94-163, title III, § 301, Dec. 22, 1975, 89 Stat. 915.)

DELEGATION OF FUNCTIONS

Functions of the President under this section delegated to the Administrator of General Services, see Section 1(a) of Ex. Ord. No. 11912, Apr. 13, 1976, 41 F.R. 15825, set out as a note under section 6201 of Title 42, The Public Health and Welfare.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 2007 of this title.

§ 2011. Retrofit devices

(a) Examination of fuel economy representations

The Federal Trade Commission shall establish a program for systematically examining fuel economy representations made with respect to retrofit devices. Whenever the Commission has reason to believe that any such representation may be inaccurate, it shall request

the EPA Administrator to evaluate, in accordance with subsection (b) of this section, the retrofit device with respect to which such representation was made.

**(b) Evaluation of retrofit devices**

(1) Upon application of any manufacturer of a retrofit device (or prototype thereof), upon the request of the Federal Trade Commission pursuant to subsection (a) of this section, or upon his own motion, the EPA Administrator shall evaluate, in accordance with rules prescribed under subsection (d) of this section, any retrofit device to determine whether the retrofit device increases fuel economy and to determine whether the representations (if any) made with respect to such retrofit device are accurate.

(2) If under paragraph (1) the EPA Administrator tests, or causes to be tested, any retrofit device upon the application of a manufacturer of such device, such manufacturer shall supply, at his own expense, one or more samples of such device to the Administrator and shall be liable for the costs of testing which are incurred by the Administrator. The procedures for testing retrofit devices so supplied may include a requirement for preliminary testing by a qualified independent testing laboratory, at the expense of the manufacturer of such device.

**(c) Results of tests; publication in Federal Register**

The EPA Administrator shall publish in the Federal Register a summary of the results of all tests conducted under this section, together with the EPA Administrator's conclusions as to—

(1) the effect of any retrofit device on fuel economy;

(2) the effect of any such device on emissions of air pollutants; and

(3) any other information which the Administrator determines to be relevant in evaluating such device.

Such summary and conclusions shall also be submitted to the Secretary and the Federal Trade Commission.

**(d) Rules establishing tests and procedures for evaluation of retrofit devices**

Within 180 days after December 22, 1975, the EPA Administrator shall, by rule, establish—

(1) testing and other procedures for evaluating the extent to which retrofit devices affect fuel economy and emissions of air pollutants, and

(2) criteria for evaluating the accuracy of fuel economy representations made with respect to retrofit devices.

**(e) Definitions**

For purposes of this section the term "retrofit device" means any component, equipment, or other device—

(1) which is designed to be installed in or on an automobile (as an addition to, as a replacement for, or through alteration or modification of, any original component, equipment, or other device); and

(2) which any manufacturer, dealer, or distributor of such device represents will provide higher fuel economy than would have result-

ed with the automobile as originally equipped,

as determined under rules of the Administrator. Such term also includes a fuel additive for use in an automobile.

(Pub. L. 92-513, title V, § 511, as added Pub. L. 94-163, title III, § 301, Dec. 22, 1975, 89 Stat. 915.)

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 2007 of this title.

**§ 2012. Reports to Congress**

(a) Within 180 days after December 22, 1975, the Secretary shall prepare and submit to the Congress and the President a comprehensive report setting forth findings and containing conclusions and recommendations with respect to (1) a requirement that each new automobile be equipped with a fuel flow instrument reading directly in miles per gallon, and (2) the most feasible means of equipping used automobiles with such instruments. Such report shall include an examination of the effectiveness of such instruments in promoting voluntary reductions in fuel consumption, the cost of such instruments, means of encouraging automobile purchasers to voluntarily purchase automobiles equipped with such instruments, and any other factor bearing on the cost and effectiveness of such instruments and their use.

(b)(1) Within 180 days after December 22, 1975, the Secretary shall prepare and submit to the Congress and the President a comprehensive report setting forth findings and containing conclusions and recommendations with respect to whether or not electric vehicles and other vehicles not consuming fuel (as defined in the first sentence of section 2001(5) of this title) should be covered by this part. Such report shall include an examination of the extent to which any such vehicle should be included under the provisions of this part, the manner in which energy requirements of such vehicles may be compared with energy requirements of fuel-consuming vehicles, the extent to which inclusion of such vehicles would stimulate their production and introduction into commerce, and any recommendations for legislative action.

(2) As used in this subsection, the term "electric vehicle" means a vehicle powered primarily by an electric motor drawing current from rechargeable batteries, fuel cells, or other portable sources of electrical current.

(Pub. L. 92-513, title V, § 512, as added Pub. L. 94-163, title III, § 301, Dec. 22, 1975, 89 Stat. 916.)

**CHAPTER 47—CONSUMER PRODUCT SAFETY**

Sec.
2051. Congressional findings and declaration of purpose.
2052. Definitions.
2053. Consumer Product Safety Commission.
    (a) Establishment; Chairman.
    (b) Term; vacancies.
    (c) Restrictions on Commissioner's outside activities.

