ORAL ARGUMENT NOT YET SCHEDULED
No. 22-1080 (and consolidated cases)

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NATURAL RESOURCES DEFENSE COUNCIL,

*Petitioner*,

v.

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, *et al.*,

*Respondents*.

On Petition for Review of a Final Rule of the
National Highway Traffic Safety Administration

———————————

## INITIAL BRIEF OF PETITIONER
## AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS
## AND STATE PETITIONERS

ERIC D. MCARTHUR
KATHLEEN M. MUELLER
PETER A. BRULAND
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
202.736.8000
emcarthur@sidley.com

*Counsel for Petitioner
American Fuel & Petrochem-
ical Manufacturers*

November 17, 2022

[ADDITIONAL COUNSEL LISTED ON INSIDE COVER]

KEN PAXTON
Attorney General of Texas
BRENT WEBSTER
First Assistant Attorney General
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel: (512) 936-1700

*Counsel for Petitioner
the State of Texas*

JUDD E. STONE II
Solicitor General
RYAN S. BAASCH
Assistant Solicitor General
Ryan.Baasch@oag.texas.gov
WESLEY S. WILLIAMS
Assistant Attorney General

*Counsel for Petitioner
the State of Texas*

LESLIE RUTLEDGE
Attorney General of Arkansas
NICHOLAS J. BRONNI
Solicitor General
DYLAN L. JACOBS
Deputy Solicitor General
Arkansas Attorney General's
Office
323 Center Street, Suite 200
Little Rock, AR 72201
Tel: (501) 682-2007
Nicholas.Bronni@Arkan-
sasAG.gov
Dylan.Jacobs@ArkansasAG.gov

*Counsel for Petitioner the State
of Arkansas*

THEODORE E. ROKITA
Indiana Attorney General
THOMAS M. FISHER
Solicitor General
Office of the Indiana
Attorney General
IGC-South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-
2770
Tel: (317) 232-6255
Tom.Fisher@atg.in.gov

*Counsel for Petitioner the
State of Indiana*

i

DANIEL CAMERON
Attorney General of Kentucky
BRETT R. NOLAN
Office of the Kentucky Attorney
General
700 Capital Avenue, Suite 118
Frankfort, KY 40601
Tel: (502) 696-5300
Brett.Nolan@ky.gov

*Counsel for Petitioner the State
of Kentucky*

JEFF LANDRY
Attorney General of Louisi-
ana
ELIZABETH B. MURRILL
Solicitor General
SCOTT ST. JOHN
Deputy Solicitor General
Louisiana    Department    of
Justice
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Petitioner the
State of Louisiana*

LYNN FITCH
Attorney General of Mississippi
JUSTIN L. MATHENY
Deputy Solicitor General
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for Petitioner the State
of Mississippi*

AUSTIN KNUDSEN
Montana Attorney General
CHRISTIAN B. CORRIGAN
Solicitor General
215 North Sanders Street
Helena, MT 59601
Chistrian.Corrigan@mt.gov

*Counsel for Petitioner the
State of Montana*

DOUGLAS J. PETERSON
Attorney General of Nebraska
JAMES A. CAMPBELL
Solicitor General of Nebraska
Office of the Nebraska Attorney
General
2115 State Capitol
Lincoln, NE 68509
Tel: (402) 471-2682
jim.campbell@nebraska.gov

*Counsel for Petitioner the State
of Nebraska*

DAVE YOST
Ohio Attorney General
BENJAMIN M. FLOWERS
Ohio Solicitor General
30 E. Broad St., Fl. 17
Columbus OH 43215
Tel: (614) 466-8980
bflowers@OhioAGO.gov

*Counsel for Petitioner the
State of Ohio*

ALAN WILSON
Attorney General of
South Carolina
JAMES EMORY SMITH, JR.
South Carolina
Deputy Solicitor General
P.O. Box 11549
Columbia, S.C. 29211
Tel: (803) 734-3642
esmith@scag.gov

*Counsel for Petitioner the State
of South Carolina*

SEAN D. REYES
Utah Attorney General
MELISSA A. HOLYOAK
Solicitor General
350 N. State Street,
Suite 230
Salt Lake City, UT 84114
Tel: (801) 366-0260
melissaholyoak@agutah.gov

*Counsel for Petitioner the
State of Utah*

iii

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**a.    Parties.** Petitioners in No. 22-1144 are the State of Texas, the State of Arkansas, the State of Indiana, the Commonwealth of Kentucky, the State of Louisiana, the State of Mississippi, the State of Montana, the State of Nebraska, the State of Ohio, the State of South Carolina, and the State of Utah. Petitioner in No. 22-1145 is American Fuel & Petrochemical Manufacturers. In the consolidated case, No. 22-1080, petitioner is the Natural Resources Defense Council.

Respondents in No. 22-1144 are the National Highway Traffic Safety Administration (NHTSA), NHTSA Administrator Steven Cliff, the United States Department of Transportation, and Secretary of Transportation Pete Buttigieg. Respondent in No. 22-1145 is NHTSA. In the consolidated case, No. 22-1080, respondents are NHTSA, Administrator Cliff, and Secretary Buttigieg.

Intervenors in Nos. 22-1144 and 22-1145 are the City and County of Denver, the City of Los Angeles, the City of New York, the City of San Francisco, the Commonwealth of Massachusetts, the Commonwealth of Pennsylvania, the District of Columbia, the Environmental Defense Fund, the Environmental Law and Policy Center, the National Coalition

for Advanced Transportation, the Natural Resources Defense Council, Public Citizen, the Sierra Club, the State of California, the State of Colorado, the State of Connecticut, the State of Delaware, the State of Hawaii, the State of Illinois, the State of Maine, the State of Maryland, the State of Michigan, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of New York, the State of North Carolina, the State of Oregon, the State of Vermont, the State of Washington, the State of Wisconsin, the Union of Concerned Scientists, and the Zero Emission Transportation Association. Intervenors in the consolidated case, No. 22-1080, are the Clean Fuels Development Coalition; Diamond Alternative Energy, LLC; ICM, Inc.; the Illinois Corn Growers Association; the Kansas Corn Growers Association; the Kentucky Corn Growers Association; the Michigan Corn Growers Association; the Missouri Corn Growers Association; the Texas Corn Growers Association; the Minnesota Soybean Growers Association; Valero Renewable Fuels Co.; and the Wisconsin Corn Growers Association.

No party has moved to participate as amicus curiae in No. 22-1144, No. 22-1145, or No. 22-1080.

**b.    Ruling Under Review.** Petitioners seek review of NHTSA's final rule amending model year 2024–2026 fuel-economy standards. *See* Corporate Average Fuel Economy Standards for Model Years 2024–2026 Passenger Cars and Light Trucks, 87 Fed. Reg. 25710 (May 2, 2022).

**c.    Related Cases.** Three consolidated cases in this Court challenge the rule under review: *National Resources Defense Council v. NHTSA*, No. 22-1080; *Texas v. NHTSA*, No. 22-1144; and *American Fuel & Petrochemical Manufacturers v. NHTSA*, No. 22-1145.

Seven consolidated cases in this Court challenge a related rule promulgated by the Environmental Protection Agency: *Texas v. EPA,* No. 22-1031; *Competitive Enterprise Institute v. EPA,* No. 22-1032; *Illinois Soybean Ass'n. v. EPA,* No. 22-1033; *American Fuel & Petrochemical Manufacturers v. EPA,* No. 22-1034; *Arizona v. EPA,* No. 22-1035; *Clean Fuels Development Coalition v. EPA,* No. 22-1036; and *Energy Marketers of America v. EPA,* No. 22-1038.

## <u>DISCLOSURE STATEMENT</u>

Petitioner American Fuel & Petrochemical Manufacturers is a national trade association that represents American refining and petrochemical companies. American Fuel & Petrochemical Manufacturers has no parent corporation, and no publicly held corporation has a 10% or greater ownership interest in American Fuel & Petrochemical Manufacturers.

# <u>TABLE OF CONTENTS</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..................................................................................iv

DISCLOSURE STATEMENT ................................................... vii

TABLE OF CONTENTS ...................................................... viii

TABLE OF AUTHORITIES ......................................................xi

GLOSSARY ............................................................... xviii

INTRODUCTION .............................................................. 1

JURISDICTIONAL STATEMENT ................................................ 4

STATEMENT OF ISSUES ...................................................... 4

PERTINENT STATUTES ....................................................... 5

STATEMENT OF THE CASE ................................................... 5

    I.    Statutory Background ............................................ 5

    II.    Regulatory Background .......................................... 11

        A.    NHTSA's 2020 Fuel-Economy Standards ................... 11

        B.    NHTSA's 2022 Amendments ...................................... 12

        C.    NHTSA's Consideration Of The Fuel Economy Of Electric Vehicles And Plug-in Hybrids ........................ 13

        D.    NHTSA's Consideration Of The Availability Of Credits ................................................... 20

SUMMARY OF ARGUMENT .................................................. 21

STANDING ................................................................. 23

STANDARD OF REVIEW ..................................................... 25

ARGUMENT ............................................................... 26

I.    NHTSA Improperly Considered The Fuel Economy Of Electric Vehicles. ....................................................... 27

    A.    The Act unambiguously bars NHTSA from considering the fuel economy of electric vehicles for any purpose. 27

    B.    NHTSA considered the fuel economy of electric vehicles when it set the 2024–2026 standards. ......................... 35

    C.    NHTSA's purported justifications for considering the fuel economy of electric vehicles fail. ........................... 37

    D.    NHTSA's consideration of the fuel economy of electric vehicles requires vacatur. ............................................ 45

II.    NHTSA Improperly Considered The Fuel Economy Of Plug-In Hybrid Vehicles When Operated On Electricity. .............. 51

    A.    The Act unambiguously requires NHTSA to calculate the fuel economy of plug-in hybrids based only on their gasoline or diesel operation. ......................................... 51

    B.    NHTSA considered the enhanced fuel economy of plug-in hybrids when it set the 2024–2026 standards. ....... 52

    C.    NHTSA's purported justification for considering the enhanced fuel economy of plug-in hybrids fails. ......... 53

    D.    NHTSA's failure to treat plug-in hybrids as operated only on gasoline or diesel requires vacatur. ................ 60

III.    NHTSA Improperly Considered Compliance Credits. ......... 62

    A.    The Act unambiguously bars NHTSA from considering compliance credits for any purpose. .............................. 62

    B.    NHTSA considered compliance credits when it set the 2024–2026 standards. ................................................... 63

    C.    NHTSA's purported justification for considering compliance credits fails. ............................................... 64

D.    NHTSA's consideration of the availability of
      compliance credits requires vacatur. ...........................65

CONCLUSION ................................................................................67

CERTIFICATE OF COMPLIANCE .........................................71

CERTIFICATE OF SERVICE..................................................72

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fuel & Petrochemical Mfrs. v. EPA,*
  3 F.4th 373 (D.C. Cir. 2021) ............................................................... 24

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n,*
  528 F.3d 934 (D.C. Cir. 2008) ............................................................ 31

*Air All. Hous. v. EPA,*
  906 F.3d 1049 (D.C. Cir. 2018) .......................................................... 24

*Ass'n of Civilian Technicians, Mont. Air Chapter No. 29 v.*
  *FLRA,*
  22 F.3d 1150 (D.C. Cir. 1994) ...................................................... 29, 63

*Auburn Hous. Auth. v. Martinez,*
  277 F.3d 138 (2d Cir. 2002) ............................................................... 56

*Azar v. Allina Health Servs.,*
  139 S. Ct. 1804 (2019) ........................................................................ 65

*Bates v. United States,*
  522 U.S. 23 (1997) .............................................................................. 30

*Bechtel v. FCC,*
  957 F.2d 873 (D.C. Cir. 1992) ............................................................ 60

*Bostock v. Clayton Cnty.,*
  140 S. Ct. 1731 (2020) ........................................................................ 41

*California v. EPA,*
  940 F.3d 1342 (D.C. Cir. 2019) .......................................................... 17

*Ctr. for Auto Safety v. NHTSA,*
  793 F.2d 1322 (D.C. Cir. 1986) ............................................................ 5

*Authorities chiefly relied upon are marked with asterisks

xi

*Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*,
  987 F.3d 158 (D.C. Cir. 2021) .............................................................. 14

*\*Freytag v. Comm'r of Internal Revenue*,
  501 U.S. 868 (1991) ............................................................... 29, 30

*Guedes v. Bureau of Alcohol, Tobacco, Firearms &
  Explosives*,
  45 F.4th 306 (D.C. Cir. 2022) ............................................................ 28

*Hermes Consol., LLC v. EPA*,
  787 F.3d 568 (D.C. Cir. 2015) ........................................................... 47

*\*HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels
  Ass'n*,
  141 S. Ct. 2172 (2021) ............................................................. 55, 56

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ........................................................................ 23

*Intel Corp. Inv. Policy Comm. v. Sulyma*,
  140 S. Ct. 768 (2020) ...................................................................... 43

*Jama v. ICE*,
  543 U.S. 335 (2005) ........................................................................ 32

*Lamie v. U.S. Trustee*,
  540 U.S. 526 (2004) ........................................................................ 28

*Landstar Express Am. v. Fed. Mar. Comm'n*,
  569 F.3d 493 (D.C. Cir. 2009) ........................................................... 42

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998) .......................................................................... 52

*Little Sisters of the Poor Saints Peter & Paul Home v.
  Pennsylvania*,
  140 S. Ct. 2367 (2020) ..................................................................... 30

*Lomax v. Ortiz-Marquez*,
  140 S. Ct. 1721 (2020) ..................................................................... 63

*Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,*
  497 U.S. 116 (1990) ................................................................ 34

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ................................................................ 11

*Me. Cmty. Health Options v. United States,*
  140 S. Ct. 1308 (2020) ............................................................ 56

*Mertens v. Hewitt Assocs.,*
  508 U.S. 248 (1993) ................................................................ 57

*Mexichem Fluor, Inc. v. EPA,*
  866 F.3d 451 (D.C. Cir. 2017) ............................................ 32, 33

*Murray Energy Corp. v. EPA,*
  936 F.3d 597 (D.C. Cir. 2019) ................................................ 64

*Nat'l Fuel Gas Supply Corp. v. FEC,*
  468 F.3d 831 (D.C. Cir. 2006) ................................................ 47

*Nixon v. United States,*
  506 U.S. 224 (1993) ................................................................ 57

*Oglala Sioux Tribe v. Nuclear Regul. Comm'n,*
  896 F.3d 520 (D.C. Cir. 2018) ................................................ 66

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation &
  Dev. Comm'n,*
  461 U.S. 190 (1983) ................................................................ 25

*Posadas v. Nat'l City Bank of N.Y.,*
  296 U.S. 497 (1936) ................................................................ 56

*Radzanower v. Touche Ross & Co.,*
  426 U.S. 148 (1976) ................................................................ 58

*Russello v. United States,*
  464 U.S. 16 (1983) .................................................................. 55

*Sw. Bell Corp. v. FCC,*
  43 F.3d 1515 (D.C. Cir. 1995) ................................................ 41

*U.S. Postal Serv. v. Postal Regul. Comm'n,*
842 F.3d 1271 (D.C. Cir. 2016) ........................................... 51

*\*United States v. Long,*
997 F.3d 342 (D.C. Cir. 2021) ............................................. 42

*United States v. Palomar-Santiago,*
141 S. Ct. 1615 (2021) .................................................. 29, 63

*\*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014) ........................................................... 41

*West Virginia v. EPA,*
142 S. Ct. 2587 (2022) ................................................. 26, 43