§ 13212. Minimum Federal fleet requirement, 42 USCA § 13212

---

🟨 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
   Title 42. The Public Health and Welfare
     Chapter 134. Energy Policy
       Subchapter I. Alternative Fuels--General

42 U.S.C.A. § 13212

§ 13212. Minimum Federal fleet requirement

Effective: December 20, 2007

Currentness

**(a) General requirements**

**(1)** The Federal Government shall acquire at least--

   **(A)** 5,000 light duty alternative fueled vehicles in fiscal year 1993;

   **(B)** 7,500 light duty alternative fueled vehicles in fiscal year 1994; and

   **(C)** 10,000 light duty alternative fueled vehicles in fiscal year 1995.

**(2)** The Secretary shall allocate the acquisitions necessary to meet the requirements under paragraph (1).

**(b) Percentage requirements**

**(1)** Of the total number of vehicles acquired by a Federal fleet, at least--

   **(A)** 25 percent in fiscal year 1996;

   **(B)** 33 percent in fiscal year 1997;

   **(C)** 50 percent in fiscal year 1998; and

---

§ 13212. Minimum Federal fleet requirement, 42 USCA § 13212

**(D)** 75 percent in fiscal year 1999 and thereafter,

shall be alternative fueled vehicles.

**(2)** The Secretary, in consultation with the Administrator of General Services where appropriate, may permit a Federal fleet to acquire a smaller percentage than is required in paragraph (1), so long as the aggregate percentage acquired by all Federal fleets is at least equal to the required percentage.

**(3)** For purposes of this subsection, the term "Federal fleet" means 20 or more light duty motor vehicles, located in a metropolitan statistical area or consolidated metropolitan statistical area, as established by the Bureau of the Census, with a 1980 population of more than 250,000, that are centrally fueled or capable of being centrally fueled and are owned, operated, leased, or otherwise controlled by or assigned to any Federal executive department, military department, Government corporation, independent establishment, or executive agency, the United States Postal Service, the Congress, the courts of the United States, or the Executive Office of the President. Such term does not include--

**(A)** motor vehicles held for lease or rental to the general public;

**(B)** motor vehicles used for motor vehicle manufacturer product evaluations or tests;

**(C)** law enforcement vehicles;

**(D)** emergency vehicles;

**(E)** motor vehicles acquired and used for military purposes that the Secretary of Defense has certified to the Secretary must be exempt for national security reasons; or

**(F)** nonroad vehicles, including farm and construction vehicles.

**(c) Allocation of incremental costs**

The General Services Administration and any other Federal agency that procures motor vehicles for distribution to other Federal agencies shall allocate the incremental cost of alternative fueled vehicles over the cost of comparable gasoline vehicles across the entire fleet of motor vehicles distributed by such agency.

**(d) Application of requirements**

The provisions of section 6374 of this title relating to the Federal acquisition of alternative fueled vehicles shall apply to the acquisition of vehicles pursuant to this section.

§ 13212. Minimum Federal fleet requirement, 42 USCA § 13212

**(e) Resale**

The Administrator of General Services shall take all feasible steps to ensure that all alternative fueled vehicles sold by the Federal Government shall remain alternative fueled vehicles at time of sale.

**(f) Vehicle emission requirements**

**(1) Definitions**

In this subsection:

**(A) Federal agency**

The term "Federal agency" does not include any office of the legislative branch, except that it does include the House of Representatives with respect to an acquisition described in paragraph (2)(C).

**(B) Medium duty passenger vehicle**

The term "medium duty passenger vehicle" has the meaning given that term [1] section 523.2 of title 49 of the Code of Federal Regulations, as in effect on December 19, 2007.

**(C) Member's Representational Allowance**

The term "Member's Representational Allowance" means the allowance described in section 5341(a) of Title 2.

**(2) Prohibition**

**(A) In general**

Except as provided in subparagraph (B), no Federal agency shall acquire a light duty motor vehicle or medium duty passenger vehicle that is not a low greenhouse gas emitting vehicle.

**(B) Exception**

The prohibition in subparagraph (A) shall not apply to acquisition of a vehicle if the head of the agency certifies in writing, in a separate certification for each individual vehicle purchased, either--

**(i)** that no low greenhouse gas emitting vehicle is available to meet the functional needs of the agency and details in writing the functional needs that could not be met with a low greenhouse gas emitting vehicle; or

**(ii)** that the agency has taken specific alternative more cost-effective measures to reduce petroleum consumption that--

**(I)** have reduced a measured and verified quantity of greenhouse gas emissions equal to or greater than the quantity of greenhouse gas reductions that would have been achieved through acquisition of a low greenhouse gas emitting vehicle over the lifetime of the vehicle; or

**(II)** will reduce each year a measured and verified quantity of greenhouse gas emissions equal to or greater than the quantity of greenhouse gas reductions that would have been achieved each year through acquisition of a low greenhouse gas emitting vehicle.

**(C) Special rule for vehicles provided by funds contained in Members' Representational Allowance**

This paragraph shall apply to the acquisition of a light duty motor vehicle or medium duty passenger vehicle using any portion of a Member's Representational Allowance, including an acquisition under a long-term lease.

**(3) Guidance**

**(A) In general**

Each year, the Administrator of the Environmental Protection Agency shall issue guidance identifying the makes and model numbers of vehicles that are low greenhouse gas emitting vehicles.

**(B) Consideration**

In identifying vehicles under subparagraph (A), the Administrator shall take into account the most stringent standards for vehicle greenhouse gas emissions applicable to and enforceable against motor vehicle manufacturers for vehicles sold anywhere in the United States.