*White Stallion Energy Ctr., LLC v. EPA,*
748 F.3d 1222 (D.C. Cir. 2014) ........................................ 35

*Whitman v. Am. Trucking Ass'ns,*
531 U.S. 457 (2001) ........................................................... 57

*Wyoming v. Oklahoma,*
502 U.S. 437 (1992) ........................................................... 25

**Statutes and Regulations**

5 U.S.C. § 706(2) ............................................................... 25

16 U.S.C. § 808(d)(1) ........................................................ 40

42 U.S.C. § 300gg-111(c)(5)(D) ........................................ 40

42 U.S.C. § 6201 ................................................................. 5

42 U.S.C. § 7507 ............................................................... 17

42 U.S.C. § 7543(a) .......................................................... 17

42 U.S.C. § 7543(b) .......................................................... 17

49 U.S.C. § 32901(a) .......................................................... 7

49 U.S.C. § 32902 ............................................................... 4

49 U.S.C. § 32902(a) ................................................................ 5

49 U.S.C. § 32902(b) ........................................................... 5, 32

49 U.S.C. § 32902(c) .............................................................. 46

49 U.S.C. § 32902(f) ........................................................... 6, 46

49 U.S.C. § 32902(g) .............................................................. 12

*49 U.S.C. § 32902(h)(1) ............................ 2, 6, 8, 27, 28, 41

*49 U.S.C. § 32902(h)(2) ......................... 3, 6, 7, 9, 51, 53

*49 U.S.C. § 32902(h)(3) ................................... 3, 7, 62

49 U.S.C. § 32903(a) .............................................................. 10

49 U.S.C. § 32903(f) .............................................................. 10

49 U.S.C. § 32904 ................................................................. 8, 9

49 U.S.C. § 32905 ............................................... 9, 10, 51, 52

49 U.S.C. § 32909 ................................................................... 4

49 U.S.C. § 32912 ................................................................... 8

49 U.S.C. § 41734(h) ............................................................. 40

Energy Policy and Conservation Act, Pub. L. No. 94-163, 89
    Stat. 871 (1977) ................................................................ 56

Chrysler Corporation Loan Guarantee Act of 1979, Pub. L.
    No. 96-185, 93 Stat. 1324 (Jan. 7, 1980) ............................. 9

Alternative Motor Fuels Act of 1988, Pub. L. No. 100-494,
    102 Stat. 2441 ......................................................... 31, 56

Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat.
    2776 ................................................................................. 31

Carl Levin and Howard P. 'Buck' McKeon National Defense
    Authorization Act for Fiscal Year 2015, Pub. L. No. 113-
    291, 128 Stat. 3292 ...............................................................59

Tex. Tax Code § 202.052(a) ......................................................24

49 C.F.R. § 1.95(a) .....................................................................5

49 C.F.R. § 531.5........................................................................6

77 Fed. Reg. 62,624 (Oct. 15, 2012) ......................53, 54, 57, 58

85 Fed. Reg. 24,174 (Apr. 30, 2020).......................................11

86 Fed. Reg. 43,583 (Aug. 5, 2021) .....................................2, 13

86 Fed. Reg. 74,434 (Dec. 30, 2021) .......................................12

## Legislative Materials

134 Cong. Rec. H8089-02 (1988) ...............................7, 8, 34, 35

H.R. Rep. No. 100-929 (1988) (Conf. Rep.) ........................7, 33

## Other Authorities

*American Heritage Dictionary* (2d ed. 1985) ..........................62

*Black's Law Dictionary* (5th ed. 1979)....................................29

California Air Resources Board, *Framework Agreement on
    Clean Cars* (Aug. 17, 2020) ................................................39

Democratic Nat'l Comm., *The Biden Plan for a Clean Energy
    Revolution and Environmental Justice,*
    https:joebiden.com/climate-plan/# (last visited Nov. 16,
    2022) ......................................................................................1

*Funk & Wagnalls New International Dictionary of the
    English Language* (1984)......................................................29

Tex. Comptroller of Pub. Accts., *Monthly State Revenue
    Watch: General Revenue-Related Funds* (Nov. 2022).........25

*Random House Dictionary of the English Language* (2d ed. 1987) ........................................................................ 29

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .................................... 30

U.S. Dep't of Transp., *Transcript of Secretary Buttigieg Remarks, CAFE Standards Announcement* (Apr. 1, 2022) ............... 13

U.S. EPA, *Electric Vehicle Myths* (Oct. 18, 2022) ................................... 17

# **GLOSSARY**

| | |
|---|---|
| EPA | Environmental Protection Agency |
| EPCA | The Energy Policy and Conservation Act of 1975 |
| NHTSA | National Highway Traffic Safety Administration |

## **INTRODUCTION**

The President has promised to "use the full authority of the executive branch to make progress and significantly reduce emissions" by "developing rigorous new fuel economy standards aimed at ensuring 100% of new sales for light- and medium-duty vehicles will be electrified."[1] But Congress never authorized the Executive Branch to force the electrification of the Nation's vehicle fleet. In fact, Congress specifically prohibited the agency tasked with setting fuel-economy standards, the National Highway Traffic Safety Administration (NHTSA), from even *considering* electric vehicles when setting those standards.

To avoid this express prohibition, the Executive Branch acted in three steps. First, the Environmental Protection Agency (EPA) for the first time acted without NHTSA and issued greenhouse-gas emission standards so strict that automakers must dedicate an increasing percentage of their fleets to electric vehicles. Second, EPA granted California a preemption waiver allowing it (and other States that adopt its standards) to mandate electric vehicles. Last, NHTSA issued its fuel-economy

---

[1] Democratic Nat'l Comm., *The Biden Plan for a Clean Energy Revolution and Environmental Justice*, https:joebiden.com/climate-plan/# (last visited Nov. 16, 2022).

standards, taking into account the electric vehicles that NHTSA claims would exist because of other federal and state requirements. The three rules followed an Executive Order requiring NHTSA and EPA to coordinate with each other, and with California, to achieve a "goal that 50 percent of all new passenger cars and light trucks sold in 2030 be zero-emission vehicles, including battery electric, plug-in hybrid electric, or fuel cell electric vehicles." 86 Fed. Reg. 43,583, 43,583 (Aug. 5, 2021).

Before this Court are challenges to all three rules. In this case, NHTSA violated Congress's express command that NHTSA "may not consider" the fuel economy of electric vehicles in setting fuel-economy standards under the Energy Policy and Conservation Act (EPCA or the Act). 49 U.S.C. § 32902(h)(1). Despite that clear prohibition, NHTSA openly considered electric vehicles—including those the agency predicted would be produced in response to California's and other States' zero-emission-vehicle mandates and EPA's prior greenhouse-gas standards—in deciding the maximum fuel-economy level that automakers can feasibly achieve. Similarly, NHTSA unlawfully considered the enhanced fuel economy of plug-in hybrid vehicles when operated on electricity and the

availability of compliance credits, in direct violation of Congress's express prohibitions on considering these factors. *See id.* § 32902(h)(2)–(3).

The result is that NHTSA's new fuel-economy standards, like EPA's new greenhouse-gas standards, amount to a *de facto* electric-vehicle mandate because they are so stringent that, as a practical matter, automakers will be forced to produce an increasing percentage of electric vehicles to meet the standards. As petitioners have shown in the other cases, the forced electrification of the Nation's vehicle fleet would have vast economic and political significance, triggering the major-questions doctrine. NHTSA must therefore point to clear congressional authorization to effectively mandate electric vehicles, which it cannot do.

Indeed, Congress has not only failed to clearly authorize NHTSA to set fuel-economy standards that effectively mandate electric vehicles; Congress has expressly forbidden NHTSA to do so. The statute's text, structure, and history show that Congress created a limited *incentive* for electric vehicles by allowing manufacturers to use them as a compliance flexibility. To prevent that compliance flexibility from becoming a regulatory *mandate*, Congress prohibited NHTSA from setting fuel-economy standards that assume a certain degree of electric-vehicle penetration in

manufacturers' fleets. In other words, Congress required NHTSA to set fuel-economy standards at the maximum feasible level achievable by a fleet of conventional internal-combustion-engine vehicles, without regard to the production of electric vehicles. NHTSA's rule flouts that plain statutory command and cannot stand.

## JURISDICTIONAL STATEMENT

The agency had jurisdiction under 49 U.S.C. § 32902, which tasks the Secretary of Transportation with setting fuel-economy standards. This Court has jurisdiction under 49 U.S.C. § 32909(a)(1). NHTSA published its "[f]inal rule" on May 2, 2022. JA__[87Fed.Reg.25,710]. Petitioners timely sought review on June 30, 2022, within "59 days after the regulation [was] prescribed." 49 U.S.C. § 32909(b).

## STATEMENT OF ISSUES

Whether NHTSA's new corporate average fuel-economy standards must be vacated because the agency exceeded its statutory authority and acted arbitrarily and capriciously by considering (i) the fuel economy of electric vehicles, (ii) the fuel economy of plug-in hybrid vehicles when operated on electricity, and (iii) the availability of compliance credits, in violation of the express statutory prohibitions in 49 U.S.C. § 32902(h).

## PERTINENT STATUTES

Pertinent statutory provisions are reproduced in the addendum.

## STATEMENT OF THE CASE

### I.    Statutory Background

"In the wake of the 1973–1974 Arab oil embargo," Congress enacted EPCA "with the purpose of enhancing the supply of fossil fuels in the United States through increased production and energy conservation programs." *Ctr. for Auto Safety v. NHTSA*, 793 F.2d 1322, 1324 (D.C. Cir. 1986); *see also* 42 U.S.C. § 6201 (statement of purpose).

The Act requires the Secretary of Transportation to prescribe "average fuel economy standards" for various categories of automobiles. 49 U.S.C. § 32902(a), (b); *see also* 49 C.F.R. § 1.95(a) (delegating authority to NHTSA). "For model years 2021 through 2030," the Act requires that "the average fuel economy required to be attained by each fleet" of automobiles manufactured for domestic sale be "the maximum feasible" standard "for each fleet for that model year." 49 U.S.C. § 32902(b)(2)(B).

The standards are expressed as a "mathematical function" that is "based on 1 or more vehicle attributes related to fuel economy." *Id.* § 32902(b)(3)(A). NHTSA has based its function on one vehicle attribute:

5

the "footprint" of the vehicle. JA__[87Fed.Reg.25,720].[2] Thus, the standards use a formula in which "generally, larger vehicles (*i.e.*, vehicles with larger footprints) will be subject to lower [miles per gallon] targets than smaller vehicles." JA__[87Fed.Reg.25,750]; *see also* 49 C.F.R. § 531.5 (current standards). Because the standards are based on vehicle footprint, they will vary depending on the mix of vehicles manufactured for domestic sale in a given model year.

In determining what level of average fuel economy is the "maximum feasible," there are certain factors NHTSA "shall consider" and other factors NHTSA "may not consider." NHTSA "shall consider": (i) "technological feasibility," (ii) "economic practicability," (iii) "the effect of other motor vehicle standards of the Government on fuel economy," and (iv) "the need of the United States to conserve energy." 49 U.S.C. § 32902(f).

Section 32902(h) sets forth three factors NHTSA is forbidden to consider in setting standards. First, NHTSA "may not consider the fuel economy of dedicated automobiles," *id.* § 32902(h)(1), *i.e.*, automobiles that

_____

[2] "Vehicle footprint is roughly measured as the rectangle that is made by the four points where the vehicle's tires touch the ground." JA__ n.29[87Fed.Reg.25,733.n.29].

operate "only on alternative fuel," *id.* § 32901(a)(8). Among the "alternative fuel[s]" the statute lists is "electricity." *Id.* § 32901(a)(1)(J). Second, NHTSA shall consider "dual fueled automobile[s]," such as plug-in hybrid vehicles, *see id.* § 32901(a)(9), "to be operated only on gasoline or diesel fuel," *id.* § 32902(h)(2), meaning NHTSA may not consider the fuel economy of such vehicles when operated on a different fuel, like electricity. Third, NHTSA "may not consider" the "trading, transferring, or availability of credits" that a manufacturer earns if it exceeds the fuel-economy standard for a given model year. *Id.* § 32902(h)(3).

Congress enacted these rules to protect the incentives it had created for alternative-fuel vehicles. The first version of Section 32902(h) appeared in legislation to "facilitate the development and use of alternative fuels." H.R. Rep. No. 100-929, at 15 (1988) (Conf. Rep.). As one of the House managers explained, Congress worried that "manufacturers taking advantage of the [bill's] incentives" would face "commensurate increases in the [fuel-economy] standard." 134 Cong. Rec. H8089-02, 25124 (1988) (statement of Rep. Dingell). In other words: Congress feared that NHTSA would raise the bar on manufacturers that built alternative-fuel vehicles—"eras[ing]" the bill's "incentives." *Id.* Congress enacted Section

7

32902(h) to prevent that outcome, ensuring that NHTSA would set fuel-economy standards "without regard to the penetration of alternative fuel vehicles in any manufacturer's fleet." *Id.*

Manufacturers that violate NHTSA's fuel-economy standards are "liable to the Government" for civil penalties. 49 U.S.C. § 32912. Because the standards are based on the footprints of the vehicles manufactured for domestic sale, "a manufacturer's compliance is determined by how its average fleet fuel economy compares to the average fuel economy of the targets of the vehicles it manufactures." JA__ n.29 [87Fed.Reg.25,733.n.29]. Although NHTSA sets the standards, the statute charges EPA with calculating manufacturers' fuel economy for compliance purposes. At the end of each model year, EPA calculates a manufacturer's average fuel economy based on the number of vehicles of each model sold and each model's fuel economy. 49 U.S.C. § 32904(a), (c).

Although NHTSA may not consider the fuel economy of electric vehicles in setting standards, *id.* § 32902(h)(1), EPA "shall include" their fuel economy when calculating the average fuel economy achieved by individual manufacturers for compliance purposes, *id.* § 32904(a)(2)(B). EPA does so by giving electric vehicles the "equivalent petroleum based

8

fuel economy values determined by the Secretary of Energy." *Id.* Congress included this provision "as an incentive for the early initiation of industrial engineering development and initial commercialization of electric vehicles." Chrysler Corporation Loan Guarantee Act of 1979, Pub. L. No. 96-185, § 18, 93 Stat. 1324, 1336 (Jan. 7, 1980). And the formula the Department of Energy has adopted "[s]ignificantly increases" electric vehicles' fuel economy for compliance purposes. JA__[87Fed.Reg.25,780]; *see also* JA__[FRIA.p.48] (under the Department of Energy's formula, electric vehicles are deemed to "reduce the energy consumption of the reference vehicle by 80 percent or more" for compliance purposes).

Similarly, although NHTSA must consider dual-fueled vehicles like plug-in hybrids "to be operated only on gas or diesel fuel" when it sets fuel-economy standards, 49 U.S.C. § 32902(h)(2), EPA must include the fuel-savings contributions of the electricity when it calculates the average fuel economy achieved by individual manufacturers. It does so under a statutory formula designed to provide a manufacturing "incentiv[e]" for automobiles that are "capable of operating on electricity in addition to gasoline or diesel." *Id.* § 32905(e)(1), (2). EPA "shall calculate" the fuel economy of electric dual-fueled vehicles as the sum of (i) 50 percent of the

fuel economy that would be achieved if the vehicle were operating on gasoline or diesel fuel, and (ii) 50 percent of the fuel economy that would be attributed to the vehicle if it were operating on electricity. *Id.* §§ 32905(e)(2), 32905(b).[3] As a result, plug-in hybrids are deemed to be second only to electric vehicles as "generally the most effective ways to improve fuel economy." JA__[FRIA.p.47]; *see also id.* (Figure 3-7).