**(C) Requirement**

The Administrator shall not identify any vehicle as a low greenhouse gas emitting vehicle if the vehicle emits greenhouse gases at a higher rate than such standards allow for the manufacturer's fleet average grams per mile of carbon dioxide-equivalent emissions for that class of vehicle, taking into account any emissions allowances and adjustment factors such standards provide.

**(g) Authorization of appropriations**

There are authorized to be appropriated for carrying out this section, such sums as may be necessary for fiscal years 1993 through 1998, to remain available until expended.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Gover

§ 13212. Minimum Federal fleet requirement, 42 USCA § 13212

### CREDIT(S)

(Pub.L. 102-486, Title III, § 303, Oct. 24, 1992, 106 Stat. 2871; Pub.L. 109-58, Title VII, § 702, Aug. 8, 2005, 119 Stat. 815; Pub.L. 110-140, Title I, § 141, Dec. 19, 2007, 121 Stat. 1517.)

### EXECUTIVE ORDERS

#### EXECUTIVE ORDER NO. 12844

Ex. Ord. No. 12844, Apr. 21, 1993, 58 F.R. 21885, as amended by Ex. Ord. No. 12974, § 3(b), Sept. 29, 1995, 60 F.R. 51875, which required the Federal Government to institute a federal fleet of alternative fueled vehicles, was superseded by Ex. Ord. No. 13031, Dec. 13, 1996, 61 F.R. 66529, set out as a note under this section.

#### EXECUTIVE ORDER NO. 13031

Ex. Ord. No. 13031, Dec. 13, 1996, 61 F.R. 66529, relating to Federal alternative fueled vehicle leadership, was revoked by Ex. Ord. No. 13149, Apr. 21, 2000, 65 F.R. 24607, set out as a note under this section.

#### EXECUTIVE ORDER NO. 13149

Ex. Ord. No. 13149, Apr. 21, 2000, 65 F.R. 24607, which related to greening the government through federal fleet and transportation efficiency, was revoked by Ex. Ord. No. 13423, Jan. 24, 2007, 72 F.R. 3919, set out as a note under 42 U.S.C.A. § 4321.

Notes of Decisions (7)

### Footnotes

1        So in original. The word "in" probably should appear after "term".

42 U.S.C.A. § 13212, 42 USCA § 13212
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

End of Document                                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Gover

§ 17002. Relationship to other law, 42 USCA § 17002

---

United States Code Annotated
   Title 42. The Public Health and Welfare
     Chapter 152. Energy Independence and Security

42 U.S.C.A. § 17002

§ 17002. Relationship to other law

Effective: December 20, 2007

Currentness

Except to the extent expressly provided in this Act or an amendment made by this Act, nothing in this Act or an amendment made by this Act supersedes, limits the authority provided or responsibility conferred by, or authorizes any violation of any provision of law (including a regulation), including any energy or environmental law or regulation.

**CREDIT(S)**

(Pub.L. 110-140, § 3, Dec. 19, 2007, 121 Stat. 1498.)

42 U.S.C.A. § 17002, 42 USCA § 17002
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

---

End of Document       © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Gover      A-17

PUBLIC LAW 101-549—NOV. 15, 1990          104 STAT. 2399

Public Law 101-549
101st Congress

## An Act

To amend the Clean Air Act to provide for attainment and maintenance of health protective national ambient air quality standards, and for other purposes.

Nov. 15, 1990
[S. 1630]

Air pollution control.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

# TITLE I—PROVISIONS FOR ATTAINMENT AND MAINTENANCE OF NATIONAL AMBIENT AIR QUALITY STANDARDS

Sec. 101.  General planning requirements.
Sec. 102.  General provisions for nonattainment areas.
Sec. 103.  Additional provisions for ozone nonattainment areas.
Sec. 104.  Additional provisions for carbon monoxide nonattainment areas.
Sec. 105.  Additional provisions for particulate matter (PM-10) nonattainment areas.
Sec. 106.  Additional provisions for areas designated nonattainment for sulfur oxides, nitrogen dioxide, and lead.
Sec. 107.  Provisions related to Indian tribes.
Sec. 108.  Miscellaneous provisions.
Sec. 109.  Interstate pollution.
Sec. 110.  Conforming amendments.
Sec. 111.  Transportation system impacts on clean air.

**SEC. 101. GENERAL PLANNING REQUIREMENTS.**

Intergovernmental relations.

(a) AREA DESIGNATIONS.—Section 107(d) of the Clean Air Act (42 U.S.C. 7407(d)) is amended to read as follows:

"(d) DESIGNATIONS.—

"(1) DESIGNATIONS GENERALLY.—

"(A) SUBMISSION BY GOVERNORS OF INITIAL DESIGNATIONS FOLLOWING PROMULGATION OF NEW OR REVISED STANDARDS.— By such date as the Administrator may reasonably require, but not later than 1 year after promulgation of a new or revised national ambient air quality standard for any pollutant under section 109, the Governor of each State shall (and at any other time the Governor of a State deems appropriate the Governor may) submit to the Administrator a list of all areas (or portions thereof) in the State, designating as—

"(i) nonattainment, any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant,

"(ii) attainment, any area (other than an area identified in clause (i)) that meets the national primary or secondary ambient air quality standard for the pollutant, or

"(iii) unclassifiable, any area that cannot be classified on the basis of available information as meeting or not

49-139 O - 90 - 1 (549)


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

A-18

104 STAT. 2520        PUBLIC LAW 101–549—NOV. 15, 1990

combined emissions of oxides of nitrogen ($NO_x$) and nonmethane hydrocarbons (NMHC) shall not exceed 3.15 grams per brake horse-power hour (equivalent to 50 percent of the combined emission standards applicable under section 202 for such air pollutants in the case of a conventional model year 1994 heavy-duty diesel-fueled vehicle or engine). No standard shall be promulgated as provided in this section for any heavy-duty vehicle of more than 26,000 lbs. GVWR.