The statute also permits manufacturers to earn "credits" by exceeding the fuel-economy level required in a particular model year. 49 U.S.C. § 32903(a). These credits can be used to offset the amount by which the manufacturer's fleet falls short of the standards in the three model years immediately before or the five model years immediately after the model year in which they were earned. *Id.* Subject to certain limitations, manufacturers can also trade credits. *Id.* § 32903(f); *see also* JA__[87Fed.Reg.25,749] (discussing limitations).

---

[3] If requested, EPA may use an alternative methodology based on the model's percentage utilization of gasoline or diesel fuel versus electricity and its alternative-fuel range. 49 U.S.C. § 32905(e)(1).

10

## II.    Regulatory Background

### A.    NHTSA's 2020 Fuel-Economy Standards

The fuel-economy standards at issue here are amendments of standards that NHTSA set in a 2020 joint rulemaking with EPA, which regulates carbon-dioxide emissions from motor vehicles under the Clean Air Act. *See Massachusetts v. EPA*, 549 U.S. 497, 532 (2007) (recognizing the "overlap" between the agencies' obligations and the need to "avoid inconsistency"). Because "tailpipe [carbon-dioxide] emissions standards are directly and inherently related to fuel economy standards," the agencies traditionally did a joint rulemaking. 85 Fed. Reg. 24,174, 24,182 (Apr. 30, 2020). The 2020 joint rulemaking established "one national program of fuel economy and tailpipe [carbon-dioxide] emission regulation" in which both standards would "increase in stringency at 1.5 percent per year" over model years 2021–2026. *Id.* at 24,175. The fuel-economy standards were "projected to require, on an average industry-fleetwide basis, 40.5 miles per gallon (mpg) in model year 2030." *Id.* at 24,176.

On his first day in office in January 2021, President Biden issued an Executive Order directing NHTSA and EPA to "immediately" review the 2020 rule for consistency with the new administration's "policy commitments," which include "reducing greenhouse gas emissions."

11

JA__[87Fed.Reg.25,730]. Following the President's directive, both agencies moved to increase the stringency of the standards they had set just one year earlier. JA__[86Fed.Reg.49,603]. This time, however, the agencies "decoupled" and conducted separate rulemakings, issuing standards with different rates of increases in model years 2023–2026.

In December 2021, EPA moved first and issued a rule—separately challenged before this Court, *see Texas v. EPA*, No. 22-1031—increasing the stringency of the tailpipe carbon-dioxide emission standards by nearly 10 percent in model year 2023, followed by a 5 percent increase in model year 2024, a 6.6 increase in model year 2025, and a 10 percent increase in model year 2026. 86 Fed. Reg. 74,434, 74,438 (Dec. 30, 2021).

## B.   NHTSA's 2022 Amendments

On May 2, 2022, NHTSA published the fuel-economy standards challenged here. NHTSA's new standards increased the stringency of the 2020 standards by 8 percent per year for model years 2024 and 2025 and by 10 percent for model year 2026. JA__[87Fed.Reg.25,720].[4] NHTSA predicts that these standards will "require an industry fleet-wide average

---

[4] NHTSA could not increase the fuel-economy standards for model year 2023, because its rule was not issued "at least 18 months before the beginning" of that model year, as the Act requires. 49 U.S.C. § 32902(g)(2).

of roughly 49 mpg in [model year] 2026." JA__[87Fed.Reg.25,710]. Under the new standards, NHTSA estimated that automakers would need to produce an increasing percentage of electric vehicles, JA__[87Fed.Reg.25,924], and plug-in hybrids, JA__[87Fed.Reg.25,922].

Secretary of Transportation Pete Buttigieg declared the new standards "a big step, and just one part of an all-of-the-above strategy" designed to "accelerate our path to cleaner energy and electric vehicles."[5] *See also* 86 Fed. Reg. at 43,583 (August 2021 Executive Order setting a 50%-by-2030 electric-vehicle goal and directing the Secretary of Transportation to set future fuel-economy standards accordingly).

## C.    NHTSA's Consideration Of The Fuel Economy Of Electric Vehicles And Plug-in Hybrids

NHTSA determined that its new standards are the "maximum feasible," JA__[87Fed.Reg.25,743], based on the agency's "analysis of potential impacts of the regulatory alternatives" it considered, JA__[87Fed.Reg.25,745]. NHTSA used the "CAFE Compliance and Effects Modeling System" to do that analysis. JA__[TSD.p.30];

---

[5] U.S. Dep't of Transp., *Transcript of Buttigieg Remarks, CAFE Standards Announcement* (Apr. 1, 2022), https://www.transportation.gov/briefing-room/transcript-secretary-buttigieg-remarks-cafe-standards-announcement.

JA__[87Fed.Reg.25,735].[6] The model "first estimates how vehicle manu-facturers might respond to a given regulatory scenario." JA__–__[TSD.pp.30–31]. Then, "the system estimates what impact that re-sponse will have on fuel consumption, emissions, and economic external-ities." JA__[TSD.p.31]. NHTSA used the model to analyze a "no-action alternative," and four "action alternatives," and it set standards based on the analysis of those alternatives.

By NHTSA's own admission, each alternative—including the no-action alternative that it relied on to set the standards—assumed that at least 4–5 percent of the vehicles in manufacturers' fleets for model years 2024–2026 would be electric vehicles, JA[87.Fed.Reg.25,924] (Table V-36), and at least 1 percent would be plug-in hybrids, JA[87.Fed.Reg.25,922] (Table V-30). Here is how NHTSA included those vehicles in its modeling and considered them in its analysis.

NHTSA began by modeling a projected "baseline" scenario in which there would be no change to the fuel-economy standards. To model the

---

[6] "CAFE" stands for corporate average fuel economy. "Welcome to—and apologies for—the acronymic world" of fuel-economy regulation. *Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158, 161 n.2 (D.C. Cir. 2021) (citation omitted).

no-action baseline, NHTSA started with detailed information about each vehicle model produced by every manufacturer during model year 2020. JA__[87Fed.Reg.25,756]. Although electric vehicles were not common in 2020, there were some "battery electric vehicles" and "plug-in hybrid electric vehicles" in the 2020 fleet, and NHTSA included them in the analysis. JA__[87Fed.Reg.25,811] (Table III-17).[7] NHTSA also compiled a list of over 50 technologies—including electric vehicles and plug-in hybrids— that manufacturers could use to improve the fuel economy of their vehicles. JA__–__[87Fed.Reg.25,756–59] (Table III-1). Using these data, NHTSA ran the model to project how the vehicle fleet would change in subsequent model years as manufacturers added fuel-saving technologies (including electric vehicles and plug-in hybrids) in response to economic factors and regulatory requirements that would exist even if NHTSA took no action. JA__[87Fed.Reg.25,756].

---

[7] "Battery electric vehicles" have "all-electric drive systems" powered by "batteries charged primarily by electricity from the grid." JA__[87Fed.Reg.25,810]. "Plug-in hybrid electric vehicles" can be powered by an internal-combustion engine and/or by batteries that can be charged "from an outside source of electricity." JA__[87Fed.Reg.25,809].

To project how manufacturers would respond to economic factors in model years 2021–2029, the model was programmed to add fuel-saving technology that is "cost effective," which NHTSA defined as technology that "pays for itself in fuel savings within a 'payback period'" of 30 months. JA__ n.89[87Fed.Reg.25,755.n.89].

To project how manufacturers would respond to regulatory factors that would exist even if NHTSA took no action, the model was programmed to add technology (including electric vehicles) that manufacturers would add to the vehicles in their 2020 fleet to comply with three categories of federal and state requirements:

- the 1.5 percent annual increase in the federal fuel-economy and emission standards set in the 2020 rule, JA__ & n.16[FRIA.p.22.&n.16];

- "the Framework Agreements between California and BMW, Ford, Honda, [Volkswagen of America], and Volvo," JA__[87Fed.Reg.25,744], in which those manufacturers contractually committed to "greater rates of electrification" than required by the 2020 rule, JA__[87Fed.Reg.25,747]; and

- the more stringent standards imposed by California's so-called "zero-emission-vehicle"[8] program and adopted by a number of other

---

[8] This term is a misnomer. The energy that powers "zero-emission" vehicles creates greenhouse gases and, as EPA has admitted, "making a typical [electric vehicle] can create more carbon pollution than making a gasoline car" due to "the additional energy required" to manufacture the

States, often called "Section 177 states, in reference to Section 177 of the Clean Air Act." JA__[87Fed.Reg.25,762]; JA__[87Fed.Reg.25,747]; JA__[TSD.p.124].[9]

NHTSA accounted for the state zero-emission-vehicle mandates by instructing the model to "conver[t]" traditional vehicles in the 2020 fleet "into battery-electric vehicles … at the first redesign opportunity" to achieve compliance with the state mandates in subsequent model years. JA__–__[87Fed.Reg.25,762–65]; JA__–__[TSD.pp.124–25].

Consequently, NHTSA's no-action alternative was a projected "baseline" fleet in which 4–5 percent of the vehicles in model years 2024–2026 were electric vehicles—more than double the 2 percent in the actual

---

battery. U.S. EPA, *Electric Vehicle Myths* (Oct. 18, 2022), https://www.epa.gov/greenvehicles/electric-vehicle-myths.

[9] The Clean Air Act contains a preemption provision, 42 U.S.C. § 7543(a), that "prohibits states from adopting their own vehicle emissions standards." *California v. EPA*, 940 F.3d 1342, 1345 (D.C. Cir. 2019). However, Section 209(b) of the Act allows EPA to "waive application of" the express preemption provision for California if, among other things, California "need[s] such State standards to meet compelling and extraordinary conditions." 42 U.S.C. § 7543(b). Section 177 allows other States to "adopt and enforce" such California standards. *Id.* § 7507. As shown in another action pending before this Court, Section 209(b) does not authorize EPA to grant a waiver for emission standards—including zero-emission-vehicle mandates like California's—that attempt to address global climate change. *See Ohio v. EPA*, No. 22-1081. NHTSA nevertheless included these preempted standards in its modeling analysis.

17

fleet in model year 2020. JA__[87Fed.Reg.25,924] (Table V-36).[10] An additional 1 percent of the vehicles in the projected baseline fleet were plug-in hybrids. JA__[87Fed.Reg.25,922] (Table V-30). The model did not treat plug-in hybrids as if they operate on only gas or diesel fuel. Instead, it gave plug-in hybrids the enhanced fuel economy attributed to electric dual-fueled vehicles under Section 32905(e). JA__–__[FRIA.pp.47–48].

Having generated this projected baseline of the fleet for model years 2021–2029, NHTSA then ran the model under four alternative scenarios to estimate whether and how manufacturers could add *additional* electric vehicles and other fuel-saving technology to comply with the stricter fuel-economy standards for model years 2024–2026 that NHTSA considered in this rulemaking. JA__[TSD.p.67]; *see also* JA__[87Fed.Reg.25,896] (Table IV-1). When modeling the action alternatives, NHTSA prohibited the model from adding electric vehicles only in model years 2024, 2025, and 2026—the model years for which NHTSA was setting new standards. JA__[TSD.p.42]. But NHTSA did not remove electric vehicles from the baseline as Section 32902(h)(1) requires, and those baseline electric

---

[10] NHTSA referred to the baseline no-action alternative as "Alternative 0." JA__n.14[87Fed.Reg.25,725.n.14].

vehicles were "included in each of the Action Alternatives," including the one NHTSA selected as the final standards. JA__[TSD.p.67].

Moreover, although NHTSA was setting standards only for model years 2024–2026, its analysis extended beyond those model years to consider how the fleet would change in each model year between 2020 and 2029 if NHTSA adopted the action alternatives under consideration. Thus, the model was permitted to introduce *additional* electric vehicles (beyond those in the baseline) that manufacturers would produce "in response to" NHTSA's amended standards before and after model years 2024–2026. JA__[87Fed.Reg.25,780]; *see also* JA__[87Fed.Reg.25,922]. These included electric vehicles that manufacturers would introduce in model year 2023 as "multi-year planning" to comply with more stringent standards in model years 2024–2026, JA__[87Fed.Reg.25,916], and electric vehicles that would be introduced as late as model year 2029 as manufacturers take "a few additional years" to "produce fleets fully responsive" to model year 2026 standards, JA__[87Fed.Reg.25,725]).

As a result, NHTSA's preferred alternative—which it adopted as the final standards—is based on modeling that assumes electric vehicles will comprise 5 percent of the fleet in model years 2023–2024, 6 percent

in model years 2025–2028, and 7 percent in model year 2029. JA__[87Fed.Reg.25,924] (Table V-36).

### D.    NHTSA's Consideration Of The Availability Of Credits

NHTSA also programmed the model to simulate how manufacturers could use credits carried forward from prior model years or transferred from other fleets to comply with the fuel-economy standards. JA__[87Fed.Reg.25,749].[11] As with electric vehicles, NHTSA prohibited the model from using credits "only [in] those model years for which NHTSA [proposed] finalizing new standards" in this rulemaking—*i.e.*, in model years 2024–2026. JA__[87Fed.Reg.25,747]. For all other model years between 2021 and 2029, if "a manufacturer needs to cover a shortfall that occurs when insufficient opportunities exist to add technology to achieve compliance with a standard, the model will apply credits. Otherwise, the manufacturer carries forward credits until they are about to expire, at which point it will use them before adding technology that is not considered cost-effective." JA__[87Fed.Reg.25,779].

---

[11] The model "does not explicitly simulate the potential that manufacturers would carry CAFE or CO2 credits back (*i.e.,* borrow) from future model years, or acquire and use CAFE compliance credits from other manufacturers." JA__ n.58[87Fed.Reg.25,749.n.58].

## SUMMARY OF ARGUMENT

NHTSA lacks statutory authority to set fuel-economy standards that effectively mandate electric vehicles. The forced electrification of the Nation's vehicle fleet is a "major question" requiring clear congressional authorization. And not only is there no clear congressional authorization for NHTSA's rule, the agency violated the express restrictions Congress imposed on NHTSA's standard-setting authority in Section 32902(h) to prevent the agency from effectively mandating electric vehicles. NHTSA's rule clearly violates all three subsections of Section 32902(h).

*First*, NHTSA violated Section 32902(h)(1), which expressly bars NHTSA from considering the fuel economy of electric vehicles. Despite that plain statutory prohibition, NHTSA considered the fuel economy of the electric vehicles that it predicted would be produced in response to factors other than the 2024–2026 fuel-economy standards—such as state zero-emission-vehicle mandates—as well as the electric vehicles NHTSA predicted would be produced in response to its new fuel-economy stand-ards before and after the model years at issue. Congress, however, did not exempt these categories of electric vehicles from the statute's unqual-ified bar. Rather, to ensure that electric vehicles would remain a

21

compliance flexibility, and not become a regulatory mandate, Congress forbade the agency from setting standards based on an assumed penetration of electric vehicles in automakers' fleets. That is *precisely* what NHTSA did in this rule, in pursuit of its extrastatutory goal to electrify the Nation's vehicle fleet. But NHTSA is not free to read qualifications or exceptions into Section 32902(h)(1) to suit its policy preferences.

*Second*, NHTSA violated Section 32902(h)(2), which expressly requires NHTSA to consider dual-fueled vehicles, like plug-in hybrids, to be operated only on gasoline or diesel fuel. NHTSA instead considered the enhanced fuel economy of plug-in hybrids when operated on electricity, reasoning that Section 32902(h)(2) is "moot" because the original statutory incentive for dual-fueled vehicles expired after model year 2019. But Section 32902(h)(2) remains in full force and effect. Its text contains no time limit nor any other indication that Congress intended it to sunset. Regardless, Congress created a new incentive for plug-in hybrids in 2014, vitiating NHTSA's "mootness" rationale.