"(b) REVISED STANDARDS THAT ARE LESS STRINGENT.—(1) The Administrator may promulgate a revised less stringent standard for the vehicles or engines referred to in subsection (a) if the Administrator determines that the 50 percent reduction required under subsection (a) is not technologically feasible for clean diesel-fueled vehicles and engines, taking into account durability, costs, lead time, safety, and other relevant factors. To provide adequate lead time the Administrator shall make a determination with regard to the technological feasibility of such 50 percent reduction before December 31, 1993.

"(2) Any person may at any time petition the Administrator to make a determination under paragraph (1). The Administrator shall act on such a petition within 6 months after the petition is filed.

"(3) Any revised less stringent standards promulgated as provided in this subsection shall require at least a 30 percent reduction in lieu of the 50 percent reduction referred to in paragraph (1).

42 USC 7586.

"SEC. 246. CENTRALLY FUELED FLEETS

"(a) FLEET PROGRAM REQUIRED FOR CERTAIN NONATTAINMENT AREAS.—

"(1) SIP REVISION.—Each State in which there is located all or part of a covered area (as defined in paragraph (2)) shall submit, within 42 months after the enactment of the Clean Air Act Amendments of 1990, a State implementation plan revision under section 110 and part D of title I to establish a clean-fuel vehicle program for fleets under this section.

"(2) COVERED AREAS.—For purposes of this subsection, each of the following shall be a 'covered area':

"(A) OZONE NONATTAINMENT AREAS.—Any ozone nonattainment area with a 1980 population of 250,000 or more classified under subpart 2 of part D of title I of this Act as Serious, Severe, or Extreme based on data for the calendar years 1987, 1988, and 1989. In determining the ozone nonattainment areas to be treated as covered areas pursuant to this subparagraph, the Administrator shall use the most recent interpretation methodology issued by the Administrator prior to the enactment of the Clean Air Act Amendments of 1990.

"(B) CARBON MONOXIDE NONATTAINMENT AREAS.—Any carbon monoxide nonattainment area with a 1980 population of 250,000 or more and a carbon monoxide design value at or above 16.0 parts per million based on data for calendar years 1988 and 1989 (as calculated according to the most recent interpretation methodology issued prior to enactment of the Clean Air Act Amendments of 1990 by the United States Environmental Protection Agency), excluding those carbon monoxide nonattainment areas in which mobile sources do not contribute significantly to carbon monoxide exceedances.

A-19

PUBLIC LAW 101–549—NOV. 15, 1990    104 STAT. 2521

"(3) PLAN REVISIONS FOR RECLASSIFIED AREAS.—In the case of ozone nonattainment areas reclassified as Serious, Severe, or Extreme under part D of title I with a 1980 population of 250,000 or more, the State shall submit a plan revision meeting the requirements of this subsection within 1 year after reclassification. Such plan revision shall implement the requirements applicable under this subsection at the time of reclassification and thereafter, except that the Administrator may adjust for a limited period the deadlines for compliance where compliance with such deadlines would be infeasible.

"(4) CONSULTATION; CONSIDERATION OF FACTORS.—Each State required to submit an implementation plan revision under this subsection shall develop such revision in consultation with fleet operators, vehicle manufacturers, fuel producers and distributors, motor vehicle fuel, and other interested parties, taking into consideration operational range, specialty uses, vehicle and fuel availability, costs, safety, resale values of vehicles and equipment and other relevant factors.

"(b) PHASE-IN OF REQUIREMENTS.—The plan revision required under this section shall contain provisions requiring that at least a specified percentage of all new covered fleet vehicles in model year 1998 and thereafter purchased by each covered fleet operator in each covered area shall be clean-fuel vehicles and shall use clean alternative fuels when operating in the covered area. For the applicable model years (MY) specified in the following table and thereafter, the specified percentage shall be as provided in the table for the vehicle types set forth in the table:

CLEAN FUEL VEHICLE PHASE-IN REQUIREMENTS FOR FLEETS

| Vehicle Type | MY1998 | MY1999 | MY2000 |
|---|---|---|---|
| Light-duty trucks up to 6,000 lbs. GVWR and light-duty vehicles | 30% | 50% | 70% |
| Heavy-duty trucks above 8,500 lbs. GVWR | 50% | 50% | 50% |

The term MY refers to model year.