*Third*, NHTSA violated Section 32902(h)(3), which forbids NHTSA to consider the availability of compliance credits in setting standards. Here again, NHTSA improperly read qualifications into the unqualified

statutory text by construing the statute to permit consideration of the availability of compliance credits in model years other than 2024–2026. And that, in turn, made compliance with the amended standards appear more feasible because NHTSA's model used credits to comply with fuel-economy standards in model years other than 2024–2026.

Each of these violations independently requires vacatur. NHTSA never claimed, let alone demonstrated, that it would or could have reached the same determination as to the maximum feasible fuel-economy level had it complied with Section 32902(h). The rule must therefore be vacated and remanded for a new determination consistent with the limitations Section 32902(h) imposes on NHTSA's decisionmaking.

## STANDING

Petitioner American Fuel & Petrochemical Manufacturers has associational standing to challenge NHTSA's regulation. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977). Petitioner is a trade association whose members produce or sell liquid fuels and the raw materials used to make them. By design, NHTSA's fuel-economy standards "will reduce domestic consumption of gasoline, producing a corresponding decrease in the Nation's demand for crude petroleum."

JA__[87Fed.Reg.25,884]; *see also* JA__[87Fed.Reg.26,068] ("[T]he final standards will save approximately 234 billion gallons of gasoline through 2050."). As explained in the accompanying declarations, depressing liquid-fuel demand injures the association's members financially. That is Article III injury-in-fact, caused by the challenged regulation and redressable by vacatur of the rule. *See, e.g., Am. Fuel & Petrochemical Mfrs. v. EPA,* 3 F.4th 373, 379–80 (D.C. Cir. 2021), *cert. denied sub nom. Growth Energy v. Am. Fuel & Petrochemical Mfrs.*, 142 S. Ct. 759 (2022). The association's members thus have standing in their own right. Further, the interests that the association seeks to protect are germane to its organizational purposes, which include safeguarding the viability of its members' businesses. And neither the claims asserted nor the relief requested requires the participation of individual members.

The State petitioners have standing for two reasons. First, NHTSA's regulation will injure the States financially by harming industries on which they rely for tax revenue. That is a "'pocketbook' injury that is incurred by the state itself." *Air All. Hous. v. EPA*, 906 F.3d 1049, 1059–60 (D.C. Cir. 2018). Consider Texas—the nation's top oil producer. Oil produced in Texas is taxed at 4.6 percent of its market value. *See* Tex.

24

Tax Code § 202.052(a). In fiscal years 2017–2021, this yielded over $16 billion in revenue. *See* Tex. Comptroller of Pub. Accts., *Monthly State Revenue Watch: General Revenue-Related Funds* (Nov. 2022), https://bit.ly/3ROvMil. NHTSA's rule "will result in significant reductions of the consumption of petroleum," JA__[87Fed.Reg.26,068], which injures Texas, *see Wyoming v. Oklahoma*, 502 U.S. 437, 448–49 (1992). Second, the States have standing to protect their quasi-sovereign interest in managing their electric grids. NHTSA's fuel-economy standards force an "increase [in] electricity consumption (as the percentage of electric vehicles increases over time)." JA__[87Fed.Reg.25,736]. The States have standing to challenge the rule to prevent this imminent strain to their electric grids and associated harms. *See, e.g., Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983).

## STANDARD OF REVIEW

This Court "shall hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(A), (C).

## ARGUMENT

NHTSA's new corporate average fuel-economy rule is part and parcel of a coordinated strategy by this administration to phase out conventional internal-combustion-engine vehicles and replace them with electric vehicles. As petitioners have shown in the cases challenging the other two prongs of this strategy, the effort to mandate electrification of the Nation's vehicle fleet raises issues of "vast economic and political significance" and therefore requires "clear congressional authorization." *West Virginia v. EPA*, 142 S. Ct. 2587, 2605, 2609 (2022); *see* Initial Br. for Private Petitioners at 22–37, *Texas v. EPA* (D.C. Cir. Nov. 3, 2022) (No. 22-1031). Here, as in those cases, there is no clear congressional authorization, and for that reason alone NHTSA's rule must be set aside.

But the problem with NHTSA's rule goes well beyond the lack of clear congressional authority. Congress expressly *prohibited* NHTSA from considering the fuel economy of electric vehicles in setting fuel-economy standards. And it did so precisely in order to ensure that electric vehicles remain the compliance flexibility that Congress intended them to be—and do not become a regulatory mandate. Yet, in service of its electrification goal, NHTSA concededly considered the fuel economy of

electric vehicles and in so doing violated Section 32902(h)(1). Along the way, the agency also violated the similar prohibitions in Sections 32902(h)(2) and (3) by considering the enhanced fuel economy of plug-in hybrids when operated on electricity and the availability of compliance credits in its standard-setting analysis.

These patent violations of the express restrictions Congress imposed on NHTSA cannot be dismissed as harmless. As described below, NHTSA's reliance on these prohibited factors made compliance with the stringent new standards appear more technologically feasible and economically practicable than it actually is. The rule must be set aside.

## I.  NHTSA Improperly Considered The Fuel Economy Of Electric Vehicles.

### A.  The Act unambiguously bars NHTSA from considering the fuel economy of electric vehicles for any purpose.

The Act forbids NHTSA to "consider" the fuel economy of electric vehicles when it sets fuel-economy standards. 49 U.S.C. § 32902(h)(1). The agency admits as much—acknowledging "Congress' direction" not to "consider the fuel economy of electric vehicles." JA__[87Fed.Reg.25,721]. But NHTSA seeks to evade this statutory prohibition by introducing extratextual exceptions to its reach. Specifically, the agency "interprets 32902(h)" as allowing NHTSA to consider electric vehicles (i) "in the

27

analytical baseline"—*i.e.*, the vehicles that NHTSA predicts would be produced in response to economic factors or other federal or state regulatory requirements regardless of its rule, or (ii) produced "in model years outside the rulemaking time frame." JA__[87Fed.Reg.25,995]. This reading conflicts with the unambiguous statutory text and would defeat Congress's intent to ensure that electric vehicles remain an option for compliance flexibility and do not become a regulatory mandate.

1.    "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004). That principle is dispositive here.

Section 32902(h)(1)'s text is plain: it provides that in "carrying out" the responsibility to set fuel-economy standards, NHTSA "may not consider" the fuel economy of electric vehicles. 49 U.S.C. § 32902(h)(1). The Act does not define *consider*, so that word must be "interpreted as taking [its] ordinary, contemporary, common meaning at the time Congress enacted the statute." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 45 F.4th 306, 315 n.3 (D.C. Cir. 2022). In 1988, as today, to *consider* meant to "take into account." *American Heritage Dictionary* 313 (2d

28

ed. 1985); *see also Random House Dictionary of the English Language* 434 (2d ed. 1987) ("to think carefully about, esp. in order to make a decision"); *Funk & Wagnalls New International Dictionary of the English Language* 287 (1984) (to "make allowance for"); *Black's Law Dictionary* 306 (6th ed. 1990) (to "give heed to"). So Section 32902(h)(1) bars NHTSA from taking into account electric vehicles' fuel economy in setting standards.

The statutory directive includes no qualifications or carveouts. Instead, Congress used mandatory language: "may not consider." *See United States v. Palomar-Santiago*, 141 S. Ct. 1615, 1620–21 (2021) ("may not" is "mandatory language"). Such language "indicates a command that admits of no discretion on the part of the person instructed to carry out the directive." *Ass'n of Civilian Technicians, Mont. Air Chapter No. 29 v. FLRA*, 22 F.3d 1150, 1153 (D.C. Cir. 1994). In other words, Congress forbade NHTSA to account for the fuel economy of *any* electric vehicle, from *any* model year, for *any* purpose when setting fuel-economy standards. No exceptions—full stop. *See Freytag v. Comm'r*, 501 U.S. 868, 874 (1991) ("[C]ourts 'are not at liberty to create an exception where Congress has declined to do so.'" (quoting *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 27 (1989))).

NHTSA's contrary reading improperly adds words to the statute that distort its meaning. In effect, NHTSA reads Section 32902(h)(1) as if it provided that NHTSA "may not consider" the fuel economy of electric vehicles *unless* the electric vehicles are not produced solely to comply with NHTSA's standards in the model years at issue in the rulemaking. That is, NHTSA believes that it *may* consider the fuel economy of *some* electric vehicles, so long as its standards are not forcing the manufacture of those vehicles in the model years covered by its rule.

But "[t]he subsection's text contains no limiting term that restricts its reach" in this way. *Id.* at 873–84. And NHTSA is not free to "supply words … that have been omitted." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012); *see Bates v. United States*, 522 U.S. 23, 29 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face."). "By introducing a limitation not found in the statute," NHTSA "alter[s], rather than … interpret[s]" Section 32902(h)(1). *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020).

**2.** What plain language provides, context confirms. Here, neighboring provisions of the Act contain express exceptions, indicating that

Congress knew how to build exceptions into the statutory scheme and that the absence of any exception in Section 32902(h)(1) was intentional.

First, the legislation that created the initial version of Section 32902(h)(1),[12] required that the "maximum number practicable" of government-owned vehicles run on "alternative fuels." Pub. L. No. 100-494, sec. 4(a), § 400AA(a)(2), 102 Stat. 2441, 2442 (codified at 42 U.S.C. § 6374(a)(2)). In assessing practicability, the "initial cost" of alternative-fuel vehicles "shall not be considered"—"*unless* the initial cost of such vehicle exceeds the initial cost of a comparable gasoline or diesel fueled vehicle by at least 5 percent." *Id.* (emphasis added). There is no similar exception to Section 32902(h)(1)'s command that NHTSA "may not consider" the fuel-economy of electric vehicles. *See Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 948 (D.C. Cir. 2008) ("Congress's

---

[12] The earliest version of Section 32902(h)(1) ordered NHTSA not to "consider the fuel economy of alcohol … or natural gas powered automobiles." Alternative Motor Fuels Act of 1988, Pub. L. No. 100-494, sec. 6(a), § 513(g)(2)(B), 102 Stat. 2441, 2450. Four years later, Congress replaced the reference to alcohol and natural gas with the broader term "dedicated" automobiles, Energy Policy Act of 1992, Pub. L. No. 102-486, § 403(5)(G)(ii)(II), 106 Stat. 2776, 2878, which it defined to include electric vehicles, *id.* § 403(5)(H)(ii), 106 Stat. at 2878.

inclusion of a provision in one section strengthens the inference that its omission from a closely related section must have been intentional.").

Second, other provisions of Section 32902 demonstrably undercut NHTSA's extratextual "constrain[t]" on the consideration of electric vehicles in "only those model years for which NHTSA is proposing or finalizing new standards." JA__[87Fed.Reg.25,747]. Specifically, Congress established different rules for standards in different model years. *See, e.g.*, 49 U.S.C. § 32902(b)(2) (different standards for "model years 2011 through 2020" versus "model years 2021 through 2030"). Congress clearly knew how to distinguish among model years, and it could have included similar language in Section 32902(h)(1) had it wanted to authorize NHTSA to deviate from the clear prohibition on considering electric vehicles in the way the agency has done here. This Court should "not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply," especially "when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama v. ICE*, 543 U.S. 335, 341 (2005).

**3.**    "Because the text is sufficiently clear," this Court "need not consider the legislative history." *Mexichem Fluor, Inc. v. EPA*, 866 F.3d

451, 459 (D.C. Cir. 2017). But that history "strongly supports" the conclusion that the statutory text means what it says, *id.*—that Congress forbade NHTSA to consider the fuel economy of any electric vehicles for any purpose in its standard-setting analysis. Congress enacted this prohibition to ensure that manufacturers have the flexibility to make electric vehicles—and to receive credits for the fuel economy the vehicles contribute to the average fuel economy of the fleet—but are not effectively required to produce electric vehicles to meet NHTSA's standards.

Congress enacted the initial version of Section 32902(h) in a bill to "facilitate the development and use of alternative fuels." H.R. Rep. No. 100-929, at 15 (1988). According to Chairman Dingell of the House Energy and Commerce Committee—one of the bill's managers—Congress added the provision:

> to ensure that the incentives provided by this bill are not erased by the Secretary's setting the CAFE standard for cars or trucks at a level that assumes a certain penetration of alternative fueled vehicles. The conferees are aware that the statute requires CAFE standards to be set at the "maximum feasible" level …. It is intended that this examination will be conducted without regard to the penetration of alternative fuel vehicles in any manufacturer's fleet, in order to ensure that manufacturers taking advantage of the incentives offered by this bill do not then find [NHTSA] including those

33

> incentive increases in the manufacturer's "maxi-
> mum fuel economy capability." This, of course,
> would wipe out the benefits associated with the in-
> creases if it resulted in commensurate increases in
> the CAFE standard.

134 Cong. Rec. H8089-02, 25124 (1988).

NHTSA has itself acknowledged the force of this reasoning. It ad-

mits that if it presumes manufacturers will use statutory credits or "flex-

ibilities" to comply with the fuel-economy standards, then "compliance

with higher standards would appear more cost effective and, potentially,

more feasible, which would thus effectively require manufacturers to use

those flexibilities if NHTSA determined that standards should be more

stringent." JA__[87Fed.Reg.25,994]. "By keeping NHTSA from including

them in our stringency determination, [Section 32902(h)] ensures that

those statutory credits remain true compliance flexibilities." *Id.*

An agency "does not have the power to adopt a policy that directly

conflicts with its governing statute." *Maislin Indus., U.S., Inc. v. Primary*

*Steel, Inc.*, 497 U.S. 116, 134–35 (1990). Yet NHTSA's reading does just

that. By interpreting Section 32902(h)(1) to allow consideration of electric

vehicles' fuel economy in the "analytical baseline" and in "model years

outside the rulemaking time frame," JA__[87Fed.Reg.25,995], NHTSA

34

effectively "assumes a certain penetration" of electric vehicles, which "result[s] in commensurate increases in the CAFE standard," 134 Cong. Rec. H8089-02, 25124 (1988). NHTSA's reading thus "effectively negates the congressional compromise that was ultimately embodied in the statutory text." *White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1264 (D.C. Cir. 2014) (Kavanaugh, J., dissenting), *rev'd sub nom. Michigan v. EPA*, 576 U.S. 743 (2015).

## B.    NHTSA considered the fuel economy of electric vehicles when it set the 2024–2026 standards.

NHTSA violated Section 32902(h)(1) because it considered the fuel economy of electric vehicles in determining the maximum feasible fuel-economy that manufacturers can achieve in model years 2024–2026. NHTSA did so in two ways—(i) by including electric vehicles in the "analytical baseline," *i.e.*, the world NHTSA projected would exist in the no-action scenario, and (ii) by considering electric vehicles that would be produced in response to NHTSA's rule in years other than 2024–2026.

1.    As explained above, the fuel-economy standards NHTSA set in this rule are based on a projected baseline fleet in which 4–5 percent of the vehicles are electric vehicles that NHTSA predicted automakers would produce even if NHTSA did not impose more stringent fuel-

35

economy standards in model years 2024–2026. Specifically, NHTSA's baseline fleet projections accounted for the fuel economy of:

- Electric vehicles that were in the fleet in 2020, and any additional electric vehicles that NHTSA predicted would be produced in subsequent model years in response to consumer demand;

- Electric vehicles that NHTSA predicted would be produced in subsequent model years to comply with the 1.5 percent annual increase in the federal fuel-economy and emission standards set by NHTSA and EPA in the 2020 joint rulemaking;

- Electric vehicles that NHTSA predicted would be produced to comply with the California Framework Agreements in which BMW, Ford, Honda, Volkswagen, and Volvo committed to produce more electric vehicles than were required under the 2020 rule; and

- Electric vehicles that NHTSA predicted would be produced to comply with state zero-emission-vehicle mandates enacted by California and the Section 177 States.