"(c) ACCELERATED STANDARD FOR LIGHT-DUTY TRUCKS UP TO 6,000 LBS. GVWR AND LIGHT-DUTY VEHICLES.—Notwithstanding the model years for which clean-fuel vehicle standards are applicable as provided in section 243, for purposes of this section, light duty trucks of up to 6,000 lbs. GVWR and light-duty vehicles manufactured in model years 1998 through model year 2000 shall be treated as clean-fuel vehicles only if such vehicles comply with the standards applicable under section 243 for vehicles in the same class for the model year 2001. The requirements of subsection (b) shall take effect on the earlier of the following:

Effective date.

"(1) The first model year after model year 1997 in which new light-duty trucks up to 6,000 lbs. GVWR and light-duty vehicles which comply with the model year 2001 standards under section 243 are offered for sale in California.

"(2) Model year 2001.

Whenever the effective date of subsection (b) is delayed pursuant to paragraph (1) of this subsection, the phase-in schedule under subsec-

tion (b) shall be modified to commence with the model year referred to in paragraph (1) in lieu of model year 1998.

"(d) CHOICE OF VEHICLES AND FUEL.—The plan revision under this subsection shall provide that the choice of clean-fuel vehicles and clean alternative fuels shall be made by the covered fleet operator subject to the requirements of this subsection.

"(e) AVAILABILITY OF CLEAN ALTERNATIVE FUEL.—The plan revision shall require fuel providers to make clean alternative fuel available to covered fleet operators at locations at which covered fleet vehicles are centrally fueled.

"(f) CREDITS.—

"(1) ISSUANCE OF CREDITS.—The State plan revision required under this section shall provide for the issuance by the State of appropriate credits to a fleet operator for any of the following (or any combination thereof):

"(A) The purchase of more clean-fuel vehicles than required under this section.

"(B) The purchase of clean fuel vehicles which meet more stringent standards established by the Administrator pursuant to paragraph (4).

"(C) The purchase of vehicles in categories which are not covered by this section but which meet standards established for such vehicles under paragraph (4).

"(2) USE OF CREDITS; LIMITATIONS BASED ON WEIGHT CLASSES.—

"(A) USE OF CREDITS.—Credits under this subsection may be used by the person holding such credits to demonstrate compliance with this section or may be traded or sold for use by any other person to demonstrate compliance with other requirements applicable under this section in the same nonattainment area. Credits obtained at any time may be held or banked for use at any later time, and when so used, such credits shall maintain the same value as if used at an earlier date.

"(B) LIMITATIONS BASED ON WEIGHT CLASSES.—Credits issued with respect to the purchase of vehicles of up to 8,500 lbs. GVWR may not be used to demonstrate compliance by any person with the requirements applicable under this subsection to vehicles of more than 8,500 lbs. GVWR. Credits issued with respect to the purchase of vehicles of more than 8,500 lbs. GVWR may not be used to demonstrate compliance by any person with the requirements applicable under this subsection to vehicles weighing up to 8,500 lbs. GVWR.

"(C) WEIGHTING.—Credits issued for purchase of a clean fuel vehicle under this subsection shall be adjusted with appropriate weighting to reflect the level of emission reduction achieved by the vehicle.

"(3) REGULATIONS AND ADMINISTRATION.—Within 12 months after the enactment of the Clean Air Act Amendments of 1990, the Administrator shall promulgate regulations for such credit program. The State shall administer the credit program established under this subsection.

"(4) STANDARDS FOR ISSUING CREDITS FOR CLEANER VEHICLES.— Solely for purposes of issuing credits under paragraph (1)(B), the Administrator shall establish under this paragraph standards for Ultra-Low Emission Vehicles ('ULEV's) and Zero Emissions Vehicles ('ZEV's) which shall be more stringent than those otherwise applicable to clean-fuel vehicles under this part. The

PUBLIC LAW 101–549—NOV. 15, 1990     104 STAT. 2523

Administrator shall certify clean fuel vehicles as complying with such more stringent standards, and administer and enforce such more stringent standards, in the same manner as in the case of the otherwise applicable clean-fuel vehicle standards established under this section. The standards established by the Administrator under this paragraph for vehicles under 8,500 lbs. GVWR or greater shall conform as closely as possible to standards which are established by the State of California for ULEV and ZEV vehicles in the same class. For vehicles of 8,500 lbs. GVWR or more, the Administrator shall promulgate comparable standards for purposes of this subsection.

"(5) EARLY FLEET CREDITS.—The State plan revision shall provide credits under this subsection to fleet operators that purchase vehicles certified to meet clean-fuel vehicle standards under this part during any period after approval of the plan revision and prior to the effective date of the fleet program under this section.

"(g) AVAILABILITY TO THE PUBLIC.—At any facility owned or operated by a department, agency, or instrumentality of the United States where vehicles subject to this subsection are supplied with clean alternative fuel, such fuel shall be offered for sale to the public for use in other vehicles during reasonable business times and subject to national security concerns, unless such fuel is commercially available for vehicles in the vicinity of such Federal facilities.

"(h) TRANSPORTATION CONTROL MEASURES.—The Administrator shall by rule, within 1 year after the enactment of the Clean Air Act Amendments of 1990, ensure that certain transportation control measures including time-of-day or day-of-week restrictions, and other similar measures that restrict vehicle usage, do not apply to any clean-fuel vehicle that meets the requirements of this section. This subsection shall apply notwithstanding title I.

"SEC. 247. VEHICLE CONVERSIONS.                    42 USC 7587.