*See supra* pp.15–17. In each case, NHTSA violated section 32902(h)(1)'s unambiguous command not to "consider the fuel economy" of electric vehicles when setting fuel-economy standards.

**2.**    NHTSA also violated section 32902(h)(1) by considering the fuel economy of electric vehicles that manufacturers would introduce to comply with the more stringent standards imposed in this rulemaking—so long as the additional electric vehicles were added before model year 2024 or after model year 2026. *See supra* p.19; JA__ n.107[FRIA.p.152.n.107]. NHTSA admits that accounting for these

36

electric vehicles, and "for shifts in fleet mix," its new fuel-economy standards will result in *"increased production of [electric vehicles] through [model year] 2029."* JA__[87Fed.Reg.25,922] (emphasis added); *see also* JA__[87Fed.Reg.25,924] (Table V-36, showing that under Alternative 2.5 (NHTSA's chosen standard) electric vehicles will comprise 7 percent of the fleet in model year 2029). As with NHTSA's baseline analysis, accounting for the fuel economy of model year 2023 and 2027–2029 electric vehicles flouts Congress's clear command in Section 32902(h)(1).

### C. NHTSA's purported justifications for considering the fuel economy of electric vehicles fail.

NHTSA offered two purported justifications for considering the fuel economy of electric vehicles. Each stalls.

**1.** NHTSA chiefly argued that it must consider electric vehicles because they "exis[t] in the world." JA__[87Fed.Reg.25,970]. Accounting for their fuel economy merely "acknowledges this reality," which would exist "whether or not NHTSA increased the stringency of [its fuel-economy] standards." JA__[87Fed.Reg.25,899]. And "OMB Circular A-4"—a regulatory guidance document that does not distinguish among specific agencies—requires that agencies "develop analytical baselines that are as accurate as possible regarding the state of the world in the absence of

37

the regulatory action being evaluated." JA__[87Fed.Reg.25,744]. This argument is wrong from beginning to end.

To begin with, it ignores that NHTSA did not consider *only* the fuel economy of electric vehicles in the "analytical baseline" that supposedly reflects the "reality" that would exist regardless of whether NHTSA increased the standards. That is unlawful on its own—but NHTSA *also* included in the model the fuel economy of *additional* electric vehicles that manufacturers would introduce in model years 2023 and 2026–2029 in response to the more stringent standards imposed in this rulemaking. *See supra* p.19. In fact, NHTSA said it analyzed the standards' impact through model year 2029 precisely because "it may take manufacturers a few additional years" to "produce fleets fully responsive to the final [model year] 2026 standards." JA__[87Fed.Reg.25,725].[13] NHTSA then justified its new standards based on the benefits they would generate

---

[13] NHTSA's modeling shows that manufacturers cannot feasibly meet the standards in model year 2026. It estimates that the industry will not achieve compliance with model year 2026 standards until model year 2027. *Compare* JA__[87Fed.Reg.25,916] (Table V-6) (new standards will require an estimated 49.1 miles per gallon in model year 2026), *with* JA__[87Fed.Reg.25,918] (Table V-12) (the fleet will achieve an estimated average fuel economy of 48.4 miles per gallon in model year 2026).

38

"over the lifetime" of the fleet of model year *"2029* vehicles," JA__[87Fed.Reg.25,724] (emphasis added)—a fleet that was projected to include *more* electric vehicles than those in the "analytical baseline." *See* JA__[87Fed.Reg.25,924] (Table V-36).

NHTSA's argument also ignores that the "analytical baseline" does not reflect "reality" for all manufacturers. Some manufacturers produced no electric vehicles in model year 2020. *See, e.g.*, JA__ n.120[87Fed.Reg.25,765.n.120] (citing a manufacturer that, at the time of the rulemaking, had never produced any electric vehicles). A baseline that includes the electric vehicles of manufacturers that chose to use them as a compliance mechanism or to cater to a particular type of consumer does not reflect the "reality" of manufacturers that chose different compliance options and focused on different market segments.

Likewise, only five manufacturers signed onto the California Framework Agreements and committed to "individual production plans to substantially electrify their respective fleets." California Air Resources Board, *Framework Agreement on Clean Cars* (Aug. 17, 2020), https://ww2.arb.ca.gov/news/framework-agreements-clean-cars; *see* JA__ n.52 [87Fed.Reg.25,747.n.52] (referring readers to this website). Yet

NHTSA included those electric vehicles in the baseline fleet it used to calculate the standards for all manufacturers. A baseline that includes electric vehicles produced by those five manufacturers does not reflect the "reality" of the rest of the industry.

In all events—to state the obvious—an Office of Management and Budget Circular cannot trump a statute. Whenever Congress directs an agency not to consider a certain factor, it is presumably requiring the agency to exclude an aspect of "reality" from its analysis—if the factor were not "real," there would be no need to direct the agency to disregard it. Congress may have good reasons for deciding that a factor that is "real" nevertheless is not *relevant* to the task at hand. *See*, *e.g.*, 49 U.S.C. § 41734(h) (directing Secretary of Transportation to determine "basic essential air service" without considering "slot availability" at high-density airports); 42 U.S.C. § 300gg-111(c)(5)(D) (directing arbitrators not to consider certain prices in determining reimbursement rates for healthcare services); 16 U.S.C. § 808(d)(1) (directing the Federal Energy Regulatory Commission not to consider adequacy of transmission facilities).

That is precisely what Congress did here when, to protect the incentives it created, *see supra* pp.7–8, Congress decided that NHTSA "may

40

not consider the fuel economy of dedicated automobiles." 49 U.S.C. § 32902(h)(1). It in no way defies "reality" to require NHTSA to continue setting fuel-economy standards based on what is achievable for internal-combustion-engine vehicles, while creating incentives for alternative-fuel vehicles. NHTSA may not like that policy choice, but it "may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). And while some have advocated amending the statute to eliminate this limitation,[14] Congress has not seen fit to do so. "The place to make new legislation, or address unwanted consequences of old legislation, lies in Congress." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1753 (2020). So "until Congress changes the statute, the agency and the courts must abide by it." *Sw. Bell Corp. v. FCC*, 43 F.3d 1515, 1524 (D.C. Cir. 1995).

    **2.** NHTSA also invoked the canon against absurdity. Section 32902(h)(1) cannot mean what it says (ventures NHTSA) because "it would be an absurd result to build a fictional baseline that pretended as

---

[14] *See* JA__[87Fed.Reg.25,994] (noting "that one of the recommendations in the 2021 [National Academy of Sciences] Report was for Congress to 'amend the statute to delete the prohibition on considering the fuel economy of dedicated alternative fueled vehicles'") (citation omitted).

41

though" electric vehicles "were not real." JA__[87Fed.Reg.24,899]. But NHTSA's absurdity argument is just a dressed-up policy argument: the agency thinks it unreasonable that the statutory text should control the "conversation about the future of the U.S. light-duty vehicle fleet, and for that matter, because of the nexus to climate change, the future of the planet and its inhabitants." JA__[87Fed.Reg.26,008].

In all events, the absurdity canon applies only in exceedingly rare circumstances. "[C]ourts may not use the absurdity canon to set aside plain text unless 'the absurdity and injustice of applying the provision to the cas[e] would be so monstrous that all mankind would, without hesitation, unite in rejecting the application.'" *United States v. Long*, 997 F.3d 342, 356 (D.C. Cir. 2021) (quoting *Pirie v. Chi. Title & Tr. Co.*, 182 U.S. 438, 452 (1901)). That is not the case here. As explained, Section 32902(h)(1) reflects a congressional judgment that the Act should give manufacturers the flexibility and incentive to produce alternative-fuel vehicles, but should not impose a *de facto* mandate by setting standards that presume that manufacturers will produce those vehicles. That judgment was "hardly irrational." *See Landstar Express Am. v. Fed. Mar. Comm'n*, 569 F.3d 493, 499 (D.C. Cir. 2009) (Kavanaugh, J.). NHTSA

42

may prefer a different policy that allows it to pursue its electrification goal. But "[i]f policy considerations suggest that the current scheme should be altered, Congress must be the one to do it." *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 778 (2020).

**3.** In addition to protecting Congress's incentives, Section 32902(h)(1) also prevents NHTSA from seizing authority over a major policy issue that Congress has not given it. NHTSA appears to have adopted its unduly narrow interpretation of Section 32902(h)(1) because "preventing NHTSA from assuming use of dedicated alternative fuel vehicles for compliance makes it more difficult for the CAFE program to facilitate a complete transition of the U.S. light-duty fleet to full electrification." JA__[87Fed.Reg.25,994]. The "complete transition" to electric vehicles that NHTSA is trying to facilitate would clearly have "vast economic and political significance" and would dramatically affect the Nation's jobs, energy grid, and national security. *West Virginia*, 142 S. Ct. at 2605. It thus requires "clear congressional authorization." *Id.* at 2609. But Congress has never sanctioned—let alone clearly—such a "transition" or authorized any federal agency to facilitate it. As petitioners have shown elsewhere, Congress has not authorized EPA to mandate electric

43

vehicles, *see Texas v. EPA*, No. 22-1031; and it has expressly preempted—under both EPCA itself and the Clean Air Act—States from doing so, *see Ohio v. EPA*, No. 22-1081.

Yet, if NHTSA had its way, it could bake these *ultra vires* electric-vehicle mandates into federal fuel-economy standards by incorporating them into the "baseline" fleet it uses to assess the average level of fuel economy that manufacturers can feasibly achieve. That would walk NHTSA right into the same major-questions problems that prohibit EPA's related actions. And far from providing clear congressional authorization, Section 32902(h)(1) expressly blocks this bootstrapping scheme. Its text and history show a clear congressional intent to *prohibit* NHTSA from setting fuel-economy standards to "facilitate" a "transition of the U.S. light-duty fleet to full electrification." JA__[87Fed.Reg.25,994].

Beyond that, relying on other state and federal electric-vehicle mandates is arbitrary and capricious because it puts NHTSA's rulemaking in a tenuous position. If a party successfully challenges any one of those laws, then NHTSA's rule will fail to reflect "reality," as it will have been set based on manufacturers' presumed compliance with unlawful standards. This practical problem further confirms that Congress did not

44

permit NHTSA to bake other entities' electric-vehicle mandates into fuel-economy rules. And it provides an independent ground for invalidating NHTSA's rule in the event that California's zero-emission-vehicle mandate, or its adoption by one or more of the Section 177 States, is determined to be unlawful, as a related case before this Court argues. *See Ohio v. EPA*, No. 22-1081. If some of the electric-vehicle-forcing laws incorporated into NHTSA's baseline are overturned, then even NHTSA's "reality" rationale would evaporate: it would be NHTSA's fuel-economy standards themselves, and not just preexisting state standards, that would require additional electrification of the Nation's vehicle fleet.

### D.  NHTSA's consideration of the fuel economy of electric vehicles requires vacatur.

In a further attempt to justify violating Section 32902(h)(1), NHTSA tried to suggest that any error was harmless. It said that it ran its model without "accounting for [zero-emission-vehicle] mandates," and that doing so "increased estimated incremental benefits and costs attributable to new CAFE standards by about 3 percent"—amounts that NHTSA said were "small differences" that were "not dispositive for NHTSA" in choosing the final standard. JA__[87Fed.Reg.25,899]. That cursory assertion is a red herring that fails to address—and cannot

45

excuse—NHTSA's decision to set stringent fuel-economy standards based on modeling results of a projected fleet that includes electric vehicles.

First, whether NHTSA's cost-benefit analysis would be substantially the same even if compliance with state zero-emission-vehicle mandates were not incorporated into the baseline is not dispositive. As explained, those were not the only electric vehicles in the model, so even if they were removed from the baseline, there would still be electric vehicles in the fleet considered in NHTSA's analysis. *See supra* pp.18, 36.

Second, NHTSA's determination that the benefits of the standards exceed the costs is not a finding that the standards are "the maximum feasible average fuel economy level," 49 U.S.C. § 32902(c), considering "technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy," *id.* § 32902(f). The cost-benefit analysis "considers the lifetime impacts attributable to all vehicles produced prior to [model year] 2030." JA__[87Fed.Reg.25,725]. As NHTSA admits, that "analysis is not one of th[e] statutory factors" that NHTSA must consider in setting the standards. JA__[87Fed.Reg.25,724].

46

Third, when NHTSA did consider the statutory factors, it repeatedly relied on the modeling results of a fleet that included electric vehicles. NHTSA did not explain why it would have (or reasonably could have) found that the amended standards are the maximum feasible standards that manufacturers can achieve in model years 2024–2026 *without* electric vehicles, as Section 32902(h)(1) requires. But this Court "ordinarily vacate[s] … unless [it] is *certain* [the agency] would have adopted [the flawed rule] even absent the flawed rationale." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (emphasis added). NHTSA has failed to clear that bar, so its error cannot be harmless. *See, e.g.*, *Hermes Consolidated, LLC v. EPA*, 787 F.3d 568, 579 (D.C. Cir. 2015) (where there are errors in "important figures" in the agency's analysis, the court "cannot conclude with sufficient certainty that the agency would have made the same decision absent its errors").

As petitioner American Fuel & Petrochemical Manufacturers explained, the standards are "not feasibly achievable by internal combustion engine vehicles" and "effectively establis[h] a partial electric vehicle … mandate." JA__–__[AFPM.pp.1–2]. Auto manufacturers agreed. *See, e.g.*, JA__[Toyota_Appendix.p.2] (the "data has consistently documented

47

that even advanced" internal-combustion-engine "powertrains will fall short of the proposed standards"); JA__[Mercedes-Benz.p.3] ("NHTSA's proposed standards for MYs 2024–2026 will require continued development of electric vehicle architectures to achieve compliance"); JA__[AutoInnovators.p.45] ("it would be impossible to support the current proposal" without the high fuel economy imputed to electric vehicles).

NHTSA cited no evidence that these commenters were mistaken. Nor did it provide any modeling to show how a fleet could comply with the final standards without *any* electric vehicles and the high imputed fuel economy they contribute to the average fuel economy of the fleet. NHTSA simply asserted that "the agency's decision of maximum feasible standards does not rely on *future* manufacturer electrification, as the analysis supporting this rule shows a path toward achieving compliance without *increasing* reliance on electrification." JA__[87Fed.Reg.25,968] (emphases added); *see also* JA__[87Fed.Reg.25,996] ("standards are maximum feasible without electrification *beyond what is already expected in the baseline*") (emphasis added); JA__87Fed.Reg.26,012] ("widespread compliance can be achieved with minimal *further* application" of electric vehicles or plug-in hybrids) (emphasis added).

48

These statements are difficult to square with the statement else-where in the preamble that "NHTSA projects increased production of [electric vehicles] through [model year] 2029," JA__[87Fed.Reg.25,922], and with modeling results showing more electric vehicles under NHTSA's standards than in the analytical baseline, JA__[87Fed.Reg.25,924] (Table V-36). But even assuming that NHTSA reasonably concluded that manufacturers can comply with the new standards without *increased* production of electric vehicles beyond those in the analytical baseline fleet, that is not a finding that compliance is technologically feasible without *any* electric vehicles, which is what Section 32902(h)(1) requires.