"(a) CONVERSION OF EXISTING AND NEW CONVENTIONAL VEHICLES TO CLEAN-FUEL VEHICLES.—The requirements of section 246 may be met through the conversion of existing or new gasoline or diesel-powered vehicles to clean-fuel vehicles which comply with the applicable requirements of that section. For purposes of such provisions the conversion of a vehicle to clean fuel vehicle shall be treated as the purchase of a clean fuel vehicle. Nothing in this part shall be construed to provide that any covered fleet operator subject to fleet vehicle purchase requirements under section 246 shall be required to convert existing or new gasoline or diesel-powered vehicles to clean-fuel vehicles or to purchase converted vehicles.

"(b) REGULATIONS.—The Administrator shall, within 24 months after the enactment of the Clean Air Act Amendments of 1990, consistent with the requirements of this title applicable to new vehicles, promulgate regulations governing conversions of conventional vehicles to clean-fuel vehicles. Such regulations shall establish criteria for such conversions which will ensure that a converted vehicle will comply with the standards applicable under this part to clean-fuel vehicles. Such regulations shall provide for the application to such conversions of the same provisions of this title (including provisions relating to administration enforcement) as are applicable to standards under section 242, 243, 244, and 245, except that in the case of conversions the Administrator may modify the

108 STAT. 1378          PUBLIC LAW 103–272—JULY 5, 1994

(A) in paragraph (D)(ii), insert "App." immediately after "(46" wherever it appears; and

(B) in paragraph (E), strike "(46 U.S.C. 801 et seq.)" and "(46 U.S.C. 843–848)" and substitute "(46 App. U.S.C. 801 et seq.)" and "(46 App. U.S.C. 843 et seq.)", respectively.

(22) In section 10721(a)(1), strike "Section 5 of title 41" and substitute "Section 3709 of the Revised Statutes (41 U.S.C. 5)".

(23) In section 10735(b)(1), strike "under this title" and substitute "under this subtitle".

(24) In section 10903(b)(2), strike "section 11347 of this title and section 405(b) of the Rail Passenger Service Act (45 U.S.C. 565(b))" and substitute "sections 11347 and 24706(c) of this title".

(25) In section 10922—

(A) in subsection (c)(1)(E), strike "provisions of section 12(f) of the Urban Mass Transportation Act of 1964" and substitute "section 10531 of this title";

(B) in subsection (c)(2)(D), strike "subtitle" wherever it appears and substitute "title";

(C) in subsection (c)(4)(C) and (j)(1), strike "subchapter" wherever it appears and substitute "title"; and

(D) in subsection (j)(2)(C), strike "subtitle" and substitute "title".

(26) In section 10927(a)(1), insert "section" before "10923".

(27) In section 10935(a) and (e)(3), strike "subchapter" and substitute "title".

(28) In section 11125(b)(2)(A), strike "the Federal Railroad Safety Act of 1970 (45 U.S.C. 431 et seq.)" and substitute "chapter 201 of this title".

(29) In section 11126(a), strike "11501(c)" and substitute "11501(f)".

(30) In section 11303(a), strike "the Ship Mortgage Act, 1920" wherever it appears and substitute "chapter 313 of title 46".

(31) In section 11347, strike "section 405 of the Rail Passenger Service Act (45 U.S.C. 565)" and substitute "sections 24307(c), 24312, and 24706(c) of this title".

(32) In section 11348(a), strike "section 504(f)," and substitute "sections 504(f) and".

(33) In section 11504(b)(2), strike "section 204 of the Motor Carrier Safety Act of 1984 (49 App. U.S.C. 2503)" and substitute "section 31132 of this title".

(34) In section 11701(a), strike "section 10530 of this subtitle" and substitute "section 10530 of this title".

LEGISLATIVE PURPOSE AND CONSTRUCTION

49 USC prec. 101 note.

SEC. 6. (a) Sections 1–4 of this Act restate, without substantive change, laws enacted before July 1, 1993, that were replaced by those sections. Those sections may not be construed as making a substantive change in the laws replaced. Laws enacted after June 30, 1993, that are inconsistent with this Act supersede this Act to the extent of the inconsistency.

(b) A reference to a law replaced by sections 1–4 of this Act, including a reference in a regulation, order, or other law, is deemed to refer to the corresponding provision enacted by this Act.

PUBLIC LAW 103–272—JULY 5, 1994          108 STAT. 1379

(c) An order, rule, or regulation in effect under a law replaced by sections 1–4 of this Act continues in effect under the corresponding provision enacted by this Act until repealed, amended, or superseded.

(d) An action taken or an offense committed under a law replaced by sections 1–4 of this Act is deemed to have been taken or committed under the corresponding provision enacted by this Act.

(e) An inference of legislative construction is not to be drawn by reason of the location in the United States Code of a provision enacted by this Act or by reason of a caption or catch line of the provision.

(f) If a provision enacted by this Act is held invalid, all valid provisions that are severable from the invalid provision remain in effect. If a provision enacted by this Act is held invalid in any of its applications, the provision remains valid for all valid applications that are severable from any of the invalid applications.

REPEALS

SEC. 7. (a) The repeal of a law by this Act may not be construed as a legislative implication that the provision was or was not in effect before its repeal.                                                                              49 USC prec. 101 note.