Beyond that, NHTSA also relied on its modeling of a fleet with electric vehicles to find that the new standards are "economically practicable." JA__[87Fed.Reg.25,971]. NHTSA cited the model's estimate that the new standards would raise vehicle costs by an average of $1,087 per vehicle in model year 2029, JA__[87Fed.Reg.25,971]; JA__[87Fed.Reg.25,724], and said that increase is "economically practicable" and one "the market can bear," JA__–__[87Fed.Reg.25,721–22]. NHTSA's Final Regulatory Impact Analysis reports that the amended standards would cause an even larger increase in average vehicle costs if

49

some electric vehicles were removed from the model. JA__–__[FRIA.pp.257–59] (Table 7-6).[15] But that analysis did not quantify the cost-increase associated with removing *all* electric vehicles.

The failure to quantify the cost of compliance for a fleet without any electric vehicles is not some minor technicality. "NHTSA agrees that affordability is a major concern," JA__[87Fed.Reg.25,976], and that standards that "raise per-vehicle cost" more than consumers will accept could "negatively impact sales and employment" and render the standards not "economically practicable," JA__[87Fed.Reg.25,969]. NHTSA further acknowledges that if consumers forgo purchasing new fuel-efficient vehicles and retain older less-efficient vehicles, the energy-saving "policy objectives of the standards may not be fully realized." JA__[87Fed.Reg.25,971]. Because NHTSA did not assess whether the standards would be economically practicable for a fleet without any electric vehicles, it cannot be said that NHTSA would or could "reach the

---

[15] When electric vehicles added to comply with state zero-emission-vehicle mandates were removed, the cost of complying with the standards rose by an average of $1,333 per vehicle, and when the electric vehicles added to comply with the fuel-economy standards outside of model years 2024–2026 were removed, the cost of complying with the standards rose by an average of $1,264. JA__[FRIA.p.25].

same result" if it adhered to Congress's prohibition on considering the fuel economy of electric vehicles. *U.S. Postal Serv. v. Postal Regul. Comm'n*, 842 F.3d 1271, 1274 (D.C. Cir. 2016).

## II. NHTSA Improperly Considered The Fuel Economy Of Plug-In Hybrid Vehicles When Operated On Electricity.

### A. The Act unambiguously requires NHTSA to calculate the fuel economy of plug-in hybrids based only on their gasoline or diesel operation.

Section 32902(h)(1) clearly forbids NHTSA to consider the fuel economy of all-electric vehicles when setting standards. But what about plug-in hybrids that can run on electricity *or* gasoline? Congress unambiguously answered that question too, in Section 32902(h)(2).

Section 32902(h)(2) provides that in "carrying out" its duty to set fuel-economy standards, NHTSA "shall consider" dual-fueled vehicles— like plug-in hybrids—"to be operated only on gasoline or diesel fuel." 49 U.S.C. § 32902(h)(2). It follows that NHTSA may not consider the fuel economy of such vehicles when "operated … on" alternative fuel. *Id.* Put another way, the agency must calculate plug-in hybrids' fuel economy based "only on" their "gasoline or diesel" operation, and not their enhanced fuel economy when running on electricity. *Id.*

51

The same context and legislative history that shed light on Section 32902(h)(1) also underscore the plain meaning of Section 32902(h)(2). Unlike surrounding provisions, Section 32902(h)(2) includes no exceptions or qualifications. *See supra* pp.30–32. Instead, Congress used "the mandatory 'shall,' which normally creates an obligation impervious to … discretion." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998). And Section 32902(h)(2)—enacted alongside Section 32902(h)(1)—embodies the same legislative purpose as its neighboring provision. *See supra* pp.33–34. All of this confirms that Section 32902(h)(2) means what it says: NHTSA must treat plug-in hybrids like gas- or diesel-powered vehicles when setting fuel-economy standards.

## B. NHTSA considered the enhanced fuel economy of plug-in hybrids when it set the 2024–2026 standards.

NHTSA violated Section 32902(h)(2) because it did not treat plug-in hybrids as if they operate on only gas or diesel fuel. Instead, the model gave plug-in hybrids the enhanced fuel economy that is attributed to electric dual-fueled vehicles under Section 32905(e). *See supra* p.18. As a result, the model's analysis of how manufacturers could satisfy the rule's more stringent fuel-economy standards shows a "shift toward electrification (which includes hybridization)." JA__[87Fed.Reg.25,918].

52

### C.   NHTSA's purported justification for considering the enhanced fuel economy of plug-in hybrids fails.

**1.**   According to NHTSA, the agency does not have to honor the statutory command to treat plug-in hybrids as though they "operat[e] only on gasoline or diesel fuel," 49 U.S.C. § 32902(h)(2), because doing so would somehow be "inappropriate and contrary to the intent" of Congress, JA__[87Fed.Reg.26,041]; *see also* JA__[87Fed.Reg.25,996] (deeming it "reasonable and appropriate" to "conside[r] the full calculated fuel economy of dual-fueled vehicles"). To explain that paradoxical inference about Congress's intent, NHTSA cited its 2012 fuel-economy rule, which concluded that the expiration of a different statutory provision rendered Section 32902(h)(2) "moot." 77 Fed. Reg. 62,624, 63,020 (Oct. 15, 2012).

NHTSA's assertion that Congress's intent is not controlled by Congress's text requires some elaboration to fully comprehend. NHTSA's theory rests on 49 U.S.C. § 32905, which created "[m]anufacturing incentives for alternative fuel automobiles" manufactured in model years 1993–2019. It did so by ordering EPA, when calculating a manufacturer's average fuel economy for compliance purposes, to use a formula that enhanced the fuel economy of dual-fueled vehicles above what they would obtain on gasoline. 49 U.S.C. § 32905(b), (f); *see* 77 Fed. Reg. at 63,127–

53

28 (explaining how "a dual-fueled vehicle that averages 25 [miles per gallon] on gasoline" might count as a "40[-mile-per-gallon] vehicle … when considering its performance on the alternative fuel"). But Congress capped the extent to which a manufacturer's fleet could benefit from the fuel-economy enhancement, with the cap declining over time until the incentive phased out entirely after model year 2019. 49 U.S.C. § 32906(a).

In its 2012 rule, NHTSA decided that Section 32902(h)(2) would no longer apply "after the statutory credit sunsets in [model year] 2019." 77 Fed. Reg. at 63,019. That was so (reasoned NHTSA) because without a "statutory credit to protect as a compliance flexibility," *id.*, it would be "inappropriate and contrary to the intent of [Congress]" to treat dual-fueled vehicles like "conventional gasoline vehicles with no recognition of their alternative fuel capability," JA__[87Fed.Reg.26,041]. Instead, the "overarching purpose" of the Act would be "better served by interpreting [Section] 32902(h)(2) as moot once the statutory credits provided for in 49 U.S.C. 32905 and 32906" expired. 77 Fed. Reg. at 63,019–20.

**2.**     Nothing in the text or structure of either provision, however, suggests that Section 32902(h)(2) is "moot." Section 32902(h)(2) has not been repealed. Nor does it say anything about credits or cross-reference

54

Section 32905, Section 32906, or any other provision of the Act. (Compare that to Section 32902(h)(2)'s next-door neighbor, subsection (h)(3), which cross-references Section 32903.) Likewise, while Section 32905 brims with cross-references, it never once mentions Section 32902.

In effect, NHTSA reads Section 32902(h)(2) as if it either contained an implied sunset clause or was impliedly repealed when Section 32905(b) expired. But Congress knows how to sunset a provision, and when it does, it does so expressly. *See HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2180 (2021) ("Congress had before it (but eschewed) many readymade models for a sunset statute if that's what it wished here."). Indeed, that Congress expressly phased out the incentive for dual-fueled vehicles in Sections 32905(b) and 32906(a), without including any comparable language phasing out NHTSA's obligation under Section 32902(h)(2), is powerful evidence that the latter is not time-limited. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another … it is generally presumed that Congress acts intentionally." (alteration in original)). Nor was that the only express sunset clause enacted alongside Section 32902(h)(2). In the same

55

statute, Congress provided that certain amendments "shall cease to be effective after September 30, 1997." *See* Pub. L. No. 100-494, sec. 4(b), 102 Stat. at 2448. And a different subsection created—and then sunset— two advisory bodies. *See id.*, sec. 4(a), § 400DD(h), 102 Stat. at 2446.[16]

Nor did Section 32905(b) impliedly repeal Section 32902(h)(2). "The cardinal rule is that repeals by implication are not favored." *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936). And to the extent that one provision could *ever* impliedly repeal another where, as here, the "two provisions were enacted on the same day as part of the same statute,"[17] the presumption against implied repeal would be "especially strong." *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 145, 150 (2d Cir. 2002). The Court must therefore give effect to each provision "unless Congress' intention to repeal is clear and manifest or the two laws are irreconcilable." *Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020)

---

[16] Congress also had a "readymade mode[l]" in the original Act. *HollyFrontier*, 141 S. Ct. at 2180; *see* Pub. L. No. 94-163, sec. 301, § 502(d)(1), 89 Stat. 871, 904 (1975) (authorizing manufacturers to seek modification of standards "for model year 1978, 1979, or 1980"—but not later years).

[17] Congress enacted the first version of Section 32902(h)(2) in the Alternative Motor Fuels Act of 1988, Pub. L. No. 100-494, sec. 6(a), § 513(g)(2)(B), 102 Stat. at 2450. The same statute introduced the precursor to Section 32905. *See id.* § 513(b), 102 Stat. at 2448.

(cleaned up) (quoting *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974)). Neither condition is met here.

First, there is no evidence—let alone "clear and manifest" evidence—that Congress intended to repeal Section 32902(h)(2). NHTSA invokes the Act's "overarching purpose." 77 Fed. Reg. at 63,019–20. But "the plain language of the enacted text is the best indicator of intent." *Nixon v. United States*, 506 U.S. 224, 232 (1993). Section 32902(h)(2)'s text imposes no time limits or other conditions on the agency's obligation to treat dual-fueled vehicles like gasoline- or diesel-fueled vehicles in setting standards. And "vague notions of a statute's 'basic purpose'" cannot "overcome the words of its text regarding the *specific* issue under consideration." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261 (1993). NHTSA "may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485 (2001).

Second, the two provisions are not at odds—let alone "irreconcilable." Section 32902(h)(2) tells NHTSA to treat dual-fueled vehicles as though they "operat[e] only on gasoline or diesel" when "carrying out" its duty to set fuel-economy standards. Meanwhile, Section 32905 orders

57

EPA, when determining a manufacturer's average fuel economy, to calculate the fuel economy of dual-fueled vehicles using a statutory formula. The provisions tell different agencies to conduct different analyses at different times for different purposes. Because those instructions are "capable of co-existence, it is the duty of the courts … to regard each as effective." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) (alteration in original) (quoting *Morton*, 417 U.S. at 551).

3.    In all events, NHTSA can no longer rely on its 2012 rationale to evade Section 32902(h)(2). In 2012, NHTSA thought that Section 32902(h)(2) would no longer serve any statutory purpose once Section 32905(b) no longer required that the fuel economy of dual-fueled vehicles be determined using a formula that increases their fuel economy. 77 Fed. Reg. at 63,020. NHTSA reasoned that was the case because Section 32902(h)(2) was meant to ensure that the fuel-economy enhancement for dual-fueled vehicles would remain a compliance measure that manufacturers may "voluntarily" employ. *Id.* at 63,019. But without any "statutory credit to protect as a compliance flexibility," NHTSA decided that Section 32902(h)(2) would be "moot." *Id.* at 63,019–20.

Whatever the merits of that analysis in 2012, when NHTSA was predicting that no compliance flexibilities would exist to protect after 2019, an intervening change in the law preserved the statutory incentive for plug-in hybrids—proving NHTSA's prediction wrong and eviscerating its rationale. In 2014, Congress amended Section 32905 to add a new subsection (e), entitled "Electric Dual Fueled Automobiles." *See* Pub. L. No. 113-291, §318(c), 128 Stat. 3292, 3341. Under that provision, when EPA calculates a manufacturer's average fuel economy, it must use a special statutory formula to "measure the fuel economy" of "any model" of "dual fueled automobile manufactured after model year 2015 that is capable of operating on electricity in addition to gasoline or diesel fuel" and meets other requirements. 49 U.S.C. § 32905(e). That formula enhances the fuel economy of plug-in hybrids, so Section 32905 still *does* give manufacturers a compliance flexibility for plug-in hybrids. *See supra* pp.9–10. Thus—even under NHTSA's theory—Section 32902(h)(2) still plays a role in protecting the compliance flexibility in Section 32905(e).

NHTSA has not acknowledged this change in the law, which negates its 2012 rationale. Even assuming that NHTSA's 2012 rationale were at one point lawful (it was not), NHTSA's continued reliance on it

here—without any explanation as to how that rationale could remain valid after the 2014 amendment—is arbitrary and capricious. *See*, *e.g.*, *Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992) ("[C]hanges in factual and legal circumstances may impose upon the agency an obligation to reconsider a settled policy or explain its failure to do so.").

### D. NHTSA's failure to treat plug-in hybrids as operated only on gasoline or diesel requires vacatur.

In attempting to justify its violation of section 32902(h)(2), NHTSA said that it ran the model with instructions not to add plug-in hybrids "during the rulemaking time frame" and got "results in [model year] 2029" that were "extremely close to results in the main standard-setting analysis." JA__[87Fed.Reg.25,996]. Specifically, NHTSA reported that average per-vehicle costs in model year 2029 dropped from $1,087 to $1,072; the percentage of traditional hybrid vehicles increased from 21 to 27 percent; and the percentage of electric vehicles increased from 6.7 to 6.9 percent. *Id.* NHTSA said these small differences would not have changed its determination of "what levels of fuel economy would be maximum feasible in the rulemaking time frame." *Id.* That analysis is flawed and does not excuse the inclusion of plug-in hybrids (and their enhanced fuel economy) in the model used to justify the fuel-economy standards.

60

First, NHTSA did not say its alternative analysis removed *all* plug-in hybrids from the model. NHTSA said only that the alternative analysis prevented the model from adding plug-in hybrids "*during the rulemaking time frame,*" JA__[87Fed.Reg.25,996] (emphasis added)—*i.e.*, in model years 2024–2026. That analysis did not cure the statutory violation because it did not remove the plug-in hybrids that were in the model's baseline, and it did not prohibit the addition of plug-in hybrids in model years 2027–2029. *See supra* p.18; JA__[87Fed.Reg.25,922] (Table V-30). Therefore, the alternative model year 2029 results that NHTSA proffered to show that the inclusion of plug-in hybrids in its standard-setting analysis was harmless were results that still included plug-in hybrids and the enhanced fuel economy they contribute to the fleetwide average.

Second, when NHTSA prohibited the model from adding plug-in hybrids during model years 2024–2026, the model responded in part by adding more electric vehicles. JA__[87Fed.Reg.25,996]. But that simply traded one statutory violation for another, because the consideration of electric vehicles in the standard-setting analysis is itself prohibited. *See supra* pp.27–35. NHTSA nowhere reported what the modeling results would be—or how its new standards could be sustained—if it complied

61

with Section 32902(h) and fully excluded the enhanced fuel economy of plug-in hybrids and electric vehicles from the model.