(b) The laws specified in the following schedule are repealed, except for rights and duties that matured, penalties that were incurred, and proceedings that were begun before the date of enactment of this Act:                                                      49 USC prec. 101 note.

Schedule of Laws Repealed

Statutes at Large

| Date | Chapter or Public Law | Section | Statutes at Large | | U.S. Code | |
|---|---|---|---|---|---|---|
| | | | Volume | Page | Title | Section |
| 1864 July 2 | 216 ............ | 15 ........................................ | 13 | 362 ............ | 45 | 88 |
| 1873 Mar. 3 | 226 ............ | 2(words after 2d semi-colon). | 17 | 508 ............ | .......... | ..................... |
| 1874 June 20 June 22 | 331 ............ 414 ............ | ....................................... ....................................... | 18 18 | 111 ............ 200 ............ | 45 45 | 83 88 |
| 1879 Mar. 3 | 183 ............ | 1(4th par. on p. 420) ....... | 20 | 420 ............ | 45 | 90 |
| 1887 Feb. 4 | 104 ............ | 25 ........................................ | 24 | 379 ............ | 49 App. | 26 |
| Mar. 3 | 345 ............ | ....................................... | 24 | 488 ............ | 45 | 94, 95 |
| 1893 Mar. 2 | 196 ............ | ....................................... | 27 | 531 ............ | 45 | 1–7 |
| 1896 Apr. 1 | 87 ............ | ....................................... | 29 | 85 ............ | 45 | 6 |
| 1897 Mar. 3 | 386 ............ | (proviso under heading "Transportation and Recruiting, Marine Corps"). | 29 | 663 ............ | 45 | 91 |

support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects at the State, local, territorial, or Tribal level or in the District of Columbia, including community- and low-income-focused lenders and capital providers.

"(c) DEFINITIONS.—In this section:

"(1) ELIGIBLE RECIPIENT.—The term 'eligible recipient' means a nonprofit organization that—

"(A) is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;

"(B) does not take deposits other than deposits from repayments and other revenue received from financial assistance provided using grant funds under this section;

"(C) is funded by public or charitable contributions; and

"(D) invests in or finances projects alone or in conjunction with other investors.

"(2) GREENHOUSE GAS.—The term 'greenhouse gas' means the air pollutants carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride.

"(3) QUALIFIED PROJECT.—The term 'qualified project' includes any project, activity, or technology that—

"(A) reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or

"(B) assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution.

"(4) ZERO-EMISSION TECHNOLOGY.—The term 'zero-emission technology' means any technology that produces zero emissions of—

"(A) any air pollutant that is listed pursuant to section 108(a) (or any precursor to such an air pollutant); and

"(B) any greenhouse gas.".

### SEC. 60104. DIESEL EMISSIONS REDUCTIONS.

(a) GOODS MOVEMENT.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $60,000,000, to remain available until September 30, 2031, for grants, rebates, and loans under section 792 of the Energy Policy Act of 2005 (42 U.S.C. 16132) to identify and reduce diesel emissions resulting from goods movement facilities, and vehicles servicing goods movement facilities, in low-income and disadvantaged communities to address the health impacts of such emissions on such communities.

(b) ADMINISTRATIVE COSTS.—The Administrator of the Environmental Protection Agency shall reserve 2 percent of the amounts made available under this section for the administrative costs necessary to carry out activities pursuant to this section.

### SEC. 60105. FUNDING TO ADDRESS AIR POLLUTION.

(a) FENCELINE AIR MONITORING AND SCREENING AIR MONITORING.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury

136 STAT. 2068          PUBLIC LAW 117–169—AUG. 16, 2022

not otherwise appropriated, $117,500,000, to remain available until September 30, 2031, for grants and other activities authorized under subsections (a) through (c) of section 103 and section 105 of the Clean Air Act (42 U.S.C. 7403(a)–(c), 7405) to deploy, integrate, support, and maintain fenceline air monitoring, screening air monitoring, national air toxics trend stations, and other air toxics and community monitoring.

(b) MULTIPOLLUTANT MONITORING STATIONS.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $50,000,000, to remain available until September 30, 2031, for grants and other activities authorized under subsections (a) through (c) of section 103 and section 105 of the Clean Air Act (42 U.S.C. 7403(a)–(c), 7405)—

(1) to expand the national ambient air quality monitoring network with new multipollutant monitoring stations; and

(2) to replace, repair, operate, and maintain existing monitors.

(c) AIR QUALITY SENSORS IN LOW-INCOME AND DISADVANTAGED COMMUNITIES.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $3,000,000, to remain available until September 30, 2031, for grants and other activities authorized under subsections (a) through (c) of section 103 and section 105 of the Clean Air Act (42 U.S.C. 7403(a)–(c), 7405) to deploy, integrate, and operate air quality sensors in low-income and disadvantaged communities.

(d) EMISSIONS FROM WOOD HEATERS.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $15,000,000, to remain available until September 30, 2031, for grants and other activities authorized under subsections (a) through (c) of section 103 and section 105 of the Clean Air Act (42 U.S.C. 7403(a)–(c), 7405) for testing and other agency activities to address emissions from wood heaters.