## III.    NHTSA Improperly Considered Compliance Credits.

### A.    The Act unambiguously bars NHTSA from considering compliance credits for any purpose.

NHTSA also violated the third, and final, prohibition in Section 32902(h), which concerns the credits manufacturers earn for exceeding fuel-economy standards. Section 32902(h)(3) states that NHTSA "may not consider, when prescribing a fuel economy standard, the trading, transferring, or availability of [compliance] credits under section 32903." 49 U.S.C. § 32902(h)(3). NHTSA concedes, as it must, that the Act bars it from "consider[ing] the availability of … credits … toward compliance." JA__[87Fed.Reg.25,778]. Yet the agency again reads qualifications into the unqualified text—limiting Section 32902(h)(3)'s reach to the "model years for which the agency is establishing maximum feasible [fuel economy] standards" in a particular rulemaking. *Id.*

For the same reasons that NHTSA is wrong about Section 32902(h)(1), it is also wrong about Section 32902(h)(3). By its plain terms, Section 32902(h)(3) bars NHTSA from taking account of compliance credits when setting fuel-economy standards. *See American Heritage*

*Dictionary* 313 (2d ed. 1985) (*consider* means "take into account"). And unlike other provisions of the same statute, *see supra* pp.30–32, Section 32902(h)(3) includes no exceptions. Just the opposite: Congress used mandatory language—"may not"—that eliminates the agency's discretion to consider compliance credits. *See Palomar-Santiago*, 141 S. Ct. at 1620–21; *Ass'n of Civilian Technicians*, 22 F.3d at 1153. The upshot is that NHTSA may not consider *any* compliance credits "when prescribing a fuel economy standard"—regardless of model year. The agency "may not narrow [Section 32902(h)(3)'s] reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020).

## B. NHTSA considered compliance credits when it set the 2024–2026 standards.

NHTSA violated Section 32902(h)(3) because it allowed its model to use compliance credits to achieve compliance in model years other than 2024–2026. This means that the model used credits to cover a "shortfall" (and avoid imposition of penalties) that would occur in model years 2027–2029 if a manufacturer could not add fuel-saving technology to achieve compliance, or if adding more fuel-saving technology would not be cost-effective. *See supra* p.20.

Even though those cost-savings occurred after model years 2024–2026, NHTSA factored them into its analysis of the maximum feasible standards in this rule. Throughout the rule, NHTSA justified the new standards for model years 2024–2026 based on the costs and benefits of the new standards "over the lifetimes of [model year] *2029* vehicles." JA__[87Fed.Reg.25,724] (emphasis added); *see also supra* p.19.

### C.    NHTSA's purported justification for considering compliance credits fails.

NHTSA sought to excuse its statutory violation on the ground that following Section 32902(h)(3) would "divorce its analysis from reality." JA__[87Fed.Reg.25,996]. But—again—Congress made a different policy choice, and NHTSA is bound by it. *See supra* pp.40–41. "[W]hen Congress directs an agency to consider only certain factors in reaching an administrative decision, the agency is not free to trespass beyond the bounds of its statutory authority by taking other factors into account." *Murray Energy Corp. v. EPA*, 936 F.3d 597, 623 (D.C. Cir. 2019) (quoting *Lead Indus. Ass'n, Inc. v. EPA*, 647 F.2d 1130, 1150 (D.C. Cir. 1980) (alteration in original)). If NHTSA wants to expand those bounds, it "can seek relief from Congress, which—unlike the courts—is both qualified and constitutionally entitled to weigh the costs and benefits of different approaches

64

and make the necessary policy judgment." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816 (2019).

### D. NHTSA's consideration of the availability of compliance credits requires vacatur.

NHTSA likewise failed to explain how its new standards could be sustained if it complied with Section 32902(h)(3)'s directive not to consider the availability of compliance credits. NHTSA said it ran the model with instructions to exclude "the potential application of compliance credits throughout [model years] 2023–2029, as well as the introduction of new [electric vehicle] models beyond those projected to be introduced in [model years 2021–2022 and/or in response to the [zero-emission-vehicle] mandate." JA__[87Fed.Reg.25,996]. The result was that "estimated average incremental costs (including civil penalties)" increased by up to $1,371 per vehicle, "with differences varying further" among manufacturers. *Id.* NHTSA's mere publication of that result, unadorned by any further analysis, does not excuse NHTSA's statutory violation.

Notably, NHTSA did not say that a cost increase of this magnitude was de minimis and could not have affected its analysis. Nor could it credibly have said that. A $1,371 increase in the average cost of model year 2029 vehicles is significantly larger (by more than 25 percent) than

the $1,087 average cost increase that NHTSA cited in finding that the new standards are "economically practicable." JA_[87Fed.Reg.25,971]; JA__[87Fed.Reg.25,724]. Here too, NHTSA did not explain how the market could bear such a large cost increase, or why the increased price would not cause decreased sales and adverse impacts on employment and energy conservation that would render the standards economically impracticable and beyond the maximum feasible. *See supra* pp.49–51.

*    *    *

In sum, NHTSA chose to skirt the prohibitions in Section 32902(h) because they make "it more difficult for the CAFE program to facilitate a complete transition of the U.S. light-duty fleet to full electrification." JA__[87Fed.Reg.25,994]. Those violations pervade the rule and cannot be excused by a few conclusory statements, unsupported by any credible evidence or detailed analysis, that NHTSA would have reached the same result regardless. Otherwise, NHTSA will have been given a path to effect "a wholesale rewrite" of the statute. *Oglala Sioux Tribe v. Nuclear Regul. Comm'n*, 896 F.3d 520, 535 (D.C. Cir. 2018).

## <u>CONCLUSION</u>

For the foregoing reasons, the rule should be vacated and remanded to determine the maximum feasible average fuel-economy level that manufacturers can achieve for model years 2024–2026 without considering the factors that Section 32902(h) forbids NHTSA to consider.

Dated: November 17, 2022

Respectfully submitted,

*/s/ Eric D. McArthur*
ERIC D. MCARTHUR
KATHLEEN M. MUELLER
PETER A. BRULAND
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
202.736.8000
emcarthur@sidley.com

*Counsel for Petitioner American Fuel & Petrochemical Manufacturers*

KEN PAXTON
Attorney General of Texas
BRENT WEBSTER
First Assistant Attorney General
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel: (512) 936-1700

JUDD E. STONE II
Solicitor General
*/s/ Ryan S. Baasch*
RYAN S. BAASCH
Assistant Solicitor General
Ryan.Baasch@oag.texas.gov
WESLEY S. WILLIAMS
Assistant Attorney General

67

*Counsel for Petitioner*
*the State of Texas*

*Counsel for Petitioner*
*the State of Texas*

LESLIE RUTLEDGE
Attorney General of Arkansas
*/s/ Nicholas J. Bronni*
NICHOLAS J. BRONNI
Solicitor General
DYLAN L. JACOBS
Deputy Solicitor General
Arkansas Attorney
General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Tel: (501) 682-2007
Nicholas.Bronni@Arkan-
sasAG.gov
Dylan.Jacobs@ArkansasAG.gov

*Counsel for Petitioner the State
of Arkansas*

THEODORE E. ROKITA
Indiana Attorney General
*/s/   Thomas   M.   Fisher*
THOMAS M. FISHER
Solicitor General
Office of the Indiana
Attorney General
IGC-South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-
2770
Tel: (317) 232-6255
Tom.Fisher@atg.in.gov

*Counsel for Petitioner the
State of Indiana*

DANIEL CAMERON
Attorney General of Kentucky
*/s/ Brett R. Nolan*
BRETT R. NOLAN
Office of the Kentucky Attorney
General
700 Capital Avenue, Suite 118
Frankfort, KY 40601
Tel: (502) 696-5300
Brett.Nolan@ky.gov

*Counsel for Petitioner the State
of Kentucky*

JEFF LANDRY
Attorney General of Louisi-
ana
*/s/ Elizabeth B. Murrill*
ELIZABETH B. MURRILL
Solicitor General
SCOTT ST. JOHN
Deputy Solicitor General
Louisiana   Department   of
Justice
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov

68

stjohnj@ag.louisiana.gov

*Counsel for Petitioner the State of Louisiana*

LYNN FITCH
Attorney General of Mississippi
*/s/ Justin L. Matheny*
JUSTIN L. MATHENY
Deputy Solicitor General
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for Petitioner the State of Mississippi*

AUSTIN KNUDSEN
Montana Attorney General
*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN
Solicitor General
215 North Sanders Street
Helena, MT 59601
Chistrian.Corrigan@mt.gov

*Counsel for Petitioner the State of Montana*

DOUGLAS J. PETERSON
Attorney General of Nebraska
*/s/ James A. Campbell*
JAMES A. CAMPBELL
Solicitor General of Nebraska
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
Tel: (402) 471-2682
jim.campbell@nebraska.gov

*Counsel for Petitioner the State of Nebraska*

DAVE YOST
Ohio Attorney General
*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS
Ohio Solicitor General
30 E. Broad St., Fl. 17
Columbus OH 43215
Tel: (614) 466-8980
bflowers@OhioAGO.gov

*Counsel for Petitioner the State of Ohio*

69

ALAN WILSON
Attorney General of
South Carolina
*/s/ James Emory Smith, Jr.*
JAMES EMORY SMITH, JR.
South Carolina
Deputy Solicitor General
P.O. Box 11549
Columbia, S.C. 29211
Tel: (803) 734-3642
esmith@scag.gov

*Counsel for Petitioner the State
of South Carolina*

SEAN D. REYES
Utah Attorney General
*/s/ Melissa A. Holyoak*
MELISSA A. HOLYOAK
Solicitor General
350 N. State Street,
Suite 230
Salt Lake City, UT 84114
Tel: (801) 366-0260
melissaholyoak@agutah.gov

*Counsel for Petitioner the
State of Utah*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

This brief complies with the type-volume requirements of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,980 words, not counting the parts excluded by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

*/s/ Eric D. McArthur*

71

## **CERTIFICATE OF SERVICE**

I certify that on November 17, 2022, I electronically filed the fore-going brief and following addendum with the Clerk of the Court using the CM/ECF System, which will send notice to all registered CM/ECF users.

*/s/ Eric D. McArthur*

# ADDENDUM

# TABLE OF CONTENTS

49 U.S.C. § § 32901(a)(1), (a)(8), (a)(9) ..............................................Add-1

49 U.S.C. § § 32902(a), (b)(2)(B), (c), (f), (h) .....................................Add-3

49 U.S.C. § 32903(a) ..................................................................Add-5

49 U.S.C. § 32904(a)(2)..............................................................Add-6

49 U.S.C. § § 32905(a), (b), (e).....................................................Add-8

49 U.S.C. § 32906(a) ..................................................................Add-9

Declaration of Susan W. Grissom ...................................................Add-11

Declaration of Jennifer M. Swenton ...............................................Add-15

## 49 U.S.C. § 32901 Definitions

**(a) General.**--In this chapter--

**(1)** "alternative fuel" means--

**(A)** methanol;

**(B)** denatured ethanol;

**(C)** other alcohols;

**(D)** except as provided in subsection (b) of this section, a mixture containing at least 85 percent of methanol, denatured ethanol, and other alcohols by volume with gasoline or other fuels;

**(E)** natural gas;

**(F)** liquefied petroleum gas;

**(G)** hydrogen;

**(H)** coal derived liquid fuels;

**(I)** fuels (except alcohol) derived from biological materials;

**(J)** electricity (including electricity from solar energy); and

**(K)** any other fuel the Secretary of Transportation prescribes by regulation that is not substantially petroleum and that would yield substantial energy security and environmental benefits.

****

**(8)** "dedicated automobile" means an automobile that operates only on alternative fuel.

**(9)** "dual fueled automobile" means an automobile that--

**(A)** is capable of operating on alternative fuel or a mixture of bio-diesel and diesel fuel meeting the standard established by the American Society for Testing and Materials or under section 211(u) of the Clean Air Act (42 U.S.C. 7545(u)) for fuel containing

Add-1

20 percent biodiesel (commonly known as "B20") and on gasoline or diesel fuel;

**(B)** provides equal or superior energy efficiency, as calculated for the applicable model year during fuel economy testing for the United States Government, when operating on alternative fuel as when operating on gasoline or diesel fuel;

**(C)** for model years 1993-1995 for an automobile capable of operating on a mixture of an alternative fuel and gasoline or diesel fuel and if the Administrator of the Environmental Protection Agency decides to extend the application of this subclause, for an additional period ending not later than the end of the last model year to which section 32905(b) and (d) of this title applies, provides equal or superior energy efficiency, as calculated for the applicable model year during fuel economy testing for the Government, when operating on a mixture of alternative fuel and gasoline or diesel fuel containing exactly 50 percent gasoline or diesel fuel as when operating on gasoline or diesel fuel; and

**(D)** for a passenger automobile, meets or exceeds the minimum driving range prescribed under subsection (c) of this section.

****

Add-2

## 49 U.S.C. § 32902 Average fuel economy standards

**(a) Prescription of standards by regulation.**--At least 18 months before the beginning of each model year, the Secretary of Transportation shall prescribe by regulation average fuel economy standards for automobiles manufactured by a manufacturer in that model year. Each standard shall be the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve in that model year.

**(b) Standards for automobiles and certain other vehicles.--**

\*\*\*\*

**(2) Fuel economy standards for automobiles**.—

\*\*\*\*

**(B) Automobile fuel economy average for model years 2021 through 2030.**--For model years 2021 through 2030, the average fuel economy required to be attained by each fleet of passenger and non-passenger automobiles manufactured for sale in the United States shall be the maximum feasible average fuel economy standard for each fleet for that model year.

\*\*\*\*

**(c) Amending passenger automobile standards.**--The Secretary of Transportation may prescribe regulations amending the standard under subsection (b) of this section for a model year to a level that the Secretary decides is the maximum feasible average fuel economy level for that model year. Section 553 of title 5 applies to a proceeding to amend the standard. However, any interested person may make an oral presentation and a transcript shall be taken of that presentation.

\*\*\*\*

**(f) Considerations on decisions on maximum feasible average fuel economy.**--When deciding maximum feasible average fuel economy under this section, the Secretary of Transportation shall consider

Add-3

technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy.

****

**(h) Limitations.**--In carrying out subsections (c), (f), and (g) of this section, the Secretary of Transportation--

    **(1)** may not consider the fuel economy of dedicated automobiles;

    **(2)** shall consider dual fueled automobiles to be operated only on gasoline or diesel fuel; and

    **(3)** may not consider, when prescribing a fuel economy standard, the trading, transferring, or availability of credits under section 32903.

****

## 49 U.S.C. § 32903 Credits for exceeding average fuel economy standards

**(a) Earning and period for applying credits.**--When the average fuel economy of passenger automobiles manufactured by a manufacturer in a particular model year exceeds an applicable average fuel economy standard under subsections (a) through (d) of section 32902 (determined by the Secretary of Transportation without regard to credits under this section), the manufacturer earns credits. The credits may be applied to--

**(1)** any of the 3 consecutive model years immediately before the model year for which the credits are earned; and

**(2)** to the extent not used under paragraph (1)1 any of the 5 consecutive model years immediately after the model year for which the credits are earned.

****

## 49 U.S.C. § 32904. Calculation of average fuel economy

**(a) Method of calculation.--(1)** The Administrator of the Environmental Protection Agency shall calculate the average fuel economy of a manufacturer subject to--

**(A)** section 32902(a) of this title in a way prescribed by the Administrator; and

**(B)** section 32902(b)-(d) of this title by dividing--

**(i)** the number of passenger automobiles manufactured by the manufacturer in a model year; by

**(ii)** the sum of the fractions obtained by dividing the number of passenger automobiles of each model manufactured by the manufacturer in that model year by the fuel economy measured for that model.

**(2)(A)** In this paragraph, "electric vehicle" means a vehicle powered primarily by an electric motor drawing electrical current from a portable source.

**(B)** If a manufacturer manufactures an electric vehicle, the Administrator shall include in the calculation of average fuel economy under paragraph (1) of this subsection equivalent petroleum based fuel economy values determined by the Secretary of Energy for various classes of electric vehicles. The Secretary shall review those values each year and determine and propose necessary revisions based on the following factors:

**(i)** the approximate electrical energy efficiency of the vehicle, considering the kind of vehicle and the mission and weight of the vehicle.

**(ii)** the national average electrical generation and transmission efficiencies.

**(iii)** the need of the United States to conserve all forms of energy and the relative scarcity and value to the United States of

Add-6

all fuel used to generate electricity.

**(iv)** the specific patterns of use of electric vehicles compared to petroleum-fueled vehicles.

## 49 U.S.C. § 32905. Manufacturing incentives for alternative fuel automobiles

**(a) Dedicated automobiles.**--Except as provided in subsection (c) of this section or section 32904(a)(2) of this title, for any model of dedicated automobile manufactured by a manufacturer after model year 1992, the fuel economy measured for that model shall be based on the fuel content of the alternative fuel used to operate the automobile. A gallon of a liquid alternative fuel used to operate a dedicated automobile is deemed to contain .15 gallon of fuel.

**(b) Dual fueled automobiles.**-- Except as provided in subsection (d) of this section or section 32904(a)(2) of this title, for any model of dual fueled automobile manufactured by a manufacturer in model years 1993 through 2019, the Administrator of the Environmental Protection Agency shall measure the fuel economy for that model by dividing 1.0 by the sum of--

   **(1)** .5 divided by the fuel economy measured under section 32904(c) of this title when operating the model on gasoline or diesel fuel; and

   **(2)** .5 divided by the fuel economy--

      **(A)** measured under subsection (a) when operating the model on alternative fuel; or

      **(B)** measured based on the fuel content of B20 when operating the model on B20, which is deemed to contain 0.15 gallon of fuel.

                              ****

**(e) Electric dual fueled automobiles.**--

   **(1) In general.**--At the request of the manufacturer, the Administrator may measure the fuel economy for any model of dual fueled automobile manufactured after model year 2015 that is capable of operating on electricity in addition to gasoline or diesel fuel, obtains its electricity from a source external to the vehicle, and meets the minimum driving range requirements established by the Secretary for

Add-8

dual fueled electric automobiles, by dividing 1.0 by the sum of--

**(A)** the percentage utilization of the model on gasoline or diesel fuel, as determined by a formula based on the model's alternative fuel range, divided by the fuel economy measured under section 32904(c); and

**(B)** the percentage utilization of the model on electricity, as determined by a formula based on the model's alternative fuel range, divided by the fuel economy measured under section 32904(a)(2).

**(2) Alternative calculation.**--If the manufacturer does not request that the Administrator calculate the manufacturing incentive for its electric dual fueled automobiles in accordance with paragraph (1), the Administrator shall calculate such incentive for such automobiles manufactured by such manufacturer after model year 2015 in accordance with subsection (b).      ****

## 49 U.S.C. § 32906 Maximum fuel economy increase for alternative fuel automobiles

**(a) In general.**--For each of model years 1993 through 2019 for each category of automobile (except an electric automobile or, beginning with model year 2016, an alternative fueled automobile that uses a fuel described in subparagraph (E) of section 32901(a)(1)), the maximum increase in average fuel economy for a manufacturer attributable to dual fueled automobiles is--

**(1)** 1.2 miles a gallon for each of model years 1993 through 2014;

**(2)** 1.0 miles per gallon for model year 2015;

**(3)** 0.8 miles per gallon for model year 2016;

**(4)** 0.6 miles per gallon for model year 2017;

**(5)** 0.4 miles per gallon for model year 2018;

**(6)** 0.2 miles per gallon for model year 2019; and

**(7)** 0 miles per gallon for model years after 2019.

Add-10

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

AMERICAN FUEL & PETROCHEMICAL
MANUFACTURERS ET AL.,

                        Petitioners,

            v.                                          Case No. 22-1145
                                                        and consolidated
NATIONAL HIGHWAY TRAFFIC SAFETY                         cases
ADMINISTRATION,

                        Respondent.

### DECLARATION OF SUSAN W. GRISSOM

I, Susan W. Grissom, declare under penalty of perjury that the fol-

lowing is true and correct, to the best of my knowledge:

1.    I am the Chief Industry Analyst for American Fuel & Petro-

chemical Manufacturers ("AFPM"), responsible for analyzing market and

economic impacts of regulatory and statutory changes on the refining and

petrochemical manufacturing industries. I have extensive experience an-

alyzing and directing the analysis of energy markets.

2.    AFPM is a national trade association representing nearly all

American refining and petrochemical companies. Our 25 refining com-

pany members own and operate 86% of U.S. domestic petroleum refining

capacity. Many of them also produce biofuels. These companies provide

jobs, contribute to economic and national security, and enable the production of products used by families and businesses throughout the United States.

3.    The refining industry supports nearly 1.8 million jobs in 42 States, plus the District of Columbia. All told, the refining industry contributes more than $305 billion to the United States economy.

4.    The National Highway Traffic Safety Administration ("NHTSA") recently promulgated a rule establishing new fuel-economy standards for model year 2024–2026 passenger cars and light trucks. *See* 87 Fed. Reg. 25,710 (May 2, 2022). NHTSA's rule requires automobile manufacturers to produce domestic vehicle fleets that achieve considerably higher average fuel economy. Whereas NHTSA's previous standards were "projected to require, on an industry-fleetwide basis, 40.5 miles per gallon (mpg) in model year 2030," 84 Fed. Reg. 24,176, the new standards will "require an industry fleet-wide average of roughly 49 mpg in [model year] 2026," 87 Fed. Reg. 25,720. According to NHTSA, "[r]equiring new cars and light trucks to achieve higher fuel economy will significantly reduce demand for transportation fuels" like "gasoline and diesel." NHTSA, Final Regulatory Impact Analysis: Final Rulemaking for Model

2

Years 2024–2026 Light Duty Vehicle Corporate Average Fuel Economy Standards 99 (Mar. 2022); *see also* 87 Fed. Reg. 26,068 (rule "will result in significant reductions of the consumption of petroleum").

5.    Further, NHTSA projects that the rule will result in "increased production of [electric vehicles] through [model year] 2029." *Id.* at 25,922. In fact, NHTSA estimates that the "Penetration Rate" of electric vehicles will jump more than 133% between 2022 and 2029. *See id.* at 25,924 (Table V-36, Alternative 2.5).

6.    NHTSA's rule depresses demand for petroleum and liquid fuels in the United States and thereby harms AFPM's member companies such as Cenovus, Flint Hills Resources, Hunt Refining, PBF Energy, Phillips 66, Placid Refining, and Valero Energy. A refining company's bottom line depends on the market's demand for transportation fuel. AFPM's members thus suffer economic injury when NHTSA imposes fuel-economy standards that result in vehicles using less fuel per mile or in greater adoption of vehicles that do not operate on gasoline, diesel, or renewable liquid fuel at all.

3

7.    These economic harms are not speculative. NHTSA itself predicts that its rule "will reduce domestic consumption of gasoline, producing a corresponding decrease in the Nation's demand for crude petroleum." *Id.* at 25,884. According to NHTSA's own projections, the rule will "save about 60 billion gallons of gasoline" "over the lives of vehicles produced prior to [model year] 2030," *id.* at 25,736, and "approximately 234 billion gallons of gasoline through 2050," *id.* at 26,068.

8.    The reduced demand for transportation fuels caused by NHTSA's fuel-economy standards results in lost sales for AFPM member companies and requires them to expend resources changing feedstock and product slates, diverting fuel to other markets, and remedying supply-chain distortions.

9.    For these reasons, NHTSA's rule financially injures AFPM's member companies that produce gasoline, diesel, and renewable liquid fuels that are blended into gasoline and diesel for sale in the United States.

Dated: __11/12/2022__                        Susan W. Grissom

4

<u>ORAL ARGUMENT NOT YET SCHEDULED</u>

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, et al., <br><br> *Petitioners,* <br><br> v. <br><br> NATIONAL HIGH TRAFFIC SAFETY ADMINISTRATION, et al., <br><br> *Respondents.* | No. 22-1080 (and consolidated cases) |

**DECLARATION OF JENNIFER M. SWENTON**

I, Jennifer M. Swenton, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.    I am the Director of Optimization & Planning in the Optimization Planning and Economics division for Valero. In this role, I am responsible for a wide range of planning and economic business matters regarding Valero's operating strategies for its West Coast, Mid-Continent, and North Atlantic refinery assets. My responsibilities include management oversight of the planning and economics teams for these Valero assets, and through my background, I also have significant technical and operational experience from several of Valero's refineries. I am also generally familiar with the planning, economics, and operations of Valero's Gulf Coast refinery assets.

2.    I am generally aware of the National Highway Transportation Administration's ("NHTSA") issuance of a final rule entitled "Corporate Average Fuel Economy Standards for Model Years 2024–2026 Passenger Cars and Light Trucks," 87 Fed. Reg. 25,710 (May

2, 2022).

3.      It is my understanding that this rule requires an increase in fuel economy for both new passenger cars and light trucks, by 8 percent per year for model years 2024–2025, and by 10 percent per year for model year 2026. As NHTSA explains, by design, these standards "will reduce domestic consumption of gasoline, producing a corresponding decrease in the Nation's demand for crude petroleum." 87 Fed. Reg. at 25,884. Specifically, NHTSA projects the new standards will reduce total gasoline consumption by about 234 billion gallons through 2050. *Id*. at 26,068. This reduction in gasoline causes competitive injury to Valero's refining businesses because it effectively restricts the opportunity to sell the products Valero's refineries produce.

4.      The rule also causes Valero competitive injury because NHTSA's fuel economy standards amount to a *de facto* electric-vehicle mandate; they are so stringent that, as a practical matter, automakers will be forced to phase out conventional combustion-engine vehicles and replace them with electric ones. Indeed, under the new standards, NHTSA estimates that automakers will need to produce a year-over-year increasing percentage of electric vehicles, *id*. at 25,923-24, and plug-in hybrids, *id*. at 25,921-22, to comply. And as Secretary of Transportation Pete Buttigieg has declared, these standards (and the authority NHTSA claims therein to force electrification) are just the beginning; he has been directed by Executive Order to set future fuel-economy standards to reach a 50% electric-vehicle goal by 2030. Forcing consumers to buy vehicles that do not operate using liquid fuels at all reduces the product demand for Valero's refining business.

5.      As a result of these displacements, NHTSA's rulemaking will cause financial injury to Valero's refining business segment, which would otherwise not occur in the

absence of the rule.

### A.    Valero's Overall Business Strategy

6.    Valero has twelve U.S. domestic refineries: two on the West Coast in California, three in the Mid-Continent region, and seven in the Gulf Coast region. Unlike some other oil and gas companies, Valero does not explore for or produce crude, i.e., it does not drill for oil. Instead, it purchases crude from third parties.

7.    Valero also does not operate any retail motor fuel stations. It sells motor fuel (i.e., gasoline and diesel) at the wholesale and bulk sale levels. Valero sells motor fuels at the wholesale level under several different channels of trade, including unbranded contract, unbranded "spot," and branded motor fuel sales. Bulk sales are made to clear the remaining refined product length from Valero's refineries to manage inventories.

### B.    Reduction in Nationwide Fuel Demand

8.    A significant reduction in nationwide gasoline demand, as contemplated by NHTSA's rule, will negatively impact Valero's business and operations. More specifically, the reduction in demand for gasoline and diesel attributable to the stricter fuel economy standards and the increased market share of electric vehicles required for compliance with such standards will result in the need for refineries to operate at lower capacities and/or to move additional gasoline and/or gasoline components to other markets. The former option naturally has a direct impact on the profitability and long-term viability of such refineries, while the latter is limited to logistical constraints and economic margins.

9.    Moreover, because Valero's refineries must maintain a relatively high operating rate to remain stable, a significant reduction in domestic market demand risks potential refinery shutdowns and even permanent closures. In this regard, one need only

consider the impact of the COVID-19 pandemic on the refining sector, which experienced negative financial margins and multiple third-party refinery closures due to the reduction in gasoline demand. However, even if operating capacity is maintained at or above the minimum operating threshold, any reduction in market demand would negatively impact the profitability of Valero's refineries, which are currently operating at close to maximum capacity (outside of required maintenance events) post-COVID as a result of normal or near-normal market demand and a reduced market supply of gasoline stemming from third-party refinery closures.

10.    In theory, the impacts of NHTSA's expected reduction in domestic demand can be mitigated to some extent through exports to Latin America and other foreign markets, but such mitigation efforts come with increased costs, logistical complications, and capacity limitations. In this regard, gasoline sales from Valero's refineries to foreign markets may be possible primarily via the shipping industry, which as an initial matter, requires the incurrence of additional transportation costs. Additionally, not all of Valero's refineries have access to marine docks. Two of Valero's Mid-Continent refineries are entirely landlocked, with limited and/or no access to export markets via pipeline, rail, or trucking. The third Mid-Continent refinery can only be accessed by barge, as opposed to large ocean-going vessels, which limits its export capacity as well. Valero's West Coast operations face similar logistical limitations due to limited dock space, vessel, and permitting constraints.

11.    To the extent capital investment might improve such constraints and allow for increased gasoline movements, that would nevertheless require significant expenditures by both Valero and third parties over whom Valero has no control, and would depend on business analyses and forecasts to justify said investment. And even if, for example, existing

Page **4** of **6**

third-party pipelines to Valero's Mid-Continent refineries were reverse-engineered so as to allow for product to be transported to the Gulf Coast, there are nevertheless additional costs associated with such pipeline use, as well as scheduling and forecasting complications, including competition with other Mid-Continent refiners for limited transportation throughput capacity.

12.    Such exports would also require Valero's West Coast refineries to compete with barrels from the Gulf Coast, the Far East, and Europe, which have lower operating and feedstock costs, and are therefore better equipped to compete in such markets. Additionally, California is one of the most expensive operating environments for refineries, and it is not at all clear these refineries would be competitive in the markets for conventional gasoline blends, as opposed to specialty blends such as CARBOB (California) and AZRBOB (Arizona).

13.    Even for Valero's Gulf Coast refineries, which are better equipped and geographically advantaged for exporting product, a large increase in foreign sales to offset domestic demand reduction would still result in logistical and permitting complications, and possibly the incurrence of additional transportation costs depending on the terms of sale. In this regard, it is unclear what the supply of and demand for gasoline and diesel in such foreign markets would look like in the scenario presented by NHTSA's rule—i.e., a scenario in which the domestic refining industry as a whole is forced to quickly and significantly increase exports. Valero currently exports, on average, less than ten percent of its domestic gasoline production.

14.    In short, NHTSA's rule will force a rapid expansion of the new vehicle market share for electric vehicles at the expense of conventional combustion-engine vehicles and a

corresponding reduction in nationwide liquid fuel demand. Such a reduction in demand will negatively impact Valero's business operations and profitability as described herein. These economic impacts are not speculative. Indeed, as NHTSA explained, the new standards will require automobile manufacturers to produce a year-over-year increasing percentage of electric vehicles and hybrids to comply and will reduce total gasoline consumption by about 234 billion gallons through 2050.  87 Fed. Reg. at 26,067.

15.    All these injuries would be substantially ameliorated if NHTSA's decision were set aside.


Dated: November 17, 2022                    _____
                                            Jennifer M. Swenton