(e) METHANE MONITORING.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $20,000,000, to remain available until September 30, 2031, for grants and other activities authorized under subsections (a) through (c) of section 103 and section 105 of the Clean Air Act (42 U.S.C. 7403(a)–(c), 7405) for monitoring emissions of methane.

(f) CLEAN AIR ACT GRANTS.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $25,000,000, to remain available until September 30, 2031, for grants and other activities authorized under subsections (a) through (c) of section 103 and section 105 of the Clean Air Act (42 U.S.C. 7403(a)–(c), 7405).

(g) GREENHOUSE GAS AND ZERO-EMISSION STANDARDS FOR MOBILE SOURCES.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the

PUBLIC LAW 117–169—AUG. 16, 2022        136 STAT. 2069

Treasury not otherwise appropriated, $5,000,000, to remain available until September 30, 2031, to provide grants to States to adopt and implement greenhouse gas and zero-emission standards for mobile sources pursuant to section 177 of the Clean Air Act (42 U.S.C. 7507).

(h) DEFINITION OF GREENHOUSE GAS.—In this section, the term "greenhouse gas" means the air pollutants carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride.

**SEC. 60106. FUNDING TO ADDRESS AIR POLLUTION AT SCHOOLS.**

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $37,500,000, to remain available until September 30, 2031, for grants and other activities to monitor and reduce greenhouse gas emissions and other air pollutants at schools in low-income and disadvantaged communities under subsections (a) through (c) of section 103 of the Clean Air Act (42 U.S.C. 7403(a)–(c)) and section 105 of that Act (42 U.S.C. 7405).

(b) TECHNICAL ASSISTANCE.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $12,500,000, to remain available until September 30, 2031, for providing technical assistance to schools in low-income and disadvantaged communities under subsections (a) through (c) of section 103 of the Clean Air Act (42 U.S.C. 7403(a)–(c)) and section 105 of that Act (42 U.S.C. 7405)—

(1) to address environmental issues;

(2) to develop school environmental quality plans that include standards for school building, design, construction, and renovation; and

(3) to identify and mitigate ongoing air pollution hazards.

(c) DEFINITION OF GREENHOUSE GAS.—In this section, the term "greenhouse gas" means the air pollutants carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride.

**SEC. 60107. LOW EMISSIONS ELECTRICITY PROGRAM.**

The Clean Air Act is amended by inserting after section 134 of such Act, as added by section 60103 of this Act, the following:

**"SEC. 135. LOW EMISSIONS ELECTRICITY PROGRAM.**        42 USC 7435.

"(a) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, to remain available until September 30, 2031—

"(1) $17,000,000 for consumer-related education and partnerships with respect to reductions in greenhouse gas emissions that result from domestic electricity generation and use;

"(2) $17,000,000 for education, technical assistance, and partnerships within low-income and disadvantaged communities with respect to reductions in greenhouse gas emissions that result from domestic electricity generation and use;

"(3) $17,000,000 for industry-related outreach, technical assistance, and partnerships with respect to reductions in

A-27

§ 1955.1. Exhaust Emission Standards and Test..., 13 CA ADC § 1955.1

---

Barclays California Code of Regulations
　Title 13. Motor Vehicles (Refs & Annos)
　　Division 3. Air Resources Board
　　　Chapter 1. Motor Vehicle Pollution Control Devices
　　　　Article 2. Approval of Motor Vehicle Pollution Control Devices (New Vehicles)

13 CCR § 1955.1

§ 1955.1. Exhaust Emission Standards and Test Procedures--1975 Through 1978 Model-Year Passenger Cars.

Currentness

(a) The exhaust emissions from new 1975 through 1978 model-year gasoline-fueled passenger cars having an engine displacement of 50 cubic inches or greater, subject to registration and sold and registered in this state, shall not exceed:

Exhaust Emission Standards
(grams per mile)

| Model Year | Hydrocarbons | Carbon Monoxide | Oxides of Nitrogen |
|---|---|---|---|
| 1975 | 0.9 * | 9.0 | 2.0 |
| 1976 | 0.9 * | 9.0 | 2.0 |
| 1977 | 0.41 | 9.0 | 1.5 |
| 1978 | 0.41 | 9.0 | 1.5 |

\* Hydrocarbon emissions from limited-production passenger cars shall not exceed 1.5 grams per mile.

(b) The test procedures for determining compliance with these standards are set forth in "California Exhaust Emission Standards and Test Procedures for 1975 through 1978 Model Passenger Cars, Light-Duty Trucks, and Medium-Duty Vehicles," adopted by the State Board, February 19, 1975, as last amended June 8, 1977.

(c) This regulation shall remain in effect until December 31, 1983, and as of that date is repealed unless a later regulation deletes or extends that date. Notwithstanding the repeal or expiration of this regulation on December 31, 1983, the provisions of the regulation as they existed prior to such repeal or expiration shall continue to be operative and effective for those events occurring prior to the repeal or expiration.

**Credits**
NOTE: Authority cited: Sections 39600 and 39601, Health and Safety Code. Reference: Sections 39002, 39003, 43000, 43100 and 43104, Health and Safety Code.

---

§ 1955.1. Exhaust Emission Standards and Test..., 13 CA ADC § 1955.1

This database is current through 3/17/23 Register 2023, No. 11.

Cal. Admin. Code tit. 13, § 1955.1, 13 CA ADC § 1955.1

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